MAURICE SUH, SBN 147485
   msuh@gibsondunn.com
KAHN A. SCOLNICK, SBN 228686
   kscolnick@gibsondunn.com
DANIEL L. WEISS, SBN 242022
   dweiss@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

Attorneys for Plaintiffs INDUSTRIAL BANK
OF KOREA; NONGHYUP BANK; KEB HANA
BANK; KOOKMIN BANK

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| INDUSTRIAL BANK OF KOREA; an agency or instrumentality of the Republic of Korea NONGHYUP BANK; a corporation of the Republic of Korea; KEB HANA BANK, a corporation of the Republic of Korea; KOOKMIN BANK, a corporation of the Republic of Korea, <br><br> Plaintiffs, <br><br> v. <br><br> ASI CORPORATION, a Delaware Corporation; ASI COMPUTER TECHNOLOGIES, INC., a California Corporation; BILL CHEN, an individual; HENRY CHEN a/k/a HUNG CHEN, an individual; FRANCES CHOU a/k/a FRANCES MEILING CHOU, an individual; CHRISTINE LIANG a/k/a CHRISTINE LI-YIN LIANG a/k/a LI YIN CHU, an individual; NEWEGG, INC., a Delaware Corporation; MAGNELL ASSOCIATE INC., DBA NEWEGG.COM, a California Corporation; and DOES 1 through 10, inclusive, <br><br> Defendants. | CASE NO. 2:17-cv-07646 <br><br> **COMPLAINT FOR:** <br><br> **(1) FRAUD;** <br><br> **(2) NEGLIGENT MISREPRESENTATION;** <br><br> **(3) NEGLIGENT SUPERVISION;** <br><br> **(4) UNFAIR COMPETITION UNDER CAL. BUSINESS & PROFESSIONS CODE § 17200** *et seq.* <br><br> **DEMAND FOR JURY TRIAL** |

Gibson, Dunn &
Crutcher LLP

Plaintiffs Industrial Bank of Korea ("IBK"), NongHyup Bank ("NH"), KEB Hana Bank ("KEB Hana"), and Kookmin Bank ("KB," and together with IBK, NH, and KEB Hana, "the Banks") complain as follows:

1.     On October 31, 2014, South Korean authorities revealed that a company called Moneual, Inc. ("Moneual")—a computer and home appliance manufacturer that had publicly portrayed itself as financially sound and technologically innovative—had perpetrated a massive fraud on many of Korea's financial institutions.  The scandal was one of the largest instances of fraud in South Korea's history, sending shockwaves throughout the country's financial industry.  A Korean court described it as a crime that "gravely undermined the trust of the society in general toward the financial system" and "caused a real risk that may put a damper on the trade insurance system and export finance system."  Moneual management personnel involved in the fraud, including its Chief Executive Officer, Hong-seok Park ("HS Park"), the ringleader of the fraudulent scheme, have been prosecuted by Korean prosecutors and convicted, imprisoned and fined.

2.     As details of the scheme unfolded, it became apparent that Moneual—with the assistance of its foreign importers, including defendants ASI Corporation and its affiliate ASI Computer Technologies, Inc. (collectively, "ASI"), and Newegg, Inc. and its affiliate Magnell Associate Inc., dba Newegg.com (collectively, "Newegg")—had fraudulently secured more than $3 billion USD in loans from ten major Korean banks, including plaintiffs herein, through an intricate scheme of circular transactions.

3.     Specifically, the Defendants participated in the scheme by issuing fraudulent purchase orders that Moneual used to sell export receivables to the Banks in exchange for loans or advances.  Moneual then engaged in a classic Ponzi scheme, selling additional receivables backed by fraudulent purchase orders from its foreign importers, including Defendants, to repay the Banks for the previous receivables they had purchased.  Defendants continued to issue these purchase orders even though little to no product actually was exported.

Gibson, Dunn &
Crutcher LLP

2

4.      Moneual's foreign importers, including Defendants, received kickbacks from Moneual in varying amounts in exchange for agreeing to collude with Moneual to defraud the Banks.

5.      In this action, the Banks sue two of the participants in Moneual's fraudulent scheme:  ASI and Newegg.  It was against the purchase orders from these two California-based importers of Moneual's goods that the Banks paid Moneual hundreds of millions of dollars, of which more than $230 million USD remains outstanding.  The Banks also sue four executives of ASI, each of whom actively participated in the scheme to defraud the Banks and each of whom accepted hundreds of thousands, or millions, of dollars in kickbacks to do so.

## THE PARTIES

### Plaintiffs:  The Banks

6.      IBK is a bank incorporated under the laws of the Republic of Korea, and it is 51.8% owned by the Ministry of Strategy and Finance of Korea.  IBK is an agency or instrumentality of the Republic of Korea as defined by 28 U.S.C. § 1603(b), with its principal place of business in Seoul, Republic of Korea.

7.      IBK was founded on August 1, 1961 as a policy bank to provide general financing and other customized financial services to small and medium-sized enterprises ("SMEs") pursuant to the Industrial Bank of Korea Act.  While maintaining this traditional role of funding the SMEs and helping to facilitate the nation's economic development, IBK also has expanded the scope of its expertise to providing a comprehensive range of financial services to institutional and individual customers, including providing comprehensive banking services to support Korean enterprises conducting business locally and overseas.  It also services its sizeable retail banking customer base on various aspects of their retail banking needs.  IBK's primary services include general and receivables financing for SMEs, taking deposits and issuing bonds or other debt instruments, and underwriting equity or debt instruments for SMEs.

8.    IBK provides numerous types of financing beyond its traditional mandate of SME financing, including corporate banking, retail banking, global markets & treasury (including international trade financing), investment banking and digital banking.  IBK has an active import and export financing business, and it had a 10.58% market share in this market segment in 2016.  IBK has branch offices in New York, London, China, Vietnam, India, and the Philippines, among other locations.

9.    NH is a bank incorporated under the laws of the Republic of Korea with its principal place of business located at 120 Tongil-ro, Chungjeongno-1 ga, Jung-gu, Seoul, Republic of Korea.  NH was established in 1961 under the Korean Agricultural Cooperatives Federation Act for the purpose of providing financial services to the agricultural sector.  Today, its main businesses include lending to farmers and agricultural cooperatives, taking deposits, and issuing marketable securities and bonds, among others.  NH has branch offices in New York, Beijing, Vietnam, India and Myanmar, performing sales activities and providing credit services locally.

10.    KEB Hana is a bank incorporated under the laws of the Republic of Korea, with its principal place of business located at 35 Euljiro (Euljiro-1 ga), Joong-gu, Seoul, Republic of Korea.  KEB Hana was incorporated on September 1, 2015, as a result of a merger between Hana Bank and Korea Exchange Bank.  KEB Hana provides lending, deposit-taking, private banking and other general banking-related services in accordance with the Korean Banking Act.  KEB Hana has branch offices in New York, New Jersey, London, China, Hong Kong, and Japan, among other locations.

11.    KB is a bank incorporated under the laws of the Republic of Korea with its principal place of business located at 84 Namdaemun-ro (Euljiro-2 ga), Joong-gu, Seoul, Republic of Korea.  KB provides lending, deposit-taking, cash management, private banking, and fund management services (including trust and pension management), among other banking services, to retail, small business, and corporate clients in accordance with the Korean Banking Act.

Gibson, Dunn &
Crutcher LLP

4

12.    KB operates outside of the Republic of Korea through overseas branches in New York, Tokyo, Oakland, California, Ho Chi Minh City and Hong Kong, among others, and local subsidiaries, including KB Kookmin International Limited (based in London), KB Kookmin Bank Cambodia PLC, KB Kookmin Bank China Limited, and KB Microfinance Myanmar Co., Ltd.  KB also manages securitized assets such as loans through special purposes entities ("SPE"), has investments in private equity funds, and manages and invests in trust funds.

**Defendants**

13.    Defendant ASI Corporation ("ASI Corp.") is or was a Delaware corporation.  Defendant ASI Computer Technologies, Inc. ("ASI Computer") is a California corporation.  The Banks are informed and believe and on that basis allege that ASI Corp. is or was an affiliate of ASI Computer; that ASI Corp. purports to have been merged into ASI Computer; but that at all relevant times, and continuing through the date of filing this Complaint, the defendants continued to use the ASI Corp. name and entity for some purposes.  Each of ASI Corp. and ASI Computer maintains a place of business at its regional office located at 19850 E. Business Parkway in Walnut, California.  In communications with third persons, ASI Corp. and ASI Computer frequently do not distinguish between themselves, and treat their officers, directors, employees, and agents as affiliated interchangeably with either or both entities.  ASI Corp. and ASI Computer share an email domain, @asipartner.com.  Unless otherwise specified, ASI Corp. and ASI Computer are collectively referred to in this Complaint as "ASI."  ASI is a wholesale distributor of computer software, hardware, and accessories.

14.    The Banks are informed and believe and on that basis allege that at all relevant times defendant Bill Chen was an officer, to wit, Vice President of Finance of ASI, and a citizen and resident of California.

15.    The Banks are informed and believe and on that basis allege that at all relevant times defendant Henry Chen a/k/a Hung Chen is or was an officer, to wit,

Vice President of Business Development and/or Vice President of Sales of ASI, and a citizen and resident of California.

16. The Banks are informed and believe and on that basis allege that at all relevant times defendant Frances Chou a/k/a Mei Ling Chou a/k/a Frances Meiling Chou was a director and agent of ASI, authorized to act on behalf of ASI, including entering into contracts and transactions on their behalf, and a citizen and resident of California.

17. The Banks are informed and believe and on that basis allege that at all relevant times defendant Christine Liang a/k/a Christine Li-Yin Liang a/k/a Li Yin Chu was an officer, to wit, President of ASI, and a citizen and resident of California. (Bill Chen, Henry Chen, Frances Chou, and Christine Liang are referred to collectively as the "Individual Defendants.")

18. Defendant Newegg, Inc. is a Delaware Corporation. Defendant Magnell Associate Inc., dba Newegg.com ("Newegg.com") is a California Corporation. The Banks are informed and believe and on that basis allege that Newegg.com is an affiliate of Newegg, Inc. Each of Newegg, Inc. and Newegg.com maintains a place of business at its headquarters office located at 17560 Rowland Street, in City of Industry, California, and at an office located at 9997 Rose Hills Road, in Whittier, California. Unless otherwise specified, Newegg, Inc. and Newegg.com are collectively referred to in this Complaint as "Newegg." Newegg is an online retailer of items including computer hardware and consumer electronics.

19. The true names and/or capacities, whether individual, corporate, associate or otherwise, of Defendants Doe 1 through 10, inclusive, are unknown to the Banks who therefore sue said defendants by such fictitious names. The Banks are informed and believe and on that basis allege that Defendants Doe 1 through 10, inclusive, are responsible in some manner for the acts and/or omissions to act alleged in this complaint, and proximately caused the injuries and damages to the Banks alleged herein. The Banks will seek leave of court to amend this complaint as the true names

and capacities of Defendants Doe 1 through 10, inclusive, are ascertained.  The Banks
will amend this complaint to set forth the true names and capacities of these defendants
when ascertained and as necessary.

**Other Relevant Entities/Persons**

20.     Moneual was a prominent Korean manufacturer of computers and home
appliances, including robot vacuum cleaners and various types of personal computers.
ASI and Newegg both purchased, or purported to purchase, products from Moneual.

21.     HS Park was the Chief Executive Officer of Moneual until his arrest and
conviction for masterminding the massive fraud that is the subject of this lawsuit.
HS Park is currently serving a 15-year prison sentence in Korea for that conviction.

**JURISDICTION AND VENUE**

22.     The Banks invoke this Court's jurisdiction under 28 U.S.C. § 1332(a)(4).
The Banks are agencies or instrumentalities of the Republic of Korea or incorporated
under the laws of the Republic of Korea, a foreign state, and defendants are citizens of
Delaware and California.  Complete diversity of citizenship therefore exists between
the parties.  The amount in controversy in this action exceeds $75,000 exclusive of
interest and costs.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1441(b)(1).  Each
defendant is a resident of California and the corporate defendants maintain a place of
business in Walnut, California, and City of Industry, California, within this District
and subject to the personal jurisdiction of this Court.

**FACTUAL ALLEGATIONS**

**Moneual Establishes Itself as a Prosperous and Fast-Growing Venture Company**

24.     In or about August 2007, HS Park acquired Dign Lab Co., Ltd. ("Dign"),
a privately held company that manufactured and sold robotic vacuum cleaners and
other home appliances.  HS Park had been involved in Dign's management since
approximately 2005.  After acquiring Dign, HS Park assumed the role of Chief

Executive Officer, and on November 27, 2007, he changed the name of the company to Moneual.  Moneual sold TVs, PCs, netbook computers, and robotic vacuum cleaners.

25.     Until its demise, Moneual was publicly perceived in Korea as a successful company on a rapid growth trajectory.  For example, Moneual participated in a highly successful national sales campaign by Lotte Mart, one of Korea's leading retailers, called "Tong Keun" ("magnanimous").  Moneual entered into an agreement to supply Lotte Mart with netbook computers—small, relatively less powerful laptops that are used mainly for web surfing—for Lotte Mart's "Tong Keun Netbook" campaign in 2010.

26.     The "Tong Keun TV" campaign in 2011 proved even more popular.  Moneual's strategy was to incorporate average to high quality LED screens inside basic frames made of plastic.  This made its production costs significantly lower than those of other, better known TV brands that used modern designs and more expensive materials.  People waited in line for hours outside Lotte Mart to purchase the TVs and the promotion generated widespread media attention.  Moneual also won the Microsoft Innovation Award at the prestigious Consumer Electronics Show in Las Vegas for three consecutive years from 2007 to 2009.  Such achievements, the success of the "Tong Keun" campaigns, and widespread media exposure through prime time TV commercials and the news, quickly earned Moneual major name recognition in Korea. As a result, third persons reasonably believed that Moneual was a legitimate and successful business enterprise.

**Moneual Requests and Receives Financial Assistance from the Banks**

27.     Between 2006 and 2014, Moneual requested that each of the Banks "factor" Moneual's open account export trade receivables, including, among others, receivables due from ASI and Newegg.  Moneual claimed that it needed financing because all of its sales were credit transactions and, as a result, it did not have enough liquidity to sustain its rapidly increasing production demands.

Gibson, Dunn &
Crutcher LLP

28.     Factoring is a form of lending under which a lender purchases a business's trade receivables at a discount to their face value, advancing money to the business and collecting the receivable from the business's customer at its maturity. Factoring is a recognized method of enhancing a business's cash flow by enabling the business to receive payment for its customer orders immediately or shortly after shipment of goods, before the customer would be required to pay for the goods under its agreed trade terms with the seller.  The customer pays the factor directly when the invoice comes due.

29.     Some of the Banks also used an "open account" (widely known as "O/A") method of payment to finance the trades between Moneual and ASI.  The O/A method is slightly different from factoring in that it is akin to a bank credit or overdraft facility where the lender provides financing for the exporter's shipment of goods within a certain credit limit during a set period of time and the documentary requirements for providing such financing is not as stringent as in factoring.  Under the O/A method, either the customer or the business that took out the loan can pay the bank when the invoice comes due.  Both factoring and the O/A method are widely used by businesses for both domestic and international sales.

30.     Before purchasing Moneual's export trade receivables from ASI, Newegg and other importers, the Banks purchased export finance facility insurance ("EFF Insurance") from the Korean Trade Insurance Corporation ("KSURE"), South Korea's official trade insurance agency, to secure some or all of the export trade transactions. KSURE is a corporation under the Korean Ministry of Trade, Industry and Energy whose functions include the operation of trade insurance programs relating to the export and import of goods, and the provision of credit-related services including credit research and credit information management for Korean enterprises.

31.     In order to purchase the EFF Insurance from KSURE, and as part of their due diligence process, the Banks requested credit investigations of Moneual and each of its importers, including ASI and Newegg.  As part of the credit investigation, each

of the Banks received a certification of ASI and Newegg's business history prepared by KSURE, which indicated fair credit ratings.

32.    The Banks also sent personnel to visit Moneual's offices and interview its executives, including the Finance Director.  The Banks asked questions about how Moneual was using its funds, Moneual's customers, the reasons for the increase in Moneual's revenues, inventory, and loans, and Moneual's business plans.  After completing their due diligence and in reliance on the information Moneual and KSURE provided them, each of the Banks entered into various export financing agreements ("EFAs") with Moneual under which Moneual agreed to transfer certain trade receivables backed by purchase orders from third parties, including ASI and Newegg, to the Banks in exchange for loans in varying amounts.

**Defendants Participate in the Fraudulent Scheme**

33.    After the Banks and Moneual entered into their respective EFAs with Moneual, Moneual sent ASI and Newegg "Standing Payment Instruction" notifications signed by Moneual's CEO, HS Park, informing them that they should make payments on Moneual's invoices directly to the Banks.  Defendant Frances Chou, identified in the notifications as "Director" for ASI, and Edison Y. Chin, identified in the notifications as Chief Operating Officer of "Newegg Trading Limited," signed the notifications in acknowledgment of the payment instructions.  The Banks are informed and believe and on that basis allege that Newegg Trading Limited of Hong Kong is an affiliate of Newegg.

34.    On or about November 1, 2013, Moneual entered into an OEM Supply Agreement (the "Supply Agreement") with ASI Computer.  Under the Supply Agreement, ASI Computer was to be the exclusive importer and distributor of Moneual products within the United States, Canada, Latin America, China and Hong Kong.  Payment for orders was due on a net 180 days basis.  The Supply Agreement is governed by California law.

35.     In the Supply Agreement, ASI guaranteed to purchase $300 million of Moneual products within two years—$50 million in 2012 and $250 million in 2013—in hindsight, an extremely large commitment, which the Banks are informed and believe and on that basis allege would have been onerous for ASI to meet.  That was especially true given Moneual's minimal market exposure and limited brand recognition in the North and Central American territories where ASI was to distribute its products, such that ASI would have been confronted with great difficulty reselling the Moneual products.

36.     Frances Chou, identified as a Director of ASI Computer, executed the Supply Agreement on behalf of ASI Computer, and Charlie Shin, identified as the VP of Moneual, executed the Supply Agreement on behalf of Moneual.  The Supply Agreement stated that the parties executing the agreement had the requisite authority to do so.

37.     On or about November 27, 2013, Moneual entered into a sales agreement ("Sales Agreement") with Newegg.com.  This Sales Agreement was executed on behalf of Newegg by Edison Chih, whom the Sales Agreement identified as the Chief Operating Officer, and by Charlie Shin, whom the Sales Agreement identified as the VP of Moneual, on behalf of Moneual.

38.     Under the Sales Agreement, Newegg could market, promote and sell Moneual's products in the United States, Canada and China.  Payment for orders was due on a net 180 days basis.  The Sales Agreement is governed by California law.

39.     In the Sales Agreement, Newegg guaranteed to purchase $50 million of Moneual products within the first year and $200 million within the second.  Although not as large of a purchase commitment as ASI's, the Banks are informed and believe and on that basis allege that Newegg would have struggled significantly to resell the large guaranteed purchase amount in the second year given Moneual's minimal market exposure and limited brand recognition in North America.

40.     The Banks are informed and believe and on that basis allege that from the time Moneual entered into EFAs with each of the banks and continuing after ASI and Newegg entered into their Supply and Sales Agreements with Moneual in October and November 2013, ASI and Newegg issued fraudulent purchase orders for the purported purchase of home theater personal computers ("HTPCs") and other goods manufactured by Moneual.  With regard to the HTPCs, Moneual purported to charge ASI and Newegg between $2,530 and $2,980 per HTPC unit, and those amounts were stated on the invoices and purchase orders from ASI and Newegg upon which the Banks advanced funds to Moneual.  However, the Banks later learned that in reality, the HTPCs were only worth $8 per unit.

41.     After entering into the EFAs, the Banks received payment for all purchased export receivables from ASI or Newegg payable before September 2014 at or near the time that payment became due.

42.     The successful consummation of some export finance transactions with ASI and Newegg, coupled with the fact that KSURE had insured many of the transactions, gave the Banks comfort as to Moneual's bona fides and credit worthiness, and induced the Banks to enter into additional export finance transactions with Moneual.

43.     In reality, however, these successful transactions with ASI, Newegg and other importers were merely a ruse orchestrated by Moneual—with the assistance of its foreign importers, including ASI and Newegg—to create the illusion that Moneual operated a genuine export business with legitimate customers and transactions so that the Banks would continue to finance Moneual's receivables.

**The Banks' Financing Agreements and Purchases of Moneual's Receivables**

44.     The details of each bank's EFA with Moneual and the export receivables from ASI and/or Newegg that it purchased are described below.

## **IBK**

45.     IBK had provided trade financing for Moneaul in connection with their exports to ASI since 2006, and since then, Moneual had been one of IBK's major customers.  IBK's *Guro-Dong* Branch in Guro District, Seoul made commercial loans to Moneual in connection with its receivables from ASI, and IBK's Credit Assessment Department was responsible for reviewing and approving the *Guro-Dong* Branch's trade finance business with Moneual.  The method of payment for the trades between Moneual and ASI was "open account," under which the seller ships the goods and all the necessary shipping and commercial documents directly to a buyer who agrees to pay a seller's invoice at a future date.  Pursuant to its "Non L/C-based Purchase of Export Receivables" Program, IBK would purchase a number of trade receivables from Moneual to the extent permitted under an approved credit limit for Moneual during a set period of time on a non-recourse basis.

46.     Between 2006 and August 2009, IBK purchased Moneual's ASI export receivables on "Documents Against Acceptance" (or "D/A") payment terms, under which the buyer agrees to pay at an agreed point in time (*i.e.*, 30, 60 or 90 days from the date of bill of lading) once it receives shipping documents along with bills of exchange by its bank.  During this time period, IBK received a steady flow of payments for the export receivables from ASI and other importers that it purchased from Moneual.  These consistent payments and the fact that Moneual appeared to continually expand its export business base and increase its revenue induced IBK to approve O/A payment terms for Moneual's export receivables starting in September 2009.

47.     On July 19, 2010, IBK entered into a "Credit Transaction Agreement (Non-LC Based Purchase of Export Receivables)" with Moneual to provide O/A financing for Moneual's exports to ASI Computer, without recourse against Moneual. IBK and Moneual subsequently entered into new Credit Transaction Agreements on December 16, 2011, May 11, 2012, December 26, 2012, April 30, 2014 and July 30,

2014, each on substantially the same terms, but with increasingly higher credit limits (collectively referred to as the "EFA"). Under the EFA, Moneual agreed to sell, and IBK agreed to purchase, Moneual's rights and benefits to receive payments from ASI Computer for the commercial invoices Moneual sent to ASI Computer for its shipments of goods. Many of these transactions were covered by EFF Insurance.

48.     Between 2006 and August 2014, IBK received payment from ASI Computer for its advances to Moneual against ASI's purchase orders at or near the time those payments became due. Attached as <u>Exhibit A-1</u> is a list of the ASI Export Receivables for which ASI received payment.

49.     However, ASI has not repaid IBK for advances made against sixty purported purchase orders from ASI totaling $83.5 million that IBK financed between March and July 2014. Payment was due on these purchase orders between September 2014 and January 2015. Frances Chou, as Director of ASI Computer signed each of these purported purchase orders. ASI has never contested that it issued any of these sixty purchase orders.

50.     Forty of these purchase orders, totaling $55.9 million, are covered by EFF Insurance from KSURE. Attached as <u>Exhibit A-2</u> is a list of the outstanding ASI export receivables IBK purchased that were covered by EFF Insurance. Because IBK believed that it would be able to collect insurance proceeds for this amount, it did not seek immediate payment from ASI. However, on June 28, 2016, IBK wrote to ASI to remind the company of its obligation to pay for the receivables that IBK had purchased from Moneual, all of which had matured by then. IBK's letter listed forty open invoices, including the ones that were past due or would be due within the following month, and demanded that ASI make payment for approximately $55.9 million worth of outstanding invoices. Attached as <u>Exhibit A-3</u> is a list of the outstanding ASI export receivables that were not covered by EFF Insurance.

51.     To date, ASI has not paid any of the invoices pertaining to these sixty purchase orders, and the total principal sum of $83,469,600 owed to IBK remains outstanding.

**<u>NH</u>**

52.     In or around 2011, Moneual submitted a loan application to NH.  On August 8, 2011, an NH representative, Byung-hyo Kim, visited Moneual's offices and interviewed Kyung-shik Kang, Moneual's Finance Director.  Thereafter, on September 2, 2011, the Guro Branch of NH consummated its first transactions with Moneual, loaning Moneual KRW 2,000,000,000 and US $1,000,000.  HS Park, Moneual's CEO, guaranteed both loans.

53.     In or around 2013, Moneual requested that NH factor its open account export receivables, including, among others, receivables due from ASI and Newegg, secured by EFF Insurance.  On February 22, 2013, in connection with this request, two different NH representatives, Myung-hee Shim and Hyun-beom Chang, visited Moneual's office located in Gasan-dong, Geumcheon-gu, Seoul, and interviewed Moneual's Finance Director.

54.     Thereafter, NH's Guro Digital Branch approved a one-year loan of $20,000,000 to Moneual conditioned on NH's factoring Moneual's open account export receivables due from China National Building Material Co., Ltd. ("CNBM").  CNBM is a Chinese state-owned enterprise that is the largest comprehensive building materials industry group in China, with 100,000 employees and over $16 billion in total assets.  NH purchased EFF Insurance from KSURE with a $20,000,000 coverage limit to secure the CNBM receivables it factored.

55.     On March 6, 2013 and September 2, 2013, NH's Guro Branch purchased Moneual's export trade receivables for its HTPC sales to CNBM in the amounts of $19,542,600 and $19,891,872, respectively.  Payments for these accounts receivable were due on September 2, 2013 and February 28, 2014, and CNBM paid NH the amounts owed in full on August 30, 2013 and March 11, 2014.  The successful

consummation of NH's first factoring transaction gave NH comfort as to Moneual's creditworthiness, and induced it to enter into additional factoring transactions with Moneual as described below, including entering into EFAs to finance Moneual's exports to ASI and Newegg.  However, the successful initial transaction with CNBM, and later, the successful transactions with Newegg, were merely part of a ruse by Moneual to provide NH with the illusion that Moneual operated a genuine export business with legitimate customers and transactions and thereby to induce it to continue to finance Moneual's receivables transactions.

56.     On December 13, 2013, after ASI and Newegg entered into the Supply and Sales Agreements with Moneual, NH's Guro Digital Branch and Moneual entered into an EFAs titled "Credit Transaction Agreement (Type I), Foreign Currency Transaction Agreement" and "Additional Agreement on Purchase of Export Accounts Recievable," pursuant to which NH agreed to provide Moneual with a one-year loan of $10,000,000, and Moneual agreed to transfer certain accounts receivable from third parties to NH pursuant to separately issued standing payment instructions.  NH and Moneual entered into similar EFAs on April 29, 2014, and July 7, 2014.  Under these agreements, NH agreed to provide Moneual with one-year loans of $20,000,000 and $8,000,000, respectively, in exchange for export trade receivables.  These agreements were signed by HS Park, Moneual's CEO, on behalf of Moneual.

57.     Pursuant to the payment instructions, Moneual directed ASI and Newegg to make payment to NH when it became due.  Frances Chou, Director for ASI, acknowledged and consented to the payment instruction on behalf of ASI, and Edison Chih acknowledged and consented to the payment instruction on behalf of Newegg.

58.     NH purchased EFF Insurance from KSURE with a $10,000,000 coverage limit, effective December 12, 2013, to secure Newegg receivables it had agreed to factor, and with $20,000,000 and $8,000,000 coverage limits, effective April 29, 2014, to secure ASI receivables.

Gibson, Dunn & Crutcher LLP

59.     On May 26, 2014, Myung-hee Shim and Byung-do Min of NH again visited Moneual's office located in Anyang-si, Gyeonggi-do, and interviewed Moneual's Finance Director.  During the meeting, Myung-hee Shim asked the Finance Director questions about how Moneual was using its funds, Moneual's customers, reasons for the increase in Moneual's revenues, inventory and loans, and Moneual's business plans.

60.     On July 25 and July 26, 2014, another NH representative, Byung-do Min, visited Moneual's Research & Development center located in Jeju-do and interviewed Jong-heon Lee, a Director of Moneual's ESCO business department.

61.     Between December 2013 and July 2014, based on the above EFAs between NH and Moneual and the EFF Insurance, and in reliance on representations made by Moneual personnel during NH's numerous on-site visits, NH purchased Moneual's ASI and Newegg receivables based on various sets of purchase orders as detailed below.

62.     The First Set of ASI Purchase Orders.  On or about April 21, 2014, ASI issued two purchase orders, each purporting to purchase 500 HTPC units from Moneual at $2,980 per unit, totaling $1,490,000 per purchase order (the "First Set of NH-ASI Purchase Orders").

63.     On April 29, 2014, NH purchased Moneual's accounts receivable due from ASI for the invoices pertaining to the First Set of NH-ASI Purchase Orders, except that for one of these purchase orders, Moneual assigned, and NH assumed, only accounts receivable of $506,600.  In total, the First Set of NH-ASI Purchase Orders had an aggregate value of $1,996,600.  These purchase orders were signed by Frances Chou, a Director of ASI, and countersigned by HS Park, CEO of Moneual.

64.     On April 25, 2014, Moneual issued commercial invoices and packing lists for these purchase orders listing ASI Computer Technologies Inc. of Fremont, CA as the Consignee of the goods, and purportedly shipped the goods purchased by these orders on that same date.

65.     Payment for the goods represented in the First Set of NH-ASI Purchase Orders was due on October 21, 2014.  However, ASI defaulted on that payment and NH has never received payment for the funds it advanced on the First Set of NH-ASI Purchase Orders.

66.     <u>The Second Set of ASI Purchase Orders</u>.  On or about May 8, 2014, ASI issued six purchase orders, each purporting to purchase 500 HTPC units from Moneual at $2,980 per unit, totaling $1,490,000 per purchase order (the "Second Set of NH-ASI Purchase Orders").  On July 9, 2014, NH purchased Moneual's accounts receivable due from ASI for the invoices pertaining to the Second Set of NH-ASI Purchase Orders, except that for one of these purchase orders, Moneual assigned, and NH assumed, only accounts receivable of $536,400.  In total, the Second Set of NH-ASI Purchase Orders had an aggregate value of $7,986,400.  These purchase orders were signed by Frances Chou, a Director of ASI, and countersigned by HS Park, CEO of Moneual.

67.     On July 8, 2014, Moneual issued commercial invoices and packing lists for these purchase orders listing ASI Computer Technologies Inc. of Fremont, CA as the Consignee of the goods, and purportedly shipped the goods purchased by these orders on that same date.

68.     Payment for the goods represented in the First Set of NH-ASI Purchase Orders was due on January 2, 2015.  However, ASI defaulted on that payment and NH has never received payment for the funds it advanced on the Second Set of NH-ASI Purchase Orders.

69.     Attached hereto as <u>Exhibit B-1</u> is a complete list of the NH-ASI Purchase Orders.

70.     <u>The First Set of Newegg Purchase Orders</u>.  On or about December 5, 2013, Newegg issued eight purchase orders, each purporting to purchase 500 HTPC units from Moneual at $2,530 per unit, totaling $1,265,000 per purchase order (the "First Set of NH-Newegg Purchase Orders").  On December 13, 2013, NH purchased

Moneual's accounts receivable due from Newegg for the invoices pertaining to the First Set of NH-Newegg Purchase Orders, except that for one of these purchase orders, Moneual assigned, and NH assumed, only accounts receivable of $1,138,500.  In total, the First Set of NH-Newegg Purchase Orders had an aggregate value of $9,993,500.  These purchase orders were signed by Edison Chih of Newegg, and countersigned by HS Park, CEO of Moneual.  The Banks are informed and believe and on that basis allege that Edison Chih was the COO of Newegg, and the same employee that signed the Sales Agreement with Moneual in his capacity as COO.

71.     Also on December 13, 2013, Moneual issued commercial invoices and packing lists for these purchase orders listing Newegg Trading Limited of Hong Kong as the Consignee of the goods, and purportedly shipped the goods purchased by these orders on that same date.  The Banks are informed and believe and on that basis allege that Newegg Trading Limited of Hong Kong is an affiliate of Newegg, Inc.

72.     Payment for the goods represented in the First Set of NH-Newegg Purchase Orders was due on May 9, 2014.  On or about February 12, 2014 and February 20, 2014, NH received bank transfers in the amount of $3,795,000 and $6,198,500 respectively—which together amounted to complete payment for the First Set of NH-Newegg Purchase Orders—from an account in the name of Newegg Trading Limited of Hong Kong.

73.     The Second Set of Newegg Purchase Orders.  On or about December 5, 2013 Newegg issued three purchase orders, each purporting to purchase 500 HTPC units from Moneual at $2,530 per unit, totaling $1,265,000 per purchase order (the "Second Set of NH-Newegg Purchase Orders").  On or about February 12, 2014, NH purchased Moneual's accounts receivable due from Newegg for the invoices pertaining to the Second Set of NH-Newegg Purchase Orders.  In total, the Second Set of NH-Newegg Purchase Orders had an aggregate value of $3,795,000.  These purchase orders also were signed by Edison Chih and countersigned by HS Park.

74.     Also on February 12, 2014, Moneual issued commercial invoices and packing lists for these purchase orders listing Newegg Trading Limited of Hong Kong as the Consignee of the goods, and purportedly shipped the goods purchased by these orders on that same date.

75.     Payment for the goods represented in the Second Set of NH-Newegg Purchase Orders was due on July 11, 2014, and on or about July 22, 2014, NH received a bank transfer for the total payment amount of $3,795,000 from an account in the name of Newegg Trading Limited of Hong Kong.

76.     The Third Set of Newegg Purchase Orders.  Also on or about December 5, 2013, Newegg issued an additional five purchase orders, each purporting to purchase 500 HTPC units from Moneual at $2,530 per unit, totaling $1,265,000 per purchase order (the "Third Set of NH-Newegg Purchase Orders").  On or about February 20, 2014, NH purchased Moneual's accounts receivable due from Newegg for the invoices pertaining to the Third Set of NH-Newegg Purchase Orders, except that for one of these purchase orders, Moneual assigned, and NH assumed, only accounts receivable of $1,138,500.  In total, the Third Set of NH-Newegg Purchase Orders had an aggregate value of $6,198,500.  These purchase orders also were signed by Edison Chih and countersigned by HS Park.

77.     Also on February 20, 2014, Moneual issued commercial invoices and packing lists for these purchase orders listing Newegg Trading Limited of Hong Kong as the Consignee of the goods, and purportedly shipped the goods purchased by these orders on that same date.

78.     Payment for the goods represented in the Second Set of NH-Newegg Purchase Orders was due on July 18, 2014, and on or about July 25, 2014, NH received a bank transfer for the total payment amount of $6,198,500 from an account in the name of Newegg Trading Limited of Hong Kong.

79.     The Fourth Set of Newegg Purchase Orders.  On or about June 13, 2014, Newegg issued three purchase orders, each purporting to purchase 500 HTPC units

from Moneual at $2,530 per unit, totaling $1,265,000 per purchase order (the "Fourth Set of NH-Newegg Purchase Orders"). On or about July 22, 2014, NH purchased Moneual's accounts receivable due from Newegg for the invoices pertaining to the Fourth Set of NH-Newegg Purchase Orders. In total, the Fourth Set of NH-Newegg Purchase Orders had an aggregate value of $3,795,000. These purchase orders also were signed by Edison Chih and countersigned by HS Park.

80.    On July 21, 2014, Moneual issued commercial invoices and packing lists for these purchase orders listing Advance Global Group Pte Ltd. of Hong Kong as the Consignee of the goods, and purportedly shipped the goods purchased by these orders on that same date. The Banks are informed and believe and on that basis allege that Advance Global Group Pte Ltd. is a paper company that never actually existed.

81.    Payment for the goods represented in the Fourth Set of NH-Newegg Purchase Orders was due on December 17, 2014. However, Newegg defaulted on that payment, and NH has never received payment for the funds it advanced on the Fourth Set of NH-Newegg Purchase Orders.

82.    The Fifth Set of Newegg Purchase Orders. Also on or about June 13, 2014, Newegg issued an additional five purchase orders, each purporting to purchase 500 HTPC units from Moneual at $2,530 per unit, totaling $1,265,000 per purchase order (the "Fifth Set of NH-Newegg Purchase Orders"). On or about July 25, 2014, NH purchased Moneual's accounts receivable due from Newegg for the invoices pertaining to the Fifth Set of NH-Newegg Purchase Orders, except that for one of these purchase orders, Moneual assigned, and NH assumed, only accounts receivable of $1,138,500. In total, the Fifth Set of NH-Newegg Purchase Orders had an aggregate value of $6,198,500. These purchase orders also were signed by Edison Chih and countersigned by HS Park.

83.    On July 24, 2014, Moneual issued commercial invoices and packing lists for these purchase orders listing Advance Global Group Pte Ltd. of Hong Kong as the

Consignee of the goods, and purportedly shipped the goods purchased by these orders on that same date.

84.    Payment for the goods represented in the Fifth Set of NH-Newegg Purchase Orders was due on December 22, 2014.  However, Newegg defaulted on that payment and NH has never received payment for the funds it advanced on the Fifth Set of NH-Newegg Purchase Orders.

85.    On November 11, 2014, NH sent Moneual a repayment notice demanding payment of the for the invoices relating to the Fourth and Fifth Set of NH-Newegg Purchase Orders and the First and Second Set of NH-ASI Purchase Orders.  However, to date, none of these invoices has been paid.  The total amount of unpaid ASI receivables is approximately $9,983,000, and the total amount of unpaid Newegg receivables is approximately $9,993,000.

86.    Attached hereto as Exhibit B-2 is a complete list of the outstanding NH-ASI Purchase Orders.

**KEB Hana**

87.    In or around 2012, Moneual requested that KEB Hana factor its open account export receivables, including, among others, receivables due from ASI and Newegg, secured by EFF Insurance.  In order to purchase EFF Insurance from KSURE, KEB Hana requested a credit investigation of Moneual and each of its import customers, including ASI and Newegg, from KSURE.  Based on KSURE's credit investigation results, KEB Hana purchased EFF Insurance from KSURE with a $10,000,000 coverage limit, effective June 7, 2013, to secure ASI receivables it factored.  It also purchased EFF Insurance from KSURE with $67,000,000 and $45,000,000 coverage limits, effective December 12, 2013 and August 22, 2014, respectively, to secure Newegg receivables it factored.

88.    At one point, Edison Chih, the COO of Newegg, visited KEB Hana with Charlie Shin, a VP of Moneual.  This visit provided further comfort to KEB Hana that Newegg and Moneual were in a legitimate trade relationship.

Gibson, Dunn &
Crutcher LLP

89.     On August 13, 2012, KEB Hana entered into a foreign currency transaction agreement and an agreement to increase export transactions with Moneual.

90.     Between August 13, 2012 and September 18, 2014, KEB Hana purchased ASI receivables from Moneual based on 74 shipments of goods that Moneual purportedly had made to ASI.  ASI made payments on or near the time that payment was due for the receivables that KEB Hana purchased between August 13, 2012 and August 4, 2014, which corresponded with 60 of the purported 74 shipments from Moneual to ASI.  The last payment due date for these shipments was September 4, 2014.  Attached hereto as Exhibit C-1 is a list of the purchase orders corresponding to these shipments.

91.     KEB Hana purchased an additional set of receivables that corresponded with the fourteen remaining purported shipments between August 14, 2014 and September 18, 2014.

92.     The First Set of ASI Purchase Orders.  On or about May 8, 2014, ASI issued fourteen purchase orders, each one purporting to purchase between $476,800 and $1,490,000 worth of goods from Moneual, including HTPCs priced at $2,980 per unit (the "First Set of Hana-ASI Purchase Orders").  KEB Hana purchased these ASI receivables from Moneual on August 14, 2014, September 11, 2014 and September 18, 2014.  In total, the First Set of Hana-ASI Purchase Orders had an aggregate value of $17,850,200.  These purchase orders were signed by Frances Chou on behalf of ASI and countersigned by HS Park.

93.     Moneual issued commercial invoices and packing lists for these purchase orders listing ASI Computer Technologies (HK) Limited as the Consignee of the goods, and purportedly shipped the goods purchased by these orders.

94.     Payments for the goods represented in the First Set of Hana-ASI Purchase Orders were due between January 14, 2015 and January 16, 2015.  However, ASI defaulted on those payments and KEB Hana has never received payment for the funds

Gibson, Dunn &
Crutcher LLP

23

it advanced on the First Set of Hana-ASI Purchase Orders.  Attached hereto as <u>Exhibit C-2</u> is a complete list of the outstanding Hana-ASI purchase orders.

95.     Between  November 9, 2012 and August 1, 2014, KEB Hana purchased Newegg receivables from Moneual based on 219 shipments of goods that Moneual purportedly had made to Newegg.  Newegg made payments on or near the time that payment was due for the receivables that KEB Hana purchased between November 9, 2012 and February 27, 2014, which corresponded with 167 of the purported 219 shipments from Moneual to Newegg.  The last payment due date for these shipments was July 28, 2014.  Attached hereto as <u>Exhibit C-3</u> is a list of the purchase orders corresponding to these shipments.

96.     KEB Hana purchased the two sets of Newegg receivables that corresponded with the fifty-two remaining purported shipments between April 4, 2014 and August 1, 2014.

97.     <u>The First Set of Newegg Purchase Orders</u>.  On or about December 5, 2013, Newegg issued thirty-seven purchase orders, each one purporting to purchase $1,265,000 worth of goods, including HTPCs, from Moneual, except for one that purported to purchase $1,214,400 worth of goods (the "First Set of Hana-Newegg Purchase Orders").  KEB Hana purchased these Newegg receivables from Moneual on April 4, 2014, May 27, 2014, May 29, 2014, June 12, 2014, June 17, 2014 and June 26, 2014.  In total, the First Set of Hana-Newegg Purchase Orders had an aggregate value of $46,754,400.  These purchase orders were signed by Edison Chih on behalf of Newegg and countersigned by HS Park.

98.     Moneual issued commercial invoices and packing lists for these purchase orders listing Newegg as the Consignee of the goods, and purportedly shipped the goods purchased by these orders.

99.     Payments for the goods represented in the First Set of Hana-Newegg Purchase Orders were due between September and November of 2014.  However,

Newegg defaulted on those payments and KEB Hana has never received payment for the funds it advanced on the First Set of Hana-Newegg Purchase Orders.

100.   <u>The Second Set of Newegg Purchase Orders</u>.  On or about June 13, 2014, Newegg issued fifteen purchase orders, each one purporting to purchase either $1,265,000 or $1,490,000 worth of goods from Moneual, including HTPCs, except for one that purported to purchase $1,400,600 worth of goods (the "Second Set of Hana-Newegg Purchase Orders").  KEB Hana purchased these Newegg receivables from Moneual on June 26, 2014, July 22, 2014 and August 1, 2014.  In total, the Second Set of Hana-Newegg Purchase Orders had an aggregate value of $20,235,600.  These purchase orders were signed by Edison Chih on behalf of Newegg and countersigned by HS Park.

101.   Moneual issued commercial invoices and packing lists for these purchase orders listing Newegg as the Consignee of the goods, and purportedly shipped the goods purchased by these orders.

102.   Payments for the goods represented in the Second Set of Hana-Newegg Purchase Orders were due between November and December of 2014.  However, Newegg defaulted on those payments and KEB Hana has never received payment for the funds it advanced on the Second Set of Hana-Newegg Purchase Orders.

103.   On or around July 15, 2016, KEB Hana sent ASI and Newegg a demand for payment of the invoices relating to the First Set of Hana-ASI Purchase Orders and the First and Second Set of Hana-Newegg Purchase Orders.  However, to date, none of these invoices has been paid.  The total amount of the unpaid ASI receivables is approximately $17,850,200, and the total amount of unpaid Newegg receivables is approximately $66,990,000.  Attached hereto as <u>Exhibit C-4</u> is a complete list of the outstanding Hana-Newegg purchase orders.

**KB**

104.   In or around 2012, Moneual requested that KB factor its open account export receivables, including, among others, receivables due from ASI and Newegg,

secured by EFF Insurance.  In order to purchase EFF Insurance from KSURE, KB requested a credit investigation of Moneual and each of its import customers, including ASI and Newegg, from KSURE.  Based on KSURE's credit investigation results, KB purchased EFF Insurance from KSURE with a $10,000,000 coverage limit, effective June 7, 2013, to secure ASI receivables it factored.  It also purchased EFF Insurance from KSURE with a $20,000,000 coverage limit, effective October 28, 2013, to secure Newegg receivables it factored.

105.   On June 13, 2013, KB and Moneual entered into a "Foreign Exchange Transaction Agreement."  Pursuant to this agreement, between June 2013 and July 2014 KB purchased Moneual's ASI and Newegg receivables based on various sets of purchase orders as detailed below.

106.   The First Set of ASI Purchase Orders.  On June 13, 2013, KB purchased Moneual's accounts receivable due from ASI corresponding to five purchase orders issued by ASI, each purporting to purchase $1,068,000 worth of goods from Moneual per purchase order (the "First Set of KB-ASI Purchase Orders").  In total, the First Set of KB-ASI Purchase Orders had an aggregate value of $5,340,000.

107.   Payment for the goods represented in the First Set of KB-ASI Purchase Orders was due on December 10, 2013, and on or about December 4, 2013, KB received a wire transfer for the total payment amount of $5,340,000 from an account in the name of ASI Computer Technologies (HK) Ltd.

108.   The Second Set of ASI Purchase Orders.  On July 29, 2013, KB purchased Moneual's accounts receivable due from ASI corresponding to four purchase orders issued by ASI, each purporting to purchase $1,068,000 worth of goods from Moneual per purchase order (the "Second Set of KB-ASI Purchase Orders").  In total, the Second Set of KB-ASI Purchase Orders had an aggregate value of $4,272,000.

Gibson, Dunn &
Crutcher LLP

109.   Payment for the goods represented in the Second Set of KB-ASI Purchase Orders was due on January 25, 2014, and on or about January 24, 2014, KB received a total payment of $5,340,000 for the Second Set of KB-ASI Purchase Orders.

110.   The Third Set of ASI Purchase Orders.  On November 5, 2013, KB purchased Moneual's accounts receivable due from ASI corresponding to eight purchase orders issued by ASI, each purporting to purchase $1,068,000 worth of goods from Moneual per purchase order (the "Third Set of KB-ASI Purchase Orders").  On November 5, 2013, KB purchased Moneual's accounts receivable due from ASI for the invoices pertaining to the Third Set of KB-ASI Purchase Orders.  In total, the Third Set of KB-ASI Purchase Orders had an aggregate value of $8,544,000.

111.   Payment for the goods represented in the Third Set of KB-ASI Purchase Orders was due on May 4, 2014, and on or about May 8, 2014, KB received a total payment of $8,544,000 for the Third Set of KB-ASI Purchase Orders.

112.   The Fourth Set of ASI Purchase Orders.  On November 28, 2013, KB purchased Moneual's accounts receivable due from ASI corresponding to three purchase orders issued by ASI purporting to purchase $1,068,000, $640,800, and $427,200 worth of goods from Moneual per purchase order (the "Fourth Set of KB-ASI Purchase Orders").  In total, the Fourth Set of KB-ASI Purchase Orders had an aggregate value of $2,136,000.

113.   Payment for the goods represented in the Fourth Set of KB-ASI Purchase Orders was due on May 26, 2014, and on or about June 5, 2014, KB received a wire transfer for the total payment amount of $2,136,000 from an account in the name of ASI Computer Technologies (HK) Ltd.

114.   The Fifth Set of ASI Purchase Orders.  On December 6, 2013, KB purchased Moneual's accounts receivable due from ASI corresponding to four purchase orders issued by ASI, each purporting to purchase $1,490,000 worth of goods, from Moneual per purchase order, except that one purchase order purported to purchase $1,192,000 worth of goods from Moneual (the "Fifth Set of KB-ASI

Purchase Orders"). In total, the Fifth Set of KB-ASI Purchase Orders had an aggregate value of $5,662,000.

115. Payment for the goods represented in the Fifth Set of KB-ASI Purchase Orders was due on June 4, 2014, and on or about June 5, 2014, KB received a total payment of $5,662,000 for the Fifth Set of KB-ASI Purchase Orders.

116. The Sixth Set of ASI Purchase Orders. On January 24, 2014, KB purchased Moneual's accounts receivable due from ASI corresponding to three purchase orders issued by ASI, each purporting to purchase $1,490,000 worth of goods, from Moneual per purchase order, except that one purchase order purported to purchase $1,341,000 worth of goods from Moneual (the "Sixth Set of KB-ASI Purchase Orders"). In total, the Sixth Set of KB-ASI Purchase Orders had an aggregate value of $4,321,000.

117. Payment for the goods represented in the Sixth Set of KB-ASI Purchase Orders was due on July 23, 2014, and on or about July 21, 2014, KB received a wire transfer for the total payment amount of $4,321,000 from an account in the name of ASI Computer Technologies (HK) Ltd.

118. The Seventh Set of ASI Purchase Orders. On May 5, 2014, KB purchased Moneual's accounts receivable due from ASI corresponding to six purchase orders issued by ASI, each purporting to purchase $1,490,000 worth of goods from Moneual, except that one purchase order purported to purchase $1,102,600 worth of goods from Moneual (the "Seventh Set of KB-ASI Purchase Orders"). In total, the Seventh Set of KB-ASI Purchase Orders had an aggregate value of $8,552,600.

119. Payment for the goods represented in the Seventh Set of KB-ASI Purchase Orders was due on November 3, 2014. However, ASI defaulted on that payment and KB has never received payment for the funds it advanced on the Seventh Set of KB-ASI Purchase Orders.

120. The Eighth Set of ASI Purchase Orders. On or about April 21, 2014, ASI issued six purchase orders, each purporting to purchase 500 HTPC units from Moneual

at $2,980 per unit, totaling $1,490,000 per purchase order (the "Eighth Set of KB-ASI Purchase Orders").  On June 9, 2014, KB purchased Moneual's ASI Receivables for the invoices pertaining to the Eighth Set of KB-ASI Purchase Orders.  In total, the Eighth Set of KB-ASI Purchase Orders had an aggregate value of $8,940,000.  These purchase orders were signed by Frances Chou, a Director of ASI.

121.   On June 5, 2014, Moneual issued commercial invoices and packing lists for these purchase orders listing ASI Computer Technologies Inc. of Fremont, California as the consignee of the goods, and purportedly shipped the goods purchased by these orders on that same date.

122.   Payment for the goods represented in the Eighth Set of KB-ASI Purchase Orders was due on December 2, 2014.  However, ASI defaulted on that payment and KB has never received payment for the funds it advanced on the Eighth Set of KB-ASI Purchase Orders.

123.   The Ninth Set of ASI Purchase Orders.  On July 21, 2014, KB purchased Moneual's accounts receivable due from ASI corresponding to three purchase orders issued by ASI, each purporting to purchase 500 HTPC units from Moneual at $2,980 per unit, totaling $1,490,000 per purchase order (the "Ninth Set of KB-ASI Purchase Orders").  In total, the Ninth Set of KB-ASI Purchase Orders had an aggregate value of $4,470,000.  These purchase orders were signed by Frances Chou, a Director of ASI.

124.   On July 18, 2014, Moneual issued commercial invoices and packing lists for these purchase orders listing ASI Computer Technologies Inc. of Fremont, California as the consignee of the goods, and purportedly shipped the goods purchased by these orders on that same date.

125.   Payment for the goods represented in the Ninth Set of KB-ASI Purchase Orders was due on January 14, 2015.  However, ASI defaulted on that payment and KB has never received payment for the funds it advanced on the Eighth Set of KB-ASI Purchase Orders.

126.   Attached hereto as <u>Exhibit D-1</u> is a complete list of the KB-ASI purchase orders.

127.   <u>The First Set of Newegg Purchase Orders</u>.  On or about October 30, 2013, KB purchased Moneual's accounts receivable due from Newegg corresponding to sixteen purchase orders issued by Newegg.  Fifteen of these purchase orders purported to $1,265,000 worth of goods per purchase order (the "First Set of KB-Newegg Purchase Orders").  The final purchase order purported to purchase $1,012,000 worth of goods from Moneual.  In total, the First Set of KB-Newegg Purchase Orders had an aggregate value of $19,987,000.

128.   Payment for the goods represented in the First Set of KB-Newegg Purchase Orders was due on March 29, 2014.  On or about January 8, 2014 and January 15, 2014, KB received a payment of $10,120,000 and $9,867,000 respectively, which together amounted to complete payment for the First Set of KB-Newegg Purchase Orders.

129.   <u>The Second Set of Newegg Purchase Orders</u>.  On or about January 1, 2014, KB purchased Moneual's accounts receivable due from Newegg corresponding to eight purchase orders issued by Newegg, each purporting to purchase $1,265,000 worth of goods from Moneual (the "Second Set of KB-Newegg Purchase Orders").  In total, the Second Set of KB-Newegg Purchase Orders had an aggregate value of $10,120,000.

130.   Payment for the goods represented in the Second Set of KB-Newegg Purchase Orders was due on or about June 7, 2014, and on or about June 12, 2014, KB received a total payment of $10,120,000 for the Second Set of KB-Newegg Purchase Orders.

131.   <u>The Third Set of Newegg Purchase Orders</u>.  On or about January 15, 2014, KB purchased Moneual's accounts receivable due from Newegg corresponding to eight purchase orders issued by Newegg.  Seven of these purchase orders purported to purchase $1,265,000 worth of goods from Moneual (the "Third Set of KB-Newegg

Gibson, Dunn &
Crutcher LLP

Purchase Orders"). The final purchase order purported to purchase $1,012,000 worth of goods from Moneual. In total, the Third Set of KB-Newegg Purchase Orders had an aggregate value of $9,867,000.

132.   Payment for the goods represented in the Third Set of KB-Newegg Purchase Orders was due on or about June 9, 2014, and on or about June 17, 2014, KB received a total payment of $9,867,000 for the Third Set of KB-Newegg Purchase Orders.

133.   <u>The Fourth Set of Newegg Purchase Orders</u>. On or about May 5, 2014, Newegg issued sixteen purchase orders, each purporting to purchase 500 HTPC units from Moneual at $2,530 per unit, totaling $1,265,000 per purchase order (the "Fourth Set of KB-Newegg Purchase Orders"). On or about June 17, 2014, KB purchased Moneual's accounts receivable due from Newegg for the invoices pertaining to the Fourth Set of KB-Newegg Purchase Orders. In total, the Fourth Set of KB-Newegg Purchase Orders had an aggregate value of $20,240,000. These purchase orders were signed by Edison Chih and countersigned by HS Park.

134.   On June 12, 2014 and June 17, 2014, Moneual issued commercial invoices and packing lists for subsets of these purchase orders listing Newegg as the Consignee of the goods, and purportedly shipped the goods purchased by these orders on these same dates.

135.   Payment for the goods represented in the Fourth Set of KB-Newegg Purchase Orders was due on November 9, 2014. However, Newegg defaulted on that payment and NH has never received payment for the funds it advanced on the Fourth Set of KB-Newegg Purchase Orders.

136.   Attached hereto as <u>Exhibit D-2</u> is a complete list of the KB-Newegg Purchase Orders.

137.   On November 5, 2014, KB sent Moneual a repayment notice demanding payment of the for the invoices relating to the Fourth Set of KB-Newegg Purchase Orders and the Seventh, Eighth, and Ninth Sets of KB-ASI Purchase Orders.

However, to date, none of these invoices has been paid.  The total amount of the unpaid Newegg receivables is approximately $19,987,000 and the total amount of unpaid ASI receivables is approximately $21,962,600.

**The Fraudulent Scheme Unravels and Defendants' Participation is Exposed**

138.   On or about October 20, 2014, Moneual filed for receivership in Korea, owing in excess of $500 million to its lenders, including the Banks.  As confirmed by news reports, Moneual's receivership filing was "abrupt," "unexpected" and "a shock" because Moneual had posted revenue of approximately U.S. $1.1 billion and an operating profit of approximately U.S. $9.65 billion in 2013.

139.   In late 2014, the Korean Customs Service conducted an investigation of Moneual's activities and prepared an internal investigation report.  On or about January 23, 2015, the Seoul district prosecutor's office indicted HS Park and other Moneual employees.  The indictment charged that those individuals had caused Moneual to execute large-scale fraud schemes using circular transactions.  The indictment further charged that Moneual had greatly exaggerated the price of its HTPCs, often charging nearly $3,000 per unit when in fact, according to the Korean authorities, they were worth only approximately $7 to $18 per unit—a fraction of a percent of the amount that Moneual had billed to ASI and Newegg and that the Banks had advanced to Moneual.  The indictment also detailed how Moneual's foreign importers, like ASI and Newegg, provided Moneual with purchase order numbers to enable Moneual executives to generate false and fraudulent purchase orders, which Moneual then used to obtain financing from at least ten banks, including the plaintiff Banks.

140.   In reliance on these purchase orders from Moneual's foreign importers, the Banks believed they were purchasing valid export receivables, when in fact, they were providing Moneual with loans and advances based on bogus purchase orders that Moneual's foreign importers helped Moneual create.

Gibson, Dunn &
Crutcher LLP

141.    Specifically referring to ASI, the Korean authorities' investigation revealed the following: that Moneual shipped the HTPCs to ASI Computer, which then sold the HTPCs to a company called Polaris Media Research Inc. ("Polaris"), a paper company that HS Park established in Hong Kong.  Polaris then sold the HTPCs to PK Paradigms Holdings Ltd. ("Paradigms"), another paper company set up by HS Park. When the payment dates for the export receivables approached, HS Park transferred money to Paradigms disguised as payment for other goods that Moneual was importing into Korea, when in fact Moneual was bringing back the very HTPCs it had exported. The money was then transferred in reverse to the supposed flow of the HTPCs (i.e., Moneual → Paradigms Polaris → ASI), to allow ASI Computer to make payments to financial institutions for the export receivables.  In fact, the HTPCs may not even have physically moved; the transfer of their ownership may only have taken place on paper. Making these circular payments enabled the participants to continue to deceive the Banks and to prolong the fraudulent scheme.

142.    The Banks are informed and believe and on that basis allege that both ASI and Newegg knew about Moneual's scheme to defraud its lenders and agreed to assist Moneual in perpetrating that scheme.

143.    The Banks are informed and believe and on that basis allege that to get the foreign importers to agree to participate in Moneual's fraudulent scheme to obtain money from lenders in exchange for bogus export receivables, Moneual paid the foreign importers, including ASI and Newegg, and executives and employees of those foreign importers, kickbacks, which HS Park called "commissions."

144.    Specifically with respect to ASI, the Banks are informed and believe and on that basis allege that Moneual paid kickbacks, directly (or, through intermediaries or family members or to offshore accounts) to officers and employees of ASI including, among others, the Individual Defendants.  The Banks are informed and believe and on that basis allege that Moneual paid each of those individuals, and each

Gibson, Dunn &
Crutcher LLP

33

of those individuals accepted, in excess of $1 million in kickbacks between 2012 and 2014.

145.   The Banks are informed and believe and on that basis allege that some or all of the kickbacks that Moneual paid to defendant Christine Liang, the President of ASI, were paid by means of wire transfer to an account in the name of an offshore company called Berwick Resources Ltd., which was controlled by Christine Liang, and some or all of the kickbacks that Moneual paid to defendant Henry Chen were paid by means of wire transfer to an account in the name of THC Ltd.

146.   ASI's participation in the fraudulent scheme to defraud the Banks was systemic and institutional, involving multiple officers, employees, and agents of the company who participated in laundering money and creating and concealing fraudulent transactions with Moneual.  The scheme was condoned at the highest levels of the company by virtue of the involvement of ASI's most senior officers including its President, Christine Liang, and its Vice Presidents Bill Chen and Henry Chen.

147.   Specifically with respect to Newegg, the Banks are informed and believe and on that basis allege that the money HS Park wired to Newegg so that it could pay the Banks and complete the fraudulent circular transactions included an additional one to two percent "commission" that Newegg would retain as payment for its participation in the scheme.

148.   HS Park was convicted in the Seoul Central District Court of defrauding ten Korean banks, including the Plaintiff banks, of over $3 billion between 2007 and 2014 based on loans that Moneual received for fraudulent export contracts. On October 16, 2015, HS Park was sentenced to 23 years in prison, and fines and forfeitures of approximately $35 million.  On May 17, 2016, the Seoul High Court reduced his sentence to 15 years in prison.  He is currently serving his sentence.

149.   The Banks are informed and believe and on that basis alleges that other employees or executives of Moneual have also been convicted of fraud based on their

Gibson, Dunn & Crutcher LLP

1   participation in the fraudulent schemes of Moneual and HS Park to defraud Moneual's

2   lenders.

3       150.   The Banks were not aware of the fraudulent scheme until the Korean

4   authorities announced the findings of their investigation on October 31, 2014.

5   ## COUNT I

6   ## Fraud

7   ### (against ASI and Individual Defendants)

8       151.   The Banks reallege the allegations of paragraphs 1 through 150 and

9   incorporates those allegations as if fully set forth here.

10       152.   While engaging in and carrying out the course of conduct alleged above,

11   Moneual and ASI made numerous misrepresentations of material fact to the Banks,

12   and/or concealed from or failed to disclose to the Banks facts that would have been

13   material to the Bank's decision to engage in financing relationships with Moneual,

14   and/or that were necessary to make the statements of Moneual and ASI not misleading.

15       153.   ASI's misrepresentations, concealments, and failures to disclose included,

16   among others, the following:

17       a.   The Supply Agreement that ASI entered into with Moneual in November

18           2013 required ASI Corp. to purchase an unrealistically high quantity of

19           goods from Moneual—$50 million in the first year of the Supply

20           Agreement and $250 million in the second—that was either impossible

21           for ASI Corp. to meet or would have been onerous given the size and

22           condition of ASI Corp.'s business.  ASI had reason to know that Moneual

23           would forward the Supply Agreement to IBK, KEB Hana and KB because

24           IBK, KEB Hana and KB had entered into EFAs with Moneual to purchase

25           its ASI receivables—and had purchased some of Moneual's ASI

26           receivables—before Moneual and ASI signed the Supply Agreement.

27           Further, ASI already had made multiple payments to IBK, KEB Hana and

28           KB for the ASI receivables those Banks purchased from Moneual before

Moneual and ASI entered the Supply Agreement. Thus, ASI was aware that IBK, KEB Hana, and KB had been purchasing ASI receivables from Moneual and collecting on those advances before ASI entered the Supply Agreement. In addition, because ASI knew that Moneual was obtaining advances on its ASI receivables from multiple banks, it could reasonably contemplate that Moneual would seek export trade financing for its ASI receivables from other banks, including NH.

b.    The HTPCs that ASI Computer was purportedly buying from Moneual were priced at an amount nearly 400 times their actual market value. No business of the size, breadth, history, and experience of ASI could legitimately have judged that the products were worth the nearly $3,000 per unit that ASI Computer was supposedly paying for them, and no such business would have bought the products at that inflated price, unless it intended to create the illusion of extensive, profitable, high-value commerce between it and its supplier for the purpose of defrauding lenders into supporting the transactions.

c.    ASI issued multiple sets of purchase orders that Moneual used to secure advances from the Banks well after it had received the goods from its first set of purchase orders from 2006 financed by IBK, and at a time when it knew or should have known that the HTPCs were wildly overpriced relative to their actual worth. ASI would not have issued those purchase orders unless it intended to deceive the Banks into providing financing to Moneual for nonexistent transactions.

d.    Between 2006 and August 2014, ASI sent the Banks multiple wire transfers amounting to hundreds of millions of dollars from an account of its Hong Kong affiliate in payment for the invoices pertaining to various sets of purchase orders. Due to the nature of Moneual's fraudulent scheme, based on circular transactions, Moneual actually may never have

physically shipped the HTPCs to ASI.  ASI made these payments to create the illusion that its purchase orders represented genuine transactions, in order to deceive the Banks into continuing to finance Moneual's exports to ASI, thereby prolonging the fraudulent scheme.

154.   Moneual and ASI made each of the misrepresentations set forth in paragraph 153(a)-(d) with knowledge of its falsity, and with the intent to deceive the Banks, by inducing them to advance millions of dollars to Moneual against fraudulent receivables that ASI had no intent to pay.

155.   The misrepresentations and deceit directed at the Banks were known or condoned at the highest levels of ASI's institutional structure.  ASI's most senior officers and agents, including its President, Christine Liang; its Vice Presidents Bill Chen and Henry Chen; and its agent and director, Frances Chou, participated in the fraudulent scheme to defraud the Banks, and conspired with and aided and abetted Moneual to carry out the fraudulent scheme by, among other things, the following:

a.   Christine Liang, the President of ASI, received kickbacks from Moneual in amounts that the Banks are informed and believe exceeded $1 million, paid to Berwick Resources Ltd., an account she controlled;

b.   Bill Chen, ASI's Vice President of Finance, participated in numerous communications and transactions with Moneual and its agents regarding transferring funds among ASI, Moneual, and multiple sham corporations set up by Moneual as part of the circular transactions that were the essence of the fraudulent scheme; colluded with Moneual and its agents to set up sham entities as customers or vendors of ASI as part of the circular transactions, to convey false information to the Banks, and to conceal negative information from becoming publicly known; and received kickbacks from Moneual in amounts that the Banks are informed and believe exceeded $1 million;

c.   Henry Chen, ASI's Vice President of Business Development and/or Vice President of Sales, communicated directly with agents of Moneual regarding submitting fraudulent purchase orders to Moneual and other entities regarding structuring the circular transactions that were the essence of the fraudulent scheme, and received kickbacks from Moneual in amounts that the Banks are informed and believe exceeded $1 million;

d.   Frances Chou, ASI's director and its employee or agent, provided material assistance to Moneual by creating sham entities to participate in the circular transactions, developing web pages for those sham entities to give them the appearance of genuine companies, and participating in or orchestrating the submission of fraudulent purchase orders and the transfer of funds among ASI, Moneual, and multiple sham corporations set up by Moneual as part of the circular transactions that were the essence of the fraudulent scheme; and received kickbacks from Moneual in amounts that the Banks are informed and believe exceeded $1 million.

156.   The Banks relied on the representations of Moneual and ASI set forth above in determining to advance hundreds of millions of dollars to Moneual against purported receivables which Moneual and ASI knew to be fraudulent.  The Banks would not have advanced money to Moneual pursuant to the EFAs, if the Banks had known that the purchase orders that ASI issued for Moneual HTPCs were fraudulent or that Moneual was engaged in a massive scheme to defraud the Banks and numerous other banks by conspiring with foreign importers such as ASI to create the illusion that Moneual was exporting millions of dollars of goods in legitimate business transactions.

157.   The Banks justifiably relied on the representations of Moneual and ASI in that the Banks conducted a commercially reasonable investigation into the business of its customer Moneual and the creditworthiness of Moneual's customers including ASI and reasonably determined, based on information which turned out to be false, that

Moneual's business was legitimate and would support the factoring agreement for Moneual's receivables.

158.   In addition to defrauding the Banks directly by making the misrepresentations alleged above, ASI rendered substantial assistance to HS Park and Moneual to enable them to carry out the scheme to defraud Moneual's lenders, including the Banks.

159.   ASI rendered such assistance by, among other actions:

a.   entering into the Supply Agreements with Moneual on unreasonable or onerous terms calling for the minimum purchase of hundreds of millions of dollars of Moneual products;

b.   issuing purchase orders for multiple units of HTPCs at enormously inflated prices relative to their true value, enabling Moneual to use those purported purchase orders to induce the Banks to enter into EFAs and ultimately advance large sums to Moneual against fraudulent receivables;

c.   paying the Banks in respect of Moneual's purported receivable on multiple sets of purchase orders, thereby enabling Moneual to construct and prolong its deceptive scheme; and

d.   suffering or permitting its executives, officers, and employees to receive millions of dollars in bribes in the form of kickbacks from Moneual.

160.   The Individual Defendants rendered such assistance by, among other actions:

a.   colluding with Moneual to set up sham entities to act as customers or vendors of ASI for the purpose of facilitating the circular transactions;

b.   submitting false and fraudulent purchase orders to Moneual and other entities to create the appearance of legitimate transactions that Moneual would use to obtain financing from the Banks;

Gibson, Dunn & Crutcher LLP

c.   Directing or orchestrating the transfer of funds among ASI, Moneual, and multiple sham corporations that constituted the circular transactions that were the essence of the fraudulent scheme; and

d.   Accepting bribes and kickbacks from Moneual amounting to millions of dollars in exchange for concealing the nature and extent of the massive fraudulent scheme.

161.   The Banks are informed and believe and on that basis allege that ASI through its directors, officers, employees, and agents, including without limitation the Individual Defendants, had actual knowledge of the fraudulent scheme perpetrated against Moneual's lenders, including the Banks, at the time that ASI and the Individual Defendants rendered each act substantially assisting Moneual and its executives, including HS Park, to carry out their fraudulent scheme.  ASI and the Individual Defendants therefore aided and abetted Moneual and HS Park in the scheme to defraud the Banks.

162.   The Banks are informed and believe and on that basis allege that ASI and the Individual Defendants shared a common plan or design with Moneual and its executives, including HS Park, and agreed with Moneual and its executives to defraud Moneual's lenders, including the Banks.  In furtherance of that common plan or design, ASI and the Individual Defendants conspired with Moneual and HS Park to defraud the Banks by engaging in the acts and making the representations alleged above.  ASI and the Individual Defendants are therefore liable to the same extent as Moneual and HS Park for the damages the Banks sustained as a result of the scheme to defraud them.

163.   As a result of the foregoing misrepresentations, concealments, and nondisclosures made to the Banks, and the Banks' reliance thereon, the Banks have been damaged in a minimum amount of $133,265,000, plus interest according to proof.

164.   The Banks are informed and believe and on that basis allege that ASI, through its officers, directors, or managing agents, including the Individual

Defendants, had advance knowledge of the unfitness of its employees and agents, and employed them with an intent to deceive and/or with a conscious disregard of the rights of others, including the Banks, and that each authorized and ratified the fraudulent conduct of its employees and agents as alleged herein.  The Banks are therefore entitled to exemplary damages against ASI in an amount sufficient to punish it and deter similar conduct in the future.

165.    By virtue of their actions as alleged herein, each of the Individual Defendants has engaged in acts of malice and fraud directed at the Banks.  The Banks are therefore entitled to exemplary damages against each Individual Defendant, in an amount sufficient to punish them and deter similar conduct in the future.

## COUNT II

### Fraud

### (NH, KEB Hana, and KB against Newegg)

166.    NH, KEB Hana, and KB reallege the allegations of paragraphs 1 through 150 and incorporates those allegations as if fully set forth here.

167.    While engaging in and carrying out the course of conduct alleged above, Moneual and Newegg made numerous misrepresentations of material fact to NH, KEB Hana, and KB, and/or concealed from or failed to disclose to NH, KEB Hana, and KB facts that would have been material to their decisions to engage in financing relationships with Moneual, and/or that were necessary to make the statements of Moneual and Newegg not misleading.

168.    Newegg's misrepresentations, concealments, and failures to disclose included, among others, the following:

a.    The Sales Agreement that Newegg entered into with Moneual in November 2013 required Newegg to purchase an unrealistically high quantity of goods from Moneual in its second year—$200 million—that would have been onerous for Newegg to meet.  Newegg had reason to know that Moneual would forward the Supply Agreement to KEB Hana

1    and KB because KEB Hana and KB had entered into EFAs with Moneual

2    to purchase its Newegg receivables—and had purchased some of

3    Moneual's Newegg receivables—before Moneual and Newegg signed the

4    Supply Agreement.  Further, Newegg already had made multiple

5    payments to KB for the Newegg receivables those Banks purchased from

6    Moneual before Moneual and Newegg entered the Supply Agreement.

7    Thus, Newegg was aware that KEB Hana and KB had been purchasing

8    Newegg receivables from Moneual before Newegg entered the Supply

9    Agreement.  In addition, because Newegg knew that Moneual was

10   obtaining advances on its Newegg receivables from multiple banks, it

11   could reasonably contemplate that Moneual would seek export trade

12   financing for its Newegg receivables from other banks, including NH.

13   b.   The HTPCs that Newegg was purportedly buying from Moneual were

14        priced at an amount more than 300 times their actual market value.  No

15        business of the size, breadth, history, and experience of Newegg could

16        legitimately have judged that the products were worth the more than

17        $2,500 per unit that Newegg was supposedly paying for them, and no

18        such business would have bought the products at that inflated price, unless

19        it intended to create the illusion of extensive, profitable, high-value

20        commerce between it and its supplier for the purpose of defrauding

21        lenders into supporting the transactions.

22   c.   Newegg issued multiple sets of purchase orders that Moneual used to

23        secure advances from the Banks well after it had received the goods from

24        its first purchase order from November 2012 financed by KEB Hana, and

25        at a time when it knew or should have known that the HTPCs were wildly

26        overpriced relative to their actual worth.  Newegg would not have issued

27        those purchase orders unless it intended to deceive the Banks into

28        providing financing to Moneual for nonexistent transactions.

d.    Between January 2013 and August 2014, Newegg sent the Banks multiple wire transfers amounting to hundreds of millions of dollars from an account of its Hong Kong affiliate in payment for the invoices pertaining to the various sets of purchase orders.  Due to the nature of Moneual's fraudulent scheme, based on circular transactions, Moneual actually may never have physically shipped the HTPCs to Newegg.  Newegg made these payments for the purpose of creating the illusion that its purchase orders represented genuine transactions, in order to deceive the Banks into continuing to finance Moneual's exports to Newegg, thereby prolonging the fraudulent scheme.

169.   Moneual and Newegg made each of the misrepresentations set forth in paragraph 168(a)-(d) with knowledge of its falsity, and with the intent to deceive NH, KEB Hana, and KB, by inducing them to advance millions of dollars to Moneual against fraudulent receivables that Newegg had no intent to pay.

170.   NH, KEB Hana, and KB relied on the representations of Moneual and Newegg set forth above in determining to advance hundreds of millions of dollars to Moneual against purported receivables which Moneual and Newegg knew to be fraudulent.  NH, KEB Hana, and KB would not have advanced money to Moneual pursuant to the EFAs if they had known that the purchase orders that Newegg issued for Moneual HTPCs were fraudulent or that Moneual was engaged in a massive scheme to defraud them and numerous other banks by conspiring with foreign importers such as Newegg to create the illusion that Moneual was exporting millions of dollars of goods in legitimate business transactions.

171.   NH, KEB Hana, and KB justifiably relied on the representations of Moneual and Newegg in that they conducted a commercially reasonable investigation into the business of its customer Moneual and the creditworthiness of Moneual's customer Newegg and reasonably determined, based on information which turned out

to be false, that Moneual's business was legitimate and would support the factoring agreement for Moneual's receivables.

172. In addition to defrauding NH, KEB Hana, and KB directly by making the misrepresentations alleged above, Newegg rendered substantial assistance to HS Park and Moneual to enable them to carry out the scheme to defraud Moneual's lenders, including the Banks.

173. Newegg rendered such assistance by, among other actions:

a. entering into the Sales Agreement with Moneual on unreasonable or onerous terms calling for the minimum purchase of hundreds of millions of dollars of Moneual products;

b. issuing purchase orders for multiple units of HTPCs at enormously inflated prices relative to their true value, enabling Moneual to use those purported purchase orders to induce NH, KEB Hana, and KB to enter into EFAs and ultimately advance large sums to Moneual against fraudulent receivables;

c. paying NH, KEB Hana, and KB in respect of Moneual's purported receivable on multiple sets of purchase orders, thereby enabling Moneual to construct and prolong its deceptive scheme; and

d. suffering or permitting its executives, officers, and employees to receive millions of dollars in bribes in the form of kickbacks from Moneual.

174. NH, KEB Hana, and KB are informed and believe and on that basis allege that Newegg, through its directors, officers, employees, and agents, including without limitation Edison Chih, had actual knowledge of the fraudulent scheme perpetrated against Moneual's lenders, including the Banks, at the time that Newegg rendered each act substantially assisting Moneual and its executives, including HS Park, to carry out their fraudulent scheme. Newegg therefore aided and abetted Moneual and HS Park in the scheme to defraud NH, KEB Hana, and KB.

Gibson, Dunn &
Crutcher LLP

44

175.   NH, KEB Hana, and KB are informed and believe and on that basis allege that Newegg shared a common plan or design with Moneual and its executives, including HS Park, and agreed with Moneual and its executives to defraud Moneual's lenders, including NH, KEB Hana, and KB.  In furtherance of that common plan or design, Newegg conspired with Moneual and HS Park to defraud NH, KEB Hana, and KB by engaging in the acts and making the representations alleged above.  Newegg is therefore liable to the same extent as Moneual and HS Park for the damages NH, KEB Hana, and KB sustained as a result of the scheme to defraud them.

176.   As a result of the foregoing misrepresentations, concealments, and nondisclosures made to NH, KEB Hana, and KB, and their reliance thereon, NH, KEB Hana, and KB have been damaged in a minimum amount of $96,970,000, plus interest according to proof.

177.   NH, KEB Hana, and KB are informed and believe and on that basis allege that Newegg, through their officers, directors, or managing agents, each had advance knowledge of the unfitness of its employees and agents, and employed them with an intent to deceive and/or with a conscious disregard of the rights of others, including NH, KEB Hana, and KB, and that each authorized and ratified the fraudulent conduct of its employees and agents as alleged herein.  NH, KEB Hana, and KB are therefore entitled to exemplary damages against Newegg in an amount sufficient to punish the defendants and deter similar conduct in the future.

## COUNT III

### Negligent Misrepresentation

### (against ASI)

178.   The Banks reallege the allegations of paragraphs 1 through 166 and incorporates those allegations as if fully set forth here.

179.   The statements and representations of Moneual and ASI as set forth above were untrue.  Moneual and ASI made those statements and representations with no

reasonable ground for believing them to be true, and with the intent to induce the Banks to rely upon them.

180.   The Banks were unaware of the falsity of those statements and representations, and justifiably relied on those statements and representations in determining to advance hundreds of millions of dollars to Moneual against purported receivables which Moneual and ASI either knew to be fraudulent or had no reasonable grounds to believe were genuine.

181.   As a proximate result of the Banks' reliance on the truth of the statements and representations of ASI, and their other acts and omissions as alleged above, each bank has been damaged in the amounts set forth below, plus interest according to proof:

- IBK: $83,469,600
- NH: $9,983,000
- KEB Hana: $17,850,200
- KB: $21,962,600

## COUNT IV

### Negligent Misrepresentation

### (NH, KEB Hana, and KB against Newegg)

182.   NH, KEB Hana, and KB reallege the allegations of paragraphs 1 through 150 and 166 through 177 and incorporates those allegations as if fully set forth here.

183.   The statements and representations of Moneual and Newegg as set forth above were untrue.  Moneual and Newegg made those statements and representations with no reasonable ground for believing them to be true, and with the intent to induce the NH, KEB Hana, and KB to rely upon them.

184.   NH, KEB Hana, and KB were unaware of the falsity of those statements and representations, and justifiably relied on those statements and representations in determining to advance hundreds of millions of dollars to Moneual against purported

Gibson, Dunn & Crutcher LLP

1  receivables which Moneual and Newegg either knew to be fraudulent or had no

2  reasonable grounds to believe were genuine.

3      185.   As a proximate result of the NH, KEB Hana, and KB's reliance on the

4  truth of the statements and representations of ASI, and their other acts and omissions

5  as alleged above, each bank has been damaged in the amounts set forth below, plus

6  interest according to proof:

7      • NH: $9,993,000

8      • KEB Hana: $66,990,000

9      • KB: $19,987,000

10              **COUNT V**

11           **Negligent Supervision**

12             **(against ASI)**

13      186.   The Banks reallege the allegations of paragraphs 1 through 165 and 178

14  through 181 and incorporates those allegations here as if fully set forth.

15      187.   The Banks are informed and believe and on that basis alleges that ASI

16  negligently trained, managed, supervised, and retained their officers, employees and

17  agents, including without limitation, the Individual Defendants, as to the performance

18  of their job duties, including the formation of agreements with suppliers, the issuance

19  of purchase orders, and communications with creditors.  The Banks are informed and

20  believe and on that basis alleges that ASI knew or should have known that their

21  officers, employees and agents were or may have been unfit or incompetent to properly

22  carry out their job duties, including those duties specified herein, and failed to

23  adequately supervise their actions.

24      188.   As a result of the negligent supervision by ASI of their officers,

25  employees and agents, ASI was enabled to take the actions described above including,

26  among other actions:

27

28

Gibson, Dunn &
Crutcher LLP

a.   entering into the Supply Agreement with Moneual on unreasonable or onerous terms calling for the minimum purchase of hundreds of millions of dollars of Moneual products;

b.   issuing purchase orders for thousands of units of HTPCs at enormously inflated prices relative to their true value, enabling Moneual to use those purported purchase orders to induce the Banks to enter into the EFAs and ultimately advance large sums to Moneual against fraudulent receivables;

c.   paying the Banks in respect of Moneual's purported receivables on multiple purchase orders, thereby enabling Moneual to construct and prolong its deceptive scheme;

d.   suffering or permitting their executives, officers, and employees to receive millions of dollars in bribes in the form of kickbacks from Moneual.

189.   The negligence of ASI in permitting its executives, officers, employees, and agents to engage in fraudulent conduct as alleged above, proximately caused damage to the Banks in an amount to be proven at trial.

## COUNT VI

### Negligent Supervision

### (against Newegg)

190.   NH, KEB Hana and KB reallege the allegations of paragraphs 1 through 150, 166 through 177, and 182 through 185 and incorporates those allegations here as if fully set forth.

191.   NH, KEB Hana and KB are informed and believe and on that basis alleges that Newegg negligently trained, managed, supervised, and retained their officers, employees and agents, including without limitation, Edison Chih, COO of Newegg, as to the performance of their job duties, including the formation of agreements with suppliers and the issuance of purchase orders.  The Banks are informed and believe and on that basis alleges that Newegg knew or should have known that their officers,

Gibson, Dunn &
Crutcher LLP

48

1  employees and agents were or may have been unfit or incompetent to properly carry
2  out their job duties, including those duties specified herein, and failed to adequately
3  supervise their actions.

4      192.   As a result of the negligent supervision by Newegg of their officers,
5  employees and agents, Newegg was enabled to take the actions described above
6  including, among other actions:

    a.    entering into the Sales Agreement with Moneual on unreasonable or
8          onerous terms calling for the minimum purchase of hundreds of millions
9          of dollars of Moneual products;

10     b.    issuing purchase orders for thousands of units of HTPCs at enormously
11         inflated prices relative to their true value, enabling Moneual to use those
12         purported purchase orders to induce the Banks to enter into the EFAs and
13         ultimately advance large sums to Moneual against fraudulent receivables;

14     c.    paying the Banks in respect of Moneual's purported receivables on
15         multiple purchase orders, thereby enabling Moneual to construct and
16         prolong its deceptive scheme.

17     193.   The negligence of Newegg in permitting its executives, officers,
18 employees, and agents to engage in fraudulent conduct as alleged above, proximately
19 caused damage to the Banks in an amount to be proven at trial.

**COUNT VII**

**Violations of California Business & Professions Code §§ 17200 *et seq*.,**

**Resulting in Unfair Competition**

**(against ASI and the Individual Defendants)**

24     194.   The Banks reallege the allegations of paragraphs 1 through 165, 178
25 through 181, and 186 through 189 and incorporates those allegations here as if fully set
26 forth.

27     195.   ASI's aforementioned actions constitute "unlawful" business practices
28 under California Business & Professions Code §§ 17200 *et seq*.—including, but not

Gibson, Dunn &
Crutcher LLP

49

limited to (i) voluntarily and intentionally participating in Moneual's scheme to defraud the Banks through the use of wire communications in violation of 18 U.S.C. § 1343 by issuing fraudulent purchase orders and making wire transfers to the banks in order to enable Moneual to continue its fraudulent scheme; (ii) negligently supervising its employees, thereby allowing them to perpetrate the fraud.

196.   The Individual Defendants' aforementioned actions constitute "unlawful" business practices under California Business & Professions Code §§ 17200 *et seq.*— including, but not limited to (i) voluntarily and intentionally participating in Moneual's scheme to defraud the Banks through the use of wire communications in violation of 18 U.S.C. § 1343 by issuing fraudulent purchase orders and making wire transfers to the banks in order to enable Moneual to continue its fraudulent scheme; (ii) accepting bribes and kickbacks from Moneual amounting to millions of dollars in exchange for concealing the nature and extent of the massive fraudulent scheme.

197.   ASI and the Individual Defendants' conduct also constituted an "unfair" and "fraudulent" practice under California Business & Professions Code §§ 17200 *et seq.*, in that it was immoral, unethical and unscrupulous, and intended to deceive the public.

198.   As a direct and proximate result of ASI and the Individual Defendants' unlawful, unfair and fraudulent acts, the Banks lost money and property in the form of injury to their business, including damage to their reputation and client relationships, as well as actual and consequential damages, including the loss of past, present, and future profits.  Pursuant to California Business and Professions Code § 17203, the Banks seek restitution and further equitable relief from ASI and the Individual Defendants as a result of their unfair, unlawful, and fraudulent acts.

## <u>COUNT VIII</u>

**Violations of California Business & Professions Code §§ 17200 *et seq*.,**

**Resulting in Unfair Competition**

**(NH, KEB Hana, and KB against Newegg)**

Gibson, Dunn &
Crutcher LLP

50

199.   NH, KEB Hana, and KB reallege the allegations of paragraphs 1 through 150, 166 through 177, 182 through 185, and 190 through 193 and incorporates those allegations here as if fully set forth.

200.   Newegg's aforementioned actions constitute "unlawful" business practices under California Business & Professions Code §§ 17200 *et seq.*—including, but not limited to (i) voluntarily and intentionally participating in Moneual's scheme to defraud the Banks through the use of wire communications in violation of 18 U.S.C. § 1343 by issuing fraudulent purchase orders and making wire transfers to the banks in order to enable Moneual to continue its fraudulent scheme; (ii) negligently supervising its employees, thereby allowing them to perpetrate the fraud.

201.   Newegg's aforementioned conduct also constituted an "unfair" and "fraudulent" practice under California Business & Professions Code §§ 17200 *et seq.*, in that it was immoral, unethical and unscrupulous, and intended to deceive the public.

202.   As a direct and proximate result of Newegg's unlawful, unfair and fraudulent acts, the NH, KEB Hana, and KB have lost money or property in the form of injury to their business, including damage to their reputation and client relationships, as well as actual and consequential damages, including the loss of past, present, and future profits.  Pursuant to California Business and Professions Code § 17203, NH, KEB Hana, and KB seek restitution and further equitable relief from Newegg as a result of its unfair, unlawful and fraudulent acts.

Gibson, Dunn &
Crutcher LLP

51

## **PRAYER FOR RELIEF**

WHEREFORE, the Banks pray that this Court:

1. Enter judgment in favor of the Banks and against ASI and the Individual Defendants for compensatory damages and restitution in an amount to be proven at trial, plus pre-judgment interest;

2. Enter judgment in favor of NH, KEB Hana and KB and against Newegg for compensatory damages and restitution in an amount to be proven at trial, plus pre-judgment interest;

3. Grant the Banks exemplary damages on Counts I and II according to proof;

4. Grant the Banks their reasonable attorneys' fees and costs of suit;

5. Grant the Banks such other and further relief as the Court deems fit.


Dated: October 18, 2017                    MAURICE SUH
                                           GIBSON, DUNN & CRUTCHER LLP


                                           By: /s/ Maurice Suh
                                                     Maurice Suh

                                           Attorneys for Plaintiffs

Gibson, Dunn &
Crutcher LLP