MAURICE SUH, SBN 147485
  msuh@gibsondunn.com
KAHN A. SCOLNICK, SBN 228686
  kscolnick@gibsondunn.com
VANESSA A PASTORA, SBN 277837
  vpastora@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

Attorneys for Plaintiffs INDUSTRIAL BANK
OF KOREA; NONGHYUP BANK; KEB HANA
BANK; KOOKMIN BANK

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| INDUSTRIAL BANK OF KOREA; an agency or instrumentality of the Republic of Korea NONGHYUP BANK; a corporation of the Republic of Korea; KEB HANA BANK, a corporation of the Republic of Korea; KOOKMIN BANK, a corporation of the Republic of Korea,<br><br>        Plaintiffs,<br><br>    v.<br><br>ASI CORPORATION, a Delaware Corporation; ASI COMPUTER TECHNOLOGIES, INC., a California Corporation; BILL CHEN, an individual; HENRY CHEN a/k/a HUNG CHEN, an individual; FRANCES CHOU a/k/a FRANCES MEILING CHOU, an individual; CHRISTINE LIANG a/k/a CHRISTINE LI-YIN LIANG a/k/a LI YIN CHU, an individual; NEWEGG, INC., a Delaware Corporation; MAGNELL ASSOCIATE INC., DBA NEWEGG.COM and ABS COMPUTER TECHNOLOGIES, a California Corporation; and DOES 1 through 10, inclusive,<br><br>        Defendants. | CASE NO. 2:17-cv-07646-MWF(JPRx)<br><br>**SECOND AMENDED COMPLAINT FOR:**<br><br>**(1) FRAUD;**<br><br>**(2) NEGLIGENT MISREPRESENTATION;**<br><br>**(3) UNFAIR COMPETITION UNDER CAL. BUSINESS & PROFESSIONS CODE § 17200** *et seq.*<br><br>**DEMAND FOR JURY TRIAL** |

1

2    Plaintiffs Industrial Bank of Korea ("IBK"), NongHyup Bank ("NH"), KEB

3 Hana Bank ("KEB Hana"), and Kookmin Bank ("KB," and together with IBK, NH,

4 and KEB Hana, "the Banks") complain as follows:

5    1.  On October 31, 2014, South Korean authorities revealed that a company

6 called Moneual, Inc. ("Moneual")—a computer and home appliance manufacturer that

7 had publicly portrayed itself as financially sound and technologically innovative—had

8 perpetrated a massive fraud on many of Korea's financial institutions.  The scandal

9 was one of the most significant frauds perpetrated against financial institutions in

10 South Korea's history, sending shockwaves throughout the country's financial

11 industry.  A Korean court described it as a crime that "gravely undermined the trust of

12 the society in general toward the financial system" and "caused a real risk that may put

13 a damper on the trade insurance system and export finance system."  Moneual

14 management personnel involved in the fraud, including its Chief Executive Officer,

15 Hong-Seok Park ("HS Park"), the ringleader of the fraudulent scheme, have been

16 prosecuted by Korean prosecutors and convicted, imprisoned and fined.

17    2.  As details of the scheme unfolded, it became apparent that Moneual, with

18 the assistance of its foreign importers—including defendants ASI Corporation and its

19 affiliate ASI Computer Technologies, Inc. (collectively, "ASI"), and Newegg, Inc., the

20 owner and operator of the website Newegg.com ("Newegg, Inc." or "Newegg.com"),

21 with the assistance of its affiliate Magnell Associate Inc., dba Newegg.com

22 ("Magnell"), and Newegg, Inc.'s Hong Kong subsidiary, nonparty Newegg Trading

23 Limited—had fraudulently secured more than $3 billion USD in loans from ten major

24 Korean banks, including plaintiffs herein, through an intricate scheme of circular

25 transactions designed to conceal their true nature.

26    3.  Specifically, the Defendants participated in the scheme by issuing—or, in

27 the case of Newegg, Inc., directing and causing its alter ego and agent, Newegg

28 Trading Limited, to issue expressly on its behalf—fraudulent purchase orders.

Defendants intended for Moneual to use these fraudulent purchase orders to lure the Banks into purchasing export receivables in exchange for loans or advances.  Moneual then engaged in a classic Ponzi scheme, selling additional receivables backed by fraudulent purchase orders from its foreign importers, including Defendants, to repay the Banks for the previous receivables they had purchased.  Defendants continued to issue these purchase orders even though little to no product actually was exported.

4.     Moneual's foreign importers, including Defendants, received kickbacks from Moneual in varying amounts in exchange for agreeing to collude with Moneual to defraud the Banks.

5.     In this action, the Banks sue some of the key participants in Moneual's fraudulent scheme:  ASI, Newegg, Inc. and Magnell.  It was against the purchase orders from these California-based importers of Moneual's goods that the Banks paid Moneual hundreds of millions of dollars, of which more than $228 million USD remains outstanding.  The Banks also sue four executives of ASI, each of whom actively participated in the scheme to defraud the Banks and each of whom accepted hundreds of thousands, or millions, of dollars in kickbacks to do so.

## THE PARTIES

### Plaintiffs:  The Banks

6.     IBK is a bank incorporated under the laws of the Republic of Korea, and it is 51.8% owned by the Ministry of Strategy and Finance of Korea.  IBK is an agency or instrumentality of the Republic of Korea as defined by 28 U.S.C. § 1603(b), with its principal place of business in Seoul, Republic of Korea.

7.     IBK was founded on August 1, 1961 as a policy bank to provide general financing and other customized financial services to small and medium-sized enterprises ("SMEs") pursuant to the Industrial Bank of Korea Act.  While maintaining this traditional role of funding the SMEs and helping to facilitate the nation's economic development, IBK also has expanded the scope of its expertise to providing a comprehensive range of financial services to institutional and individual customers,

1  including providing comprehensive banking services to support Korean enterprises

2  conducting business locally and overseas.  It also services its sizeable retail banking

3  customer base on various aspects of their retail banking needs.  IBK's primary services

4  include general and receivables financing for SMEs, taking deposits and issuing bonds

5  or other debt instruments, and underwriting equity or debt instruments for SMEs.

6      8.      IBK provides numerous types of financing beyond its traditional mandate

7  of SME financing, including corporate banking, retail banking, global markets &

8  treasury (including international trade financing), investment banking and digital

9  banking.  IBK has an active import and export financing business, and it had a 10.58%

10  market share in this market segment in 2016.  IBK has branch offices in New York,

11  London, China, Vietnam, India, and the Philippines, among other locations.

12      9.      NH is a bank incorporated under the laws of the Republic of Korea with

13  its principal place of business located at 120 Tongil-ro, Chungjeongno-1 ga, Jung-gu,

14  Seoul, Republic of Korea.  NH was established in 1961 under the Korean Agricultural

15  Cooperatives Federation Act for the purpose of providing financial services to the

16  agricultural sector.  Today, its main businesses include lending to farmers and

17  agricultural cooperatives, taking deposits, and issuing marketable securities and bonds,

18  among others.  NH has branch offices in New York, Beijing, Vietnam, India and

19  Myanmar, performing sales activities and providing credit services locally.

20      10.      KEB Hana is a bank incorporated under the laws of the Republic of

21  Korea, with its principal place of business located at 35 Euljiro (Euljiro-1 ga), Joong-

22  gu, Seoul, Republic of Korea.  KEB Hana was incorporated on September 1, 2015, as a

23  result of a merger between Hana Bank and Korea Exchange Bank.  KEB Hana

24  provides lending, deposit-taking, private banking and other general banking-related

25  services in accordance with the Korean Banking Act.  KEB Hana has branch offices in

26  New York, New Jersey, London, China, Hong Kong, and Japan, among other

27  locations.

28

Gibson, Dunn &
Crutcher LLP

11.     KB is a bank incorporated under the laws of the Republic of Korea with its principal place of business located at 84 Namdaemun-ro (Euljiro-2 ga), Joong-gu, Seoul, Republic of Korea.  KB provides lending, deposit-taking, cash management, private banking, and fund management services (including trust and pension management), among other banking services, to retail, small business, and corporate clients in accordance with the Korean Banking Act.

12.     KB operates outside of the Republic of Korea through overseas branches in New York, Tokyo, Oakland, California, Ho Chi Minh City and Hong Kong, among others, and local subsidiaries, including KB Kookmin International Limited (based in London), KB Kookmin Bank Cambodia PLC, KB Kookmin Bank China Limited, and KB Microfinance Myanmar Co., Ltd.  KB also manages securitized assets such as loans through special purposes entities ("SPE"), has investments in private equity funds, and manages and invests in trust funds.

**Defendants**

13.     Defendant ASI Corporation ("ASI Corp.") is or was a Delaware corporation.  Defendant ASI Computer Technologies, Inc. ("ASI Computer") is a California corporation.  The Banks are informed and believe and on that basis allege that ASI Corp. is or was an affiliate of ASI Computer; that ASI Corp. purports to have been merged into ASI Computer; but that at all relevant times, and continuing through the date of filing this Complaint, the defendants continued to use the ASI Corp. name and entity for some purposes.  Each of ASI Corp. and ASI Computer maintains a place of business at its regional office located at 19850 E. Business Parkway in Walnut, California.  In communications with third persons, ASI Corp. and ASI Computer frequently do not distinguish between themselves, and treat their officers, directors, employees, and agents as affiliated interchangeably with either or both entities.  ASI Corp. and ASI Computer share an email domain, @asipartner.com.  Unless otherwise specified, ASI Corp. and ASI Computer are collectively referred to in this Complaint as "ASI."  Founded in 1987, ASI is a wholesale distributor of computer software,

hardware, and accessories that has over 500 employees and operates in four different countries, including through 13 sales and warehouse locations in the U.S. and Canada. The Banks are informed and believe and on that basis allege that ASI supports over 7,000 customers and generates over $1.2 billion in annual revenue.

14.     The Banks are informed and believe and on that basis allege that at all relevant times defendant Bill Chen was an officer, to wit, Chief Financial Officer and/or Vice President of Finance of ASI, and a citizen and resident of California.

15.     The Banks are informed and believe and on that basis allege that at all relevant times defendant Henry Chen a/k/a Hung Chen is or was an officer, to wit, Vice President of Business Development and/or Vice President of Sales of ASI, and a citizen and resident of California.

16.     The Banks are informed and believe and on that basis allege that at all relevant times defendant Frances Chou a/k/a Mei Ling Chou a/k/a Frances Meiling Chou was a director and agent of ASI, authorized to act on behalf of ASI, including entering into contracts and transactions on their behalf, and a citizen and resident of California.

17.     The Banks are informed and believe and on that basis allege that at all relevant times defendant Christine Liang a/k/a Christine Li-Yin Liang a/k/a Li Yin Chu was an officer, to wit, Chief Executive Officer and/or President of ASI, and a citizen and resident of California.  The Banks are informed and believe and on that basis allege that at all relevant times, defendant Christine Liang controlled the activities of ASI central to this Second Amended Complaint (Bill Chen, Henry Chen, Frances Chou, and Christine Liang are referred to collectively as the "Individual Defendants.").

18.     Defendant Newegg, Inc. is a Delaware corporation and a California-based e-tailer founded by Fred Chang in 2000.  Newegg, Inc. owns and operates the website "Newegg.com," which is the second largest online-only retailer in the United States, and the leading tech-focused e-tailer in North America, with reported revenues of $2.6

billion in 2016.  Newegg, Inc.'s headquarters are located at 17560 Rowland Street, in City of Industry, California, and at all relevant times, it maintained a place of business at offices located at 16839 Gale Avenue, in City of Industry, California, and 9997 Rose Hills Road, in Whittier, California.  Newegg, Inc. has more than 1,000 employees.

19.     Newegg.com—Newegg, Inc.'s consumer-facing website—sells primarily consumer electronics, smart home, and gaming products, and has more than 36 million registered users in the United States, Canada, and China.

20.     As explained below, at all relevant times, the Banks reasonably understood—as Newegg, Inc. and Moneual intended them to—that Moneual was ultimately transacting with Newegg, Inc., the California-based corporation that owns and operates the California-based e-tailer Newegg.com, and on that basis, purchased trade receivables from Moneual.  The Banks were led to believe, and therefore allege, that at all relevant times, in furtherance of the fraudulent scheme, Defendants' references to Newegg.com were actually references to Newegg, Inc., as the website has no separate legal existence apart from the company that owns and controls it, Newegg, Inc.  Indeed, if a visitor to Newegg.com clicks on the website's "About Us" link, the user is directed to information about Newegg, Inc.—namely, "Newegg, Inc. is the leading tech-focused e-retailer in North America. . ."  Thus, for purposes of this action, Newegg, Inc. and Newegg.com are one and the same, and all references to "Newegg.com" mean and include Newegg, Inc.

21.     Defendant Magnell is a wholly owned subsidiary of Newegg, Inc., founded by Fred Chang in 1990 (before he founded Newegg, Inc.).  Magnell is a California corporation that is registered to do business as both "Newegg.com" and ABS Computer Technologies.  According to its website, www.abs.com, Magnell builds highly regarded computers, which are then sold exclusively on Newegg.com.

22.     Like Newegg, Inc., Magnell's headquarters also are located at 17560 Rowland Street, in City of Industry, California, and at all relevant times, it also maintained a place of business at offices located at 16839 Gale Avenue, in City of

Industry, and 9997 Rose Hills Road, in Whittier, California.  The Banks are informed and believe, and on that basis allege, that Magnell's annual sales exceed $2.2 billion.

23.     Through the fraudulent transactions described below, the Banks were intentionally and fraudulently led to believe that (a) Moneual was doing business with the California-based e-tailer, Newegg.com, the owner and operator of which they understood to be Newegg, Inc.; (b) the ultimate responsibility for paying the receivables due on the Moneual-Newegg transactions was Newegg, Inc.; (c) the payments the Banks were receiving were ultimately coming from Newegg, Inc., which owns and operates Newegg.com; and (d) Newegg, Inc. was merely acting through its Hong Kong subsidiary, Newegg Trading Limited, with respect to the purchase orders and purported physical delivery of the goods.

24.     Nevertheless, the Banks have also named Magnell as a Defendant in this action because Magnell is registered to do business as Newegg.com, and because there are other indicia that Newegg.com may act through Magnell in some respects (even though the ultimate control and responsibility for Newegg.com still resides at all times with the parent, Newegg, Inc.).  Further, because both Newegg, Inc. and Magnell are based at the same address and offices in California, and share a founder, other employees, and directors, the Banks cannot without discovery discern precisely what Magnell's role was, if any, in the scheme described below involving Newegg.com.  Thus, the Banks name Magnell as a Defendant to the extent that it took actions under the name Newegg.com, at the behest of Newegg, Inc., in furtherance of the fraudulent scheme.

25.     The true names and/or capacities, whether individual, corporate, associate or otherwise, of Defendants Doe 1 through 10, inclusive, are unknown to the Banks who therefore sue said defendants by such fictitious names.  The Banks are informed and believe and on that basis allege that Defendants Doe 1 through 10, inclusive, are responsible in some manner for the acts and/or omissions to act alleged in this complaint, and proximately caused the injuries and damages to the Banks alleged

Gibson, Dunn &
Crutcher LLP

SECOND AMENDED COMPLAINT

herein.  The Banks will seek leave of court to amend this complaint as the true names and capacities of Defendants Doe 1 through 10, inclusive, are ascertained.  The Banks will amend this complaint to set forth the true names and capacities of these defendants when ascertained and as necessary.

**Other Relevant Entities/Persons**

26.   Moneual was a prominent Korean manufacturer of computers and home appliances, including robot vacuum cleaners and various types of personal computers. ASI and Newegg both purchased, or purported to purchase, products from Moneual.

27.   HS Park was the Chief Executive Officer of Moneual until his arrest and conviction for masterminding the massive fraud that is the subject of this lawsuit. HS Park is currently serving a 15-year prison sentence in Korea for that conviction.

28.   Newegg Trading Limited is a Hong Kong corporation incorporated in Hong Kong on December 3, 2010.  Its registered office is located at Unit 1001, 10/F., Infinitus Plaza, 199 Des Voeux Road Central, Hong Kong.  Newegg Trading Limited is a subsidiary and affiliate of Newegg, Inc.  It is wholly-owned by Newegg Greater China (Hong Kong) Company Limited, which is in turn wholly-owned by Newegg Enterprises LLC.  Newegg Enterprises LLC's registered address is 17560 Rowland Street, in City of Industry, California, the same address as Newegg, Inc. and Magnell's headquarters.  Further, a sales agreement executed by Newegg.com—which is owned and operated by Newegg, Inc.—in furtherance of the fraudulent scheme refers to Newegg Trading Limited as a subsidiary of Newegg.com, and two guaranties (the "Guaranties") issued by Newegg, Inc. guaranteeing payment on behalf of Newegg Trading Limited in furtherance of the fraudulent scheme refer to Newegg Trading Limited as a "subsidiary and an affiliate of Newegg, Inc."

29.   At all relevant times, Newegg, Inc., Magnell, and Newegg Trading Limited were agents, partners, representatives, affiliates, alter egos and/or co-conspirators of each other and each was acting within the scope of such agency, partnership, representation, affiliation, or conspiracy in undertaking the actions alleged

herein.  Newegg, Inc. had full knowledge of, gave substantial assistance to, directed, authorized, consented to, and ratified the alleged misconduct, and is therefore legally responsible for Magnell's and Newegg Trading Limited's acts and omissions as well as its own.

30.    At all relevant times, Newegg, Inc. dominated, influenced, and controlled Magnell and Newegg Trading Limited, creating a unity of interest and ownership among these entities such that their separate corporate existences ceased to exist with respect to the actions alleged herein.

31.    Newegg, Inc., Magnell, and Newegg Trading Limited share identical equitable ownership, as Magnell and Newegg Trading Limited are wholly-owned subsidiaries of Newegg, Inc.

32.    At all relevant times, Newegg, Inc., Magnell, and Newegg Trading Limited shared employees and directors, including, but not limited to, the very employees and directors that took actions in furtherance of the scheme to defraud the Banks.  Specifically:

    a. Fred Chang founded Newegg, Inc. and Magnell.  At all relevant times, Fred Chang was the Chief Executive Officer and Chairman of Newegg, Inc., the Personnel Manager of Magnell, and one of two directors of Newegg Trading Limited.  Fred Chang signed the Guaranties on behalf of Newegg, Inc. and a sales agreement (the "Chang Sales Agreement") on behalf of Newegg.com—which referred to Newegg, Inc., the entity that owns and operates the website and does business as Newegg.com—that enabled Moneual to procure trade financing from NH, KEB Hana, and KB.

    b. At all relevant times, Edison Chih was Fred Chang's special assistant, as well as the Chief Operating Officer and the Director of Corporate Planning at Newegg, Inc., and the Chief Operating Officer at Newegg Trading Limited.  Edison Chih signed the

purchase orders issued on behalf of Newegg.com—which referred to Newegg, Inc., the entity that owns and operates the website and does business as Newegg.com—that enabled Moneual to procure trade financing from NH, KEB Hana, and KB, and signed a sales agreement on behalf of Newegg.com (the "Chih Sales Agreement" and with the Chang Sales Agreement, the "Sales Agreements") in furtherance of the same objective.  He also signed "Standing Payment Instructions" ("SPIs") through which Moneual assigned to NH, KEB Hana, and KB the receivables from Newegg, Inc., acting through Newegg Trading Limited.  As such, Edison Chih, again, the COO of both Newegg, Inc. and Newegg Trading Limited, controlled Newegg Trading Limited's day-to-day operations with respect to the fraudulent scheme.

    c.  Nicole Lee is the President of Newegg Greater China (Hong Kong) Company Limited.  In this role, her job duties include management and oversight of Newegg Trading Limited's finances.  She is also the Chief Human Resources Officer of Newegg, Inc.

    d.  Newegg Trading Limited's only other director is Yueh Pai Chang.  Yueh Pai (a.k.a. "Robert") Chang is Newegg, Inc.'s Chief Financial Officer.

33.    At all relevant times, Newegg, Inc.—which owns, operates and acted through Newegg.com—held itself out as liable for Newegg Trading Limited's debts in the Guaranties, Sales Agreements, purchase orders and insurance policies.

34.    As explained throughout this complaint, Newegg, Inc. used Newegg Trading Limited as a mere shell or conduit for its affairs in conducting the fraudulent scheme, and the two entities acted as a single enterprise rather than as two distinct entities in seeking to defraud the Banks.

35.     Because Newegg, Inc. and Newegg Trading Limited acted as a single enterprise in perpetuating the fraud against the Banks, the failure to disregard their separate identities would necessarily result in fraud or injustice.

36.     At all relevant times, Newegg Trading Limited acted as Newegg, Inc.'s agent, and Newegg, Inc. controlled, directed and authorized Newegg Trading Limited's actions alleged herein.  In undertaking the misconduct alleged, Newegg Trading Limited was acting within the scope of its authority on behalf of Newegg, Inc.

37.     For example, and as described more thoroughly below:

   a. Newegg, Inc. executed two Guaranties guaranteeing payment for up to $70 million of Newegg Trading Limited's purchase orders, collectively.

   b. Newegg.com—which is owned and operated by Newegg, Inc., and thus necessarily referred to Newegg, Inc.— later entered into two Sales Agreements with Moneual through which it guaranteed the purchase of $650 million worth of Moneual's products.  These Sales Agreements explicitly stated that Newegg.com, described in the Sales Agreements as a "California-based e-tailer," was the ultimate "Customer" of Moneual's products, but that its subsidiaries could issue the purchase orders.  The Chang Sales Agreement specifically stated that although Newegg Trading Limited would issue the purchase orders and make payments, Newegg.com—again, owned and operated by Newegg, Inc., and thus necessarily referring to Newegg, Inc.—would guarantee the purchases and take full financial responsibility for any issues arising from Newegg Trading Limited's actions.

   c. The outstanding fraudulent purchase orders that allowed Moneual to secure trade financing from NH, KEB Hana, and KB stated explicitly that Newegg Trading Limited was issuing the purchase

Gibson, Dunn &
Crutcher LLP

12

1   orders on behalf of Newegg.com—again, owned and operated by

2   Newegg, Inc., and thus necessarily referring to Newegg, Inc.—on

3   the basis of certain sales agreements.

4       d.  Initially, the insurance policies that the Banks purchased to insure

5   the Newegg-Moneual transactions named Newegg Trading Limited

6   as the importer, but explicitly named "Newegg Inc (Newegg Com)"

7   as the guarantor of payment for the Newegg Trading Limited

8   purchase orders, and listed the United States as the country of the

9   guarantor of payment.  Later, when the credit limits increased, the

10   insurance policies insuring the Newegg-Moneual transactions

11   named "Newegg Inc (Newegg Com)," instead of Newegg Trading

12   Limited, as Moneual's importer, and listed the United States as the

13   "Country of Payor."  Some of these insurance policies explicitly

14   stated that Newegg Trading Limited was Newegg, Inc.'s agent, and

15   included a special term extending coverage to the Banks' purchase

16   of trade receivables for purchase orders issued by Newegg Trading

17   Limited, as Newegg, Inc.'s agent, based on Sales Agreements

18   between Moneual as the exporter and Newegg, Inc. as the importer.

19   **<u>JURISDICTION AND VENUE</u>**

20       38.    The Banks invoke this Court's jurisdiction under 28 U.S.C. § 1332(a)(4).

21   The Banks are agencies or instrumentalities of the Republic of Korea or incorporated

22   under the laws of the Republic of Korea, a foreign state, and defendants are citizens of

23   Delaware, California and Hong Kong.  Complete diversity of citizenship therefore

24   exists between the parties.  The amount in controversy in this action exceeds $75,000

25   exclusive of interest and costs.

26       39.    Venue is proper in this District pursuant to 28 U.S.C. § 1441(b)(1).  Each

27   Individual Defendant is or was a resident of California and the corporate defendants

28

Gibson, Dunn &
Crutcher LLP

SECOND AMENDED COMPLAINT

1  maintain a place of business in Walnut, California, and City of Industry, California,

2  within this District and subject to the personal jurisdiction of this Court.

3  ### FACTUAL ALLEGATIONS

4  **Moneual Establishes Itself as a Prosperous and Fast-Growing Venture Company**

5  40.     In or about August 2007, HS Park acquired Dign Lab Co., Ltd. ("Dign"),

6  a privately held company that manufactured and sold robotic vacuum cleaners and

7  other home appliances.  HS Park had been involved in Dign's management since

8  approximately 2005.  After acquiring Dign, HS Park assumed the role of Chief

9  Executive Officer, and on November 27, 2007, he changed the name of the company to

10 Moneual.  Moneual sold TVs, PCs, netbook computers, and robotic vacuum cleaners.

11 41.     Until its demise, Moneual was publicly perceived in Korea as a successful

12 company on a rapid growth trajectory.  For example, Moneual participated in a highly

13 successful national sales campaign by Lotte Mart, one of Korea's leading retailers,

14 called "Tong Keun" ("magnanimous").  Moneual entered into an agreement to supply

15 Lotte Mart with netbook computers—small, relatively less powerful laptops that are

16 used mainly for web surfing—for Lotte Mart's "Tong Keun Netbook" campaign in

17 2010.

18 42.     The "Tong Keun TV" campaign in 2011 proved even more popular.

19 Moneual's strategy was to incorporate average to high quality LED screens inside

20 basic frames made of plastic.  This made its production costs significantly lower than

21 those of other, better known TV brands that used modern designs and more expensive

22 materials.  People waited in line for hours outside retailers to purchase the TVs and the

23 promotion generated widespread media attention.  Moneual also won the Microsoft

24 Innovation Award at the prestigious Consumer Electronics Show in Las Vegas for

25 three consecutive years from 2007 to 2009.  Such achievements, the success of the

26 "Tong Keun" campaigns, and widespread media exposure through prime time TV

27 commercials and the news, quickly earned Moneual major name recognition in Korea.

28

Gibson, Dunn &
Crutcher LLP

As a result, third persons reasonably believed that Moneual was a legitimate and successful business enterprise.

**Moneual Requests Financial Assistance from the Banks**

43.    Between 2006 and 2014, Moneual requested that each of the Banks "factor" Moneual's open account export trade receivables, including, among others, receivables due from ASI and Newegg, Inc., issued and paid on Newegg, Inc.'s behalf through its subsidiary, Newegg Trading Limited.  Moneual claimed that it needed financing because all of its sales were credit transactions and, as a result, it did not have enough liquidity to sustain its rapidly increasing production demands.

44.    Factoring is a form of lending under which a lender purchases a business's trade receivables at a discount to their face value, advancing money to the business and collecting the receivable from the business's customer at its maturity. Factoring is a recognized method of enhancing a business's cash flow by enabling the business to receive payment for its customer orders immediately or shortly after shipment of goods, before the customer would be required to pay for the goods under its agreed trade terms with the seller.  The customer pays the factor directly when the invoice comes due.

45.    The Banks used an "open account" (widely known as "O/A") method of factoring to finance the trades between Moneual and ASI.  The O/A method of factoring is akin to a bank credit or overdraft facility where the lender provides financing for the exporter's shipment of goods within a certain credit limit during a certain period of time.  Under the O/A method of factoring, copies of transaction documents satisfy the documentary requirements necessary to extend financing to the exporter, as opposed to the "documents against acceptance" (widely known as "D/A") method of factoring, which generally requires the lender to collect original documents. Under the O/A method, either the customer or the business that took out the loan can pay the bank when the invoice comes due.  The O/A method of factoring is widely used by businesses for both domestic and international sales.

46.     Many of the trade receivables Moneual sold to the Banks were secured by export finance facility ("EFF") insurance from the Korean Trade Insurance Corporation ("KSURE"), South Korea's official trade insurance agency.  KSURE is a corporation under the Korean Ministry of Trade, Industry and Energy whose functions include the operation of trade insurance programs relating to the export and import of goods, and the provision of credit-related services including credit research and credit information management for Korean enterprises.

47.     Moneual applied to KSURE for EFF insurance to insure its transactions with particular customers.  Before agreeing to extend trade insurance credit lines to Moneual for its ASI and Newegg export receivables, KSURE conducted due diligence on Moneual, ASI, Newegg, Inc., and Newegg Trading Limited, which included conducting credit investigations on each of these entities, and preparing credit certifications of each of their business histories.

48.     After obtaining the EFF insurance credit lines from KSURE, HS Park would approach the Banks to request that they factor Moneual's trade receivables from ASI and Newegg Trading Limited, acting on behalf of Newegg, Inc., up to the insurance credit limits.

**Defendants Participate in the Fraudulent Scheme**

**ASI**

49.     The Banks are informed and believe and on that basis allege that at some point between 2006 and 2010, and continuing until the scheme was uncovered in late 2014, ASI issued fraudulent purchase orders for the purported purchase of home theater personal computers ("HTPCs") and other goods manufactured by Moneual so that Moneual could obtain loans from the Banks and other financial institutions by selling the export receivables backed by the fraudulent purchase orders.  In return, ASI and the Individual Defendants received a percentage of the total amount of the funds Moneual obtained through selling the export receivables based on the fraudulent purchase orders to the Banks.

50.     ASI's purchase orders stated the date, the order number, the description and item number of the items requested, the quantity ordered, the per unit cost of the items, the total cost per order, the designated delivery address, ASI's bank information and address, and the payment terms.  According to the purchase orders, payment was due between 150 and 180 days from the bill of lading date.  Defendant Frances Chou, identified in the purchase orders as a Director of ASI, signed all of the purchase orders.

51.     The invoices that Moneual issued to ASI listed Moneual as the seller and ASI or ASI Computer Technologies (HK) Limited ("ASI (HK)") as the consignee. The Banks are informed and believe and on that basis allege that ASI (HK) is an affiliate of ASI.  The invoices also stated the date, the corresponding purchase order number, the item number, a description of the item, the quantity ordered, the per unit cost, and the total amount invoiced.  HS Park, identified in the invoices as the CEO of Moneual, signed the invoices.  Moneual purported to charge ASI  $2,980 per HTPC unit, as stated on the invoices and purchase orders from ASI upon which the Banks advanced funds to Moneual.

52.     ASI also issued confirmation letters to Moneual declaring that it had received the ordered products.  Initially, Moneual did transfer the HTPCs to ASI. However, the Banks are informed and believe and on that basis allege that beginning in 2013, and possibly as early as 2011, no actual physical transfer occurred—the transfer of ownership took place on paper only.  ASI continued to issue confirmation letters to Moneual declaring that it had received the ordered products even after Moneual stopped shipping the HTPCs to ASI.  Frances Chou, identified as a Director of ASI in the confirmation letters, signed the confirmation letters.  Moneual transmitted these confirmation letters to the Banks.

53.     For each set of export receivables Moneual sought to sell to the Banks, Moneual would send ASI "Standing Payment Instructions" ("SPI") informing ASI that Moneual had designated the specified Bank as its "payee and assignee" for certain "sales contracts"—identified by purchase order numbers—and instructing them to pay

such Bank directly when payment on its invoices came due.  HS Park, Moneual's CEO, signed the SPIs, and Defendant Frances Chou, identified in the SPIs as a Director of ASI, counter-signed the SPIs on behalf of ASI.

54.     In accordance with the SPIs ASI had consented to and acknowledged, the Banks received payment for all purchased export receivables from ASI or from ASI (HK) payable before September 2014 at or near the time that payment became due.

55.     The Banks are informed and believe and on that basis allege that Defendant Bill Chen, ASI's CFO, personally approved all of ASI's Moneual-related payments.

56.     The Banks are informed and believe and on that basis allege that Defendant Henry Chen, ASI's Vice President of Sales, and Defendant Frances Chou, a director and agent of ASI, resolved any discrepancies between ASI's purchase orders and Moneual's corresponding invoices that arose during the course of the fraudulent scheme.

57.     On or about November 1, 2013, Moneual entered into an OEM Supply Agreement (the "Supply Agreement") with ASI.  Under the Supply Agreement, ASI was to be the exclusive importer and distributor of Moneual products within the United States, Canada, Latin America, China and Hong Kong.  Payment for orders was due on a net 180 days basis.  In the Supply Agreement, ASI guaranteed to purchase $300 million of Moneual products within two years—$50 million in 2012 and $250 million in 2013.  The Supply Agreement is governed by California law.

58.     Frances Chou, identified as a Director of ASI, executed the Supply Agreement on behalf of ASI, and Charlie Shin, identified as the VP of Moneual, executed the Supply Agreement on behalf of Moneual.  The Supply Agreement stated that the parties executing the agreement had the requisite authority to do so.  After it was executed, Moneual transmitted the Supply Agreement to the relevant Bank branches.

**Newegg, Inc.**

Gibson, Dunn & Crutcher LLP

SECOND AMENDED COMPLAINT

59.     Beginning in 2012 and continuing until the scheme was uncovered in late 2014, Newegg, Inc., acting through its subsidiary, Newegg Trading Limited—which Newegg, Inc. directed and controlled at all relevant times—issued fraudulent purchase orders for the purported purchase of HTPCs and other goods manufactured by Moneual so that Moneual could obtain loans from the Banks and other financial institutions by selling the export receivables backed by the fraudulent purchase orders. In return, Newegg Trading Limited, and ultimately Newegg, Inc., received a percentage of the total amount of the funds Moneual obtained through selling the export receivables based on the fraudulent purchase orders to the Banks.

60.     According to an investigation conducted by the Korean Customs Service that ultimately led to HS Park's prosecution, no goods were physically transferred in connection with any of the transactions entered into between Moneual and Newegg Trading Limited, which was acting on behalf of Newegg, Inc.; these transactions took place on paper only.

61.     In the course of the Korean Customs Service investigation, HS Park stated that in or around 2012, Defendant Frances Chou introduced him to Edison Chih, the COO of Newegg, Inc. and Newegg Trading Limited.  According to HS Park, Mr. Chih explained that Newegg, Inc. was preparing for an initial public offering, but that it needed to demonstrate increased sales to make that happen.  Thus, Mr. Chih asked if Newegg, Inc. could participate in the fraudulent scheme in order to boost its sales records and revenue figures.  Mr. Chih stated that Newegg, Inc. would not take a large commission and would place orders with Moneual in large quantities.

62.     Shi-Young Park ("SY Park"), a Moneual employee, and Chul-Wook Shin ("CW Shin"), Moneual's former Vice President, corroborated Mr. Park's statement. CW Shin also stated that HS Park assigned the Newegg.com relationship to him, and that he understood that Moneual was transacting with the second largest online retailer in the United States.

63.     Although Newegg, Inc. directed and authorized the Moneual transactions, it used Hong-Kong based Newegg Trading Limited to execute the transactions because Moneual had a manufacturing contractor in Hong Kong that purportedly manufactured its HTPCs.  This made carrying out the fraudulent scheme without any actual movement of goods easier to accomplish.  Purporting to deliver the HTPCs from Moneual's own Hong Kong-based manufacturing plant to Newegg, Inc.'s subsidiary in Hong Kong, Newegg Trading Limited, allowed Moneual to sell export receivables without actually having to transfer or purport to transfer any goods overseas.  In connection with these Hong Kong to Hong Kong deliveries, Moneual issued or procured fraudulent trucking invoices and warehouse receipts that it provided to the Banks with its applications to sell export receivables to serve as confirmation of delivery.

64.     However, Moneual could not secure EFF insurance for its transactions with Newegg Trading Limited without a guaranty from Newegg, Inc., as Newegg Trading Limited did not have a high enough credit rating.  Thus, on or about August 25, 2012, Newegg, Inc., which had a much higher credit rating, agreed to guarantee Newegg Trading Limited's export receivables, and executed a guaranty (the "August 2012 Guaranty") to that effect.  Under the August 2012 Guaranty, Newegg, Inc. "unconditionally and irrevocably" guaranteed payment of up to $20 million to Moneual and its successors and assigns on behalf of Newegg Trading Limited.  Fred Chang, the founder, Chairman, and CEO of Newegg, Inc., signed the guaranty on behalf of Newegg, Inc.  Moneual transmitted the August 2012 Guaranty from Newegg, Inc. to KSURE, and on the basis of this Guaranty, KSURE extended Moneual an insurance credit line for the Newegg Trading Limited trade receivables.

65.     On or about January 17, 2013, Newegg, Inc. executed another guaranty (the "January 2013 Guaranty") through which it "unconditionally and irrevocably" guaranteed payment of up to $50 million to Moneual and its successors and assigns on behalf of Newegg Trading Limited.  Fred Chang, the founder, Chairman, and CEO of

Newegg, Inc., signed the January 2013 Guaranty on behalf of Newegg, Inc.  Newegg, Inc. executed the January 2013 Guaranty so that Moneual could procure EFF insurance with a higher credit limit for the Newegg Trading Limited export receivables, and Moneual transmitted this Guaranty to KSURE.

66.     Both Guaranties state that for all purposes, the Guaranties are deemed to have been made in California, and are governed by California law.  They also state that Moneual, Newegg, Inc., and Newegg Trading Limited consent to the venue and jurisdiction of courts in Los Angeles County, California.

67.     Because Moneual could not have obtained EFF insurance from KSURE or trade financing from the Banks for its transactions with Newegg Trading Limited without the Guaranties from Newegg, Inc., Newegg, Inc. was central to Moneual's ability to carry out the fraudulent scheme using Newegg Trading Limited's export receivables.

68.     Later in 2013, Moneual sought to increase the KSURE coverage limit for its Newegg Trading Limited export receivables significantly so that it could increase the volume of transactions and secure additional financing from the Banks.  But again, because Newegg.com had a much higher credit rating than Newegg Trading Limited, Moneual could obtain the increased coverage limit only if the covered importer for the Moneual transactions was Newegg, Inc. (which owned and operated Newegg.com), rather than Newegg Trading Limited.

69.     To that end, Newegg, Inc., acting under the name Newegg.com, entered into two Sales Agreements with Moneual on or about November 27, 2013, under which it agreed to market, promote and sell Moneual's products in the United States, Canada and China.  Both Sales Agreements identify *Newegg.com*—not Newegg Trading Limited—as Moneual's "Customer," and describe Newegg.com as "a California-based corporation" and "an E-tailer offering a broad selection of products and services."  The Sales Agreements state that Newegg.com "desires to purchase the products for resale."  Both Sales Agreements are governed by California law, and state

that Newegg.com has the power and authority to enter into the Sales Agreements and to fully perform its obligations.

70.    The Chih Sales Agreement was executed on behalf of Newegg.com—which again, is owned and operated by Newegg, Inc., and thus necessarily refers to Newegg, Inc.—by Edison Chih, the COO of Newegg, Inc. and Newegg Trading Limited, and by Charlie Shin, the VP of Moneual, on behalf of Moneual.  The Chang Sales Agreement was executed on behalf of Newegg.com by Fred Chang—the founder, CEO, and Chairman of Newegg, Inc., which owns and operates Newegg.com—and by HS Park, the CEO of Moneual, on behalf of Moneual.

71.    Under the Chih Sales Agreement, Newegg.com—which is owned and operated by Newegg, Inc., and thus necessarily refers to Newegg, Inc.—agreed to guarantee the total purchase amount of $50 million of Moneual products by the end of the first year and $200 million within the second.  Under the Chang Sales Agreement, Newegg.com—again, owned and operated by Newegg, Inc.—agreed to guarantee the total purchase amount of $100 million of Moneual products by the end of the first year and $300 million within the second.  Payment for orders was due on a net 180 days basis.

72.    To permit Newegg Trading Limited to continue to carry out the transactions on Newegg, Inc.'s behalf—even though Newegg, Inc., acting under the name of its website, Newegg.com, was the contracting party with Moneual and the party that guaranteed to purchase significant amounts of Moneual's goods—both Sales Agreements state: "Each customer purchasing entity (including any affiliate, subsidiary or division) may elect to purchase Products under this Agreement[.]"  But the Sales Agreements also state that all purchase orders submitted to Moneual are to be governed by the terms of the Moneual-Newegg.com Sales Agreements.

73.    Further, the Chang Sales Agreement explicitly states that Newegg.com's purchase orders "shall be issued, handled, and paid by subsidiary from Hong Kong (NEWEGG TRADING LIMITED)," but that the California-based e-tailer

Gibson, Dunn & Crutcher LLP

1   Newegg.com—which necessarily referred to its owner and operator, Newegg, Inc.—

2   would "guarantee the total amount of purchase from the subsidiary in Hong Kong and

3   be fully responsible for any financial issues arising by the subsidiary."

4        74.    Moneual transmitted the Chang Sales Agreement to KEB Hana, and

5   transmitted the Chih Sales Agreement to NH and KB.

6        75.    All of the KSURE EFF insurance policies purchased by and issued to the

7   Banks after Moneual entered into the Sales Agreements with Newegg.com state that

8   the insured importer is "Newegg Inc (Newegg Com)" and that Newegg, Inc.'s

9   representative is Fred Chang or James Wu.  James Wu is the former Chief

10  Administrative Officer of Newegg, Inc., and the current Chief Technology Officer and

11  COO of Newegg, Inc.  The insurance policies list the "Importer Address" as 16839

12  Gale Avenue, in City of Industry, California, one of Newegg, Inc.'s office addresses,

13  and state that the United States is the "Country of Payor."  Further, some of these

14  insurance policies state explicitly that Newegg Trading Limited is Newegg, Inc.'s

15  agent and representative, and that the policy covers the purchase of trade receivables

16  based on purchase orders issued by the agent—Newegg Trading Limited—and arising

17  out of the "Sales Agreement" between the exporter, Moneual, and the importer,

18  Newegg, Inc.  These insurance policies also required that the Newegg Trading Limited

19  purchase orders contain the clause, "on behalf of NEWEGG.COM on the basis of

20  Sales Agreement between Moneual Inc. and NEWEGG.COM on Nov 27, 2013."

21       76.    Absent the Sales Agreements, pursuant to which Newegg.com—which is

22  owned and operated by Newegg, Inc., and thus necessarily referred to Newegg, Inc.—

23  guaranteed to purchase a significant amount of goods from Moneual, Moneual would

24  not have been able to secure higher insurance credit limits.  Without higher insurance

25  credit limits, Moneual would not have been able to continue the fraudulent scheme, as

26  the Banks relied on, among other things, the fact that KSURE had extended insurance

27  lines to cover Moneual's transactions with Newegg, Inc. in agreeing to continue to

28  factor these export receivables.

Gibson, Dunn &
Crutcher LLP

77.     As instructed by the insurance policies, after Moneual and Newegg.com entered into the Sales Agreements, the Newegg Trading Limited purchase orders submitted to Moneual (and then transmitted to the Banks) stated explicitly that they were issued on behalf of Newegg.com on the basis of sales agreements between Moneual and Newegg.com.

78.     At all relevant times, the Newegg Trading Limited purchase orders submitted to Moneual (and then transmitted to the Banks) contained the Newegg.com logo, which was intended to, and did, give the Banks further assurance and comfort that they were ultimately dealing with the California-based e-tailer, not simply its Hong Kong subsidiary.  The purchase orders also referenced Newegg.com's Standard PO Terms and Conditions and its Vendor Code of Conduct.  Further, the purchase orders stated that Newegg.com—which, again, is owned and operated by Newegg, Inc., and thus necessarily referred to Newegg, Inc.—would issue payments for goods and/or services according to the prices and payment terms in the purchase orders.

79.     The purchase orders also stated the date, the order number, the description of the items requested, the quantity ordered, the per unit cost of the items, the total cost per order, the designated delivery address, and the payment terms.  According to the purchase orders, the payment was due on a net 150 or 180 days basis.  Edison Chih, Newegg, Inc. and Newegg Trading Limited's COO, approved and signed the purchase orders.

80.     The invoices that Moneual issued to Newegg Trading Limited listed Moneual as the seller and Newegg Trading Limited or Advance Global Group Pte Ltd. of Hong Kong ("Advance Global") as the consignee of the goods.  The Banks are informed and believe and on that basis allege that Advance Global is a paper company that never actually existed.  The invoices also stated the date, the invoice number and corresponding purchase order number, the item number, a description of the item, the quantity ordered, the per unit cost, and the total amount invoiced.  HS Park, identified in the invoices as the CEO of Moneual, signed the invoices.  Moneual purported to

charge Newegg Trading Limited between $2,530 and $2,980 per HTPC unit, and those amounts were stated on the invoices and purchase orders from Newegg Trading Limited upon which the Banks advanced funds to Moneual.

81.     For each set of export receivables Moneual sought to sell to the Banks, Moneual would send Newegg, Inc.'s agent and representative, Newegg Trading Limited, SPIs informing it that Moneual had designated the specified Bank as its "payee and assignee" for certain "sales contracts"—identified by purchase order numbers—and instructing Newegg, Inc., through Newegg Trading Limited, to pay such Bank directly when payment on its invoices came due.  HS Park, Moneual's CEO, signed the SPIs, and Edison Chih, the COO of Newegg, Inc. and Newegg Trading Limited, counter-signed the SPIs.

82.     In accordance with the SPIs Edison Chih had consented to and acknowledged, the Banks received payment for all purchased export receivables from Newegg, Inc.—acting through Newegg Trading Limited—payable before September 2014 at or near the time that payment became due.  The wire transfers for these payments involved U.S. banks.

83.     The successful consummation of some export finance transactions with ASI and Newegg, Inc. (acting through Newegg Trading Limited), coupled with the fact that KSURE had insured many of the transactions, gave the Banks comfort as to Moneual's bona fides and credit worthiness, and induced the Banks to enter into additional export finance transactions with Moneual.

84.     In reality, however, these transactions with ASI, Newegg, Inc. (through Newegg Trading Limited as its alter ego and agent), and other importers were merely a ruse orchestrated by Moneual—with the assistance of its foreign importers, including ASI and Newegg, Inc.—to create the illusion that Moneual operated a genuine export business with legitimate customers and transactions so that the Banks would continue to finance Moneual's receivables.

**Moneual Receives Financial Assistance from the Banks**

85.     In connection with purchasing Moneual's export trade receivables from ASI, Newegg, Inc., acting through Newegg Trading Limited, and other importers, the Banks purchased EFF insurance from KSURE.

86.     In order to purchase EFF insurance from KSURE, and as part of their due diligence process, the Banks requested credit investigations of Moneual and each of its importers, including ASI, Newegg, Inc., and Newegg Trading Limited, and received a certification of each of their business histories prepared by KSURE.

87.     The ASI credit certification indicated fair credit ratings.

88.     Newegg Trading Limited's credit rating was not as high, but as explained, the initial EFF insurance policies stated that "Newegg Inc (Newegg Com)" would act as a guarantor for Newegg Trading Limited, and Newegg, Inc. had a strong credit rating.  In connection with seeking to sell its Newegg Trading Limited trade receivables, Moneual transmitted both Guaranties to KEB Hana, which began factoring Moneual's receivables due from Newegg Trading Limited in November 2012, and transmitted the January 2013 Guaranty to KB, which began factoring the receivables in October 2013.

89.     Later, as explained, when Moneual sought to increase the insurance credit limits, the EFF insurance policies the Banks purchased stated explicitly that Newegg, Inc. was the insured importer.

90.     On the strength of Newegg, Inc.'s credit, NH, KEB Hana, and KB purchased EFF insurance and agreed to finance the receivables for the Moneual-Newegg transactions, because Newegg, Inc. was acting as the guarantor, and later, as Moneual's counterparty for the transactions.

91.     The EFF insurance policies issued to the Banks also listed the documents KSURE reviewed in determining to extend insurance credit lines to Moneual for its transactions with ASI and Newegg, Inc., acting through Newegg Trading Limited. The fact that KSURE, South Korea's official trade insurance agency, also had performed due diligence on Moneual, ASI, Newegg, Inc., and Newegg Trading

Gibson, Dunn & Crutcher LLP

SECOND AMENDED COMPLAINT

Limited, and had decided to insure the receivables from these importers gave the Banks further comfort when agreeing to finance these transactions.

92.     The Banks also sent personnel to visit Moneual's offices and meet with and interview its executives, including Moneual's finance director, both before entering the factoring relationships and during the factoring relationships.  The Banks asked questions about how Moneual was using its funds, Moneual's customers, the reasons for the increase in Moneual's revenues, inventory, and loans, and Moneual's business plans.  Bank personnel met with Moneual executives on a regular basis throughout the factoring relationships.  Bank branch managers or credit analysts also visited the Hong Kong-based manufacturing contractor Moneual purportedly used to manufacture its goods.

93.     After completing their due diligence and in reliance on the information Moneual and KSURE provided them, each of the Banks entered into various export EFAs with Moneual under which Moneual agreed to transfer certain trade receivables backed by purchase orders from third parties—including ASI and Newegg, Inc., acting through Newegg Trading Limited—to the Banks in exchange for loans in varying amounts.  Under the EFAs, Moneual agreed to sell, and the Banks agreed to purchase, up to specified credit limits, Moneual's rights and benefits to receive payments from ASI and Newegg, Inc., acting through Newegg Trading Limited, for commercial invoices Moneual sent to ASI and Newegg, Inc., acting through Newegg Trading Limited, for the shipments of goods.  Many of these transactions were covered by EFF insurance.

94.     Moneual would then submit applications to sell certain export receivables due from ASI and Newegg, Inc., acting through Newegg Trading Limited, to the Banks under the EFAs.  In connection with its applications to sell the export receivables, Moneual would transmit to the Banks the purchase orders that ASI or Newegg, Inc. (through Newegg Trading Limited), had placed with Moneual, the commercial invoices Moneual had issued to ASI or Newegg, Inc., through Newegg

Trading Limited, various documents associated with shipping and representing shipping confirmation—such as bills of lading, trucking invoices, packing lists, delivery requests, and statements of transaction—and the executed SPIs acknowledging the assignment of the ASI and Newegg, Inc. (acting through Newegg Trading Limited) receivables to the Banks.

95.     Members of the relevant departments or branches of the Banks reviewed the purchase orders, commercial invoices, shipping documents and SPIs that backed the export receivables prior to approving Moneual's export receivable applications. The applications to sell the export receivables and supporting documentation were subject to between three and four levels of review and approval.  The supporting documents on their face did not give any indication of the underlying fraudulent scheme.

96.     The Banks also engaged in annual due diligence and credit reviews of Moneual's business.

97.     The details of each Bank's EFAs with Moneual and the export receivables from ASI and/or Newegg, Inc., acting through Newegg Trading Limited, that it purchased are described below.

**The Banks' Financing Agreements and Purchases of Moneual's Receivables**

   **IBK**

98.     IBK had provided trade financing for Moneual in connection with their exports to ASI since 2006, and since then, Moneual had been one of IBK's major customers.  IBK's *Guro-Dong* Branch in Guro District, Seoul made commercial loans to Moneual in connection with its receivables from ASI, and IBK's Credit Assessment Department was responsible for reviewing and approving the *Guro-Dong* Branch's trade finance business with Moneual.  The method of payment for the trades between Moneual and ASI was "open account," under which the seller ships the goods and all the necessary shipping and commercial documents directly to a buyer who agrees to pay a seller's invoice at a future date.  Pursuant to its "Non L/C-based Purchase of

Export Receivables" Program, IBK would purchase a number of trade receivables from Moneual to the extent permitted under an approved credit limit for Moneual during a set period of time on a non-recourse basis.

99.    Between 2006 and August 2009, IBK purchased Moneual's ASI export receivables on D/A payment terms, under which the buyer agrees to pay at an agreed point in time (*i.e.*, 30, 60 or 90 days from the date of bill of lading) once it receives shipping documents along with bills of exchange by its bank.  During this time period, IBK received a steady flow of payments for the export receivables from ASI and other importers that it purchased from Moneual.  These consistent payments and the fact that Moneual appeared to continually expand its export business base and increase its revenue induced IBK to approve O/A payment terms for Moneual's export receivables starting in September 2009.

100.   On July 19, 2010, IBK entered into an EFA titled "Credit Transaction Agreement (Non-LC Based Purchase of Export Receivables)" with Moneual to provide O/A financing for Moneual's exports to ASI Computer, without recourse against Moneual.  IBK and Moneual subsequently entered into new EFAs on December 16, 2011, May 11, 2012, December 26, 2012, April 30, 2014 and July 30, 2014, each on substantially the same terms, but with varying credit limits.  Under the EFAs, Moneual agreed to sell, and IBK agreed to purchase, Moneual's rights and benefits to receive payments from ASI for the commercial invoices Moneual sent to ASI for the shipments of goods, up to the approved credit limits.

101.   In connection with each set of export receivables Moneual sought to sell to IBK under the EFAs, Moneual sent ASI an SPI informing it that Moneual had assigned the right to payment for goods sold pursuant to certain identified purchase orders to IBK, and instructing ASI to pay IBK directly when payment became due. Frances Chou, identified in the SPIs as a Director of ASI, signed the SPIs in acknowledgment and consent of the assignment and payment instructions.

Gibson, Dunn & Crutcher LLP

102.   Moneual employees Sohee Kim, Gyewon Chun or Bomi Cho would hand-deliver Moneual's applications to sell export receivables pursuant to the EFAs and the documents that backed those export receivables—such as ASI's purchase orders and the corresponding Moneual invoices, shipping documents, and signed SPIs—to IBK's *Guro Dong* Branch, or send them via courier to Mr. Sueng-hyun Cho, Deputy Manager of IBK's *Guro Dong* Branch.  Moneual transmitted the purchase orders and other supporting documentation to IBK on the dates that IBK approved Moneual's applications to sell the export receivables under the EFAs.

103.   Members of IBK's *Guro Dong* Branch reviewed the purchase orders and other supporting documents that Moneual submitted with its applications prior to approving Moneual's applications to sell export receivables.  Four team members, including the deputy branch manager, reviewed and approved each of Moneual's applications.

104.   Exhibits A-1, A-2, and A-3, attached to this complaint and incorporated herein by reference, contain the ASI purchase order numbers for each export receivable that IBK purchased from Moneual, the date the purchase order was issued, the date IBK purchased the export receivable, and the date payment to IBK became due.

105.   Between 2006 and July 2014, IBK received payment from ASI Computer for its advances to Moneual against ASI's purchase orders at or near the time those payments became due.  Exhibit A-1 lists the details—including the purchase order numbers, dates issued and purchased by IBK, and dates payment became due—of the ASI Export Receivables for which ASI received payment.

106.   However, ASI has not repaid IBK for advances made against sixty purported purchase orders from ASI totaling $83.5 million that IBK financed between March and July 2014.  Payment was due on these purchase orders between September 2014 and January 2015.  Frances Chou, as Director of ASI, signed each of these

purported purchase orders.  ASI has never contested that it issued any of these sixty purchase orders.

107.   Frances Chou, as Director of ASI, also signed the SPIs acknowledging and consenting to the assignment and payment instructions for payments associated with these purchase orders on: March 14, 2014 (corresponding to purchase orders dated November 21, 2013, and December 19, 2013), March 18, 2014 (corresponding to purchase orders dated December 19, 2013), April 10, 2014, April 23, 2014 (both corresponding to purchase orders dated March 20, 2014), April 25, 2014, May 13, 2014, May 15, 2014, June 5, 2014 (all corresponding to purchase orders dated April 21, 2014), July 14, 2014 (corresponding to purchase orders dated March 20, 2014, and April 21, 2014), and July 28, 2014 (corresponding to purchase orders dated July 9, 2014).

108.   Forty of these purchase orders, totaling $55.9 million, are covered by EFF Insurance from KSURE.  Exhibit A-2 lists the details—including the purchase order numbers, dates issued and purchased by IBK, and dates payment became due—of the outstanding ASI export receivables IBK purchased that were covered by EFF Insurance.  Because IBK believed that it would be able to collect insurance proceeds for this amount, it did not seek immediate payment from ASI.  However, on June 28, 2016, IBK wrote to ASI to remind the company of its obligation to pay for the receivables that IBK had purchased from Moneual, all of which had matured by then.  IBK's letter listed forty open invoices, including the ones that were past due or would be due within the following month, and demanded that ASI make payment for approximately $55.9 million worth of outstanding invoices.  Exhibit A-3 lists the details—including the purchase order numbers, dates issued and purchased by IBK, and dates payment became due—of the outstanding ASI export receivables that were not covered by EFF Insurance.

109.   To date, ASI has not paid any of the invoices pertaining to these sixty purchase orders, and the total principal sum of $83,469,800 owed to IBK remains outstanding.

## **NH**

110.   In or around 2011, Moneual submitted a loan application to NH.  On August 8, 2011, an NH representative, Byung-hyo Kim, visited Moneual's offices and interviewed Kyung-Sik ("KS") Kang, Moneual's finance director.  Thereafter, on September 2, 2011, the Guro Branch of NH consummated its first transactions with Moneual, loaning Moneual KRW 2,000,000,000 and US $1,000,000.  HS Park, Moneual's CEO, guaranteed both loans.

111.   In or around 2013, Moneual requested that NH factor its open account export receivables, including, among others, receivables due from ASI and Newegg, Inc., acting through Newegg Trading Limited, secured by EFF Insurance.  On February 22, 2013, in connection with this request, two different NH representatives, Myung-hee Shim and Hyun-beom Chang, visited Moneual's office located in Gasan-dong, Geumcheon-gu, Seoul, and interviewed Moneual's finance director.

112.   Also on February 22, 2013, NH's Guro Digital Branch approved a one-year loan of $20,000,000 to Moneual conditioned on NH's factoring Moneual's open account export receivables due from China National Building Material Co., Ltd. ("CNBM").  CNBM is a Chinese state-owned enterprise that is the largest comprehensive building materials industry group in China, with 100,000 employees and over $16 billion in total assets.  On March 5, 2013, NH purchased EFF insurance from KSURE with a $20,000,000 coverage limit to secure the CNBM receivables it factored.

113.   On March 6, 2013 and September 2, 2013, NH's Guro Digital Branch purchased Moneual's export trade receivables for its HTPC sales to CNBM in the amounts of $19,542,600 and $19,891,872, respectively.  Payments for these accounts receivable were due on September 2, 2013, and February 28, 2014, respectively and

CNBM paid NH the amounts owed in full on August 30, 2013, and March 11, 2014, respectively.  The successful consummation of NH's first factoring transaction with Moneual gave NH comfort as to Moneual's creditworthiness, and induced it to enter into additional factoring transactions with Moneual as described below, including entering into EFAs to finance Moneual's exports to ASI and Newegg, Inc., acting through Newegg Trading Limited.

114.   Prior to purchasing the EFF insurance and agreeing to factor these trade receivables, NH asked Moneual additional questions about ASI, Newegg, Inc., and Newegg Trading Limited related to their business and revenue via email.

115.   On December 12, 2013, after Newegg.com—which is owned and operated by Newegg, Inc.—had entered into the Sales Agreements with Moneual, NH purchased EFF Insurance from KSURE with a $10,000,000 coverage limit to secure Moneual's receivables from Newegg, Inc. (acting through Newegg Trading Limited). The EFF insurance policy NH purchased explicitly named Newegg, Inc. as the insured importer, Fred Chang, Newegg, Inc.'s founder, Chairman and CEO, as Newegg, Inc.'s representative, and 16839 Gale Avenue, in City of Industry, California, as the importer's address.  It also listed the United States as the "Country of Payor."  Further, it explicitly named Newegg Trading Limited as Newegg, Inc.'s agent or representative, and stated that coverage extended to the purchase of trade receivables for purchase orders issued by Newegg, Inc.'s agent, Newegg Trading Limited, on Newegg, Inc.'s behalf on the basis of sales agreements between Moneual and Newegg.com.  It also required the purchase orders to state that they were issued on Newegg.com's behalf on the basis of the Sales Agreement.  NH received the Chih Sales Agreement from Moneual in connection with financing export receivables.

116.   On December 13, 2013, after purchasing the EFF insurance securing Newegg, Inc.'s export receivables, NH's Guro Digital Branch and Moneual entered into an EFA titled "Credit Transaction Agreement (Type I), Foreign Currency Transaction Agreement" and "Additional Agreement on Purchase of Export Accounts

Receivable," pursuant to which NH agreed to provide Moneual with a one-year loan of $10,000,000, and Moneual agreed to transfer export receivables up to that limit to NH. This agreement was signed by HS Park on behalf of Moneual.

117.   On April 29, 2014, and July 7, 2014, after ASI had entered into the Supply Agreement with Moneual, NH purchased EFF Insurance from KSURE with $20,000,000 and $8,000,000 coverage limits, respectively, to secure ASI receivables.

118.   Also on April 29, 2014 and July 7, 2014, NH agreed to provide Moneual with one-year loans of $20,000,000 and $8,000,000, respectively, and Moneual agreed to transfer export receivables up to that limit to NH.  These agreements were signed by HS Park, Moneual's CEO, on behalf of Moneual.

119.   For each set of ASI export receivables or export receivables due from Newegg, Inc., acting through NTL, that Moneual transferred to NH under the EFAs, Moneual accounting team employees Sung Hoon Kang and Sohee Kim would hand-deliver or send Moneual's applications to sell export receivables and the documents that backed those export receivables—such as the ASI or Newegg Trading Limited purchase orders, which stated explicitly that they were issued on behalf of Newegg.com, and the corresponding Moneual invoices, shipping documents, and signed SPIs—to NH's *Guro* Digital Branch.

120.   Members of NH's *Guro* Digital Branch—specifically, but not limited to, Young Uk Kim, a manager, In Rae Noh, a Deputy General Manager, Jung Mi Song, a General Manager, Jae Hwan Koh, a General Manager, and Ki Kun Chang, the Branch Manager—received and reviewed the purchase orders and other supporting documents that Moneual submitted with its applications, and approved each of Moneual's applications to sell export receivables based on that documentation.  Moneual transmitted the purchase orders and other supporting documentation to NH on the dates that NH purchased the export receivables.

121.   After the initial review at the branch level, document review specialists at
NH's International Trade Support Center (BPR) also reviewed the purchase orders and
other supporting documentation.

122.   On May 26, 2014, Myung-hee Shim and Byung-do Min of NH again
visited Moneual's office located in Anyang-si, Gyeonggi-do, and interviewed
Moneual's finance director.  During the meeting, Myung-hee Shim asked the Finance
Director questions about how Moneual was using its funds, Moneual's customers,
reasons for the increase in Moneual's revenues, inventory and loans, and Moneual's
business plans.

123.   NH's *Guro* Digital Branch also had regular contact with Moneual's
finance director, and members of the branch would meet with him at Moneual's offices
to discuss Moneual's business with NH throughout the course of NH's relationship
with Moneual.

124.   On July 25 and July 26, 2014, another NH representative, Byung-do Min,
visited Moneual's Research & Development center located in Jeju-do and interviewed
Jong-heon Lee, a Director of Moneual's ESCO business department.  Moneual had
received a $40 million dollar loan to build this state-of-the-art facility, and it further
confirmed to NH that Moneual had a profitable and growing business.

125.   Between December 2013 and July 2014, based on the above EFAs
between NH and Moneual and in reliance on the information in the EFF Insurance
policies, the representations made by Moneual personnel during NH's numerous on-
site visits, and the documents that NH received from Moneual and reviewed—such as
the ASI purchase orders and Newegg, Inc. purchase orders, issued through Newegg
Trading Limited, the Supply and Sales Agreements, and other supporting
documentation demonstrating that ASI and Newegg, Inc., through Newegg Trading
Limited, had purchased goods from Moneual, that Moneual had shipped the goods, and
that ASI and Newegg, Inc., through Newegg Trading Limited, intended to pay it for

the goods—NH purchased Moneual's ASI and Newegg, Inc. receivables based on various sets of purchase orders, as detailed below.

126.   <u>The First Set of ASI Purchase Orders.</u>  On or about April 21, 2014, ASI issued two purchase orders, each purporting to purchase 500 HTPC units from Moneual at $2,980 per unit, totaling $1,490,000 per purchase order (the "First Set of NH-ASI Purchase Orders").  These purchase orders were signed by Defendant Frances Chou, a Director of ASI, and countersigned by HS Park, CEO of Moneual.

127.   On April 25, 2014, Moneual issued commercial invoices and packing lists for these purchase orders listing ASI Computer Technologies Inc. of Fremont, California as the consignee of the goods, and purportedly shipped the goods purchased by these orders on that same date.

128.   Moneual also sent ASI an SPI informing ASI that Moneual had assigned the right to payment for goods sold pursuant to the First Set of NH-ASI Purchase Orders to NH and instructing ASI to pay NH directly when payment became due.  On April 25, 2014, Defendant Frances Chou, identified in the SPI as a Director of ASI, signed the SPI acknowledging and consenting to the assignment and payment instructions.

129.   On April 29, 2014, NH purchased Moneual's accounts receivable due from ASI for the invoices pertaining to the First Set of NH-ASI Purchase Orders, except that for one of these purchase orders, Moneual assigned, and NH assumed, only accounts receivable of $506,600.  NH received copies of the First Set of NH-ASI Purchase Orders and corresponding commercial invoices, packing lists, shipping documents, and SPIs from Moneual in connection with its application to sell export receivables, and reviewed that documentation prior to approving the application to purchase the receivables.  In total, the First Set of NH-ASI Purchase Orders had an aggregate value of $1,996,600.

130.   Payment for the goods represented in the First Set of NH-ASI Purchase Orders was due on October 21, 2014.  However, ASI defaulted on that payment and

NH has never received payment for the funds it advanced on the First Set of NH-ASI Purchase Orders.

131.   The Second Set of ASI Purchase Orders.   On or about May 8, 2014, ASI issued six purchase orders, each purporting to purchase 500 HTPC units from Moneual at $2,980 per unit, totaling $1,490,000 per purchase order (the "Second Set of NH-ASI Purchase Orders").   These purchase orders were signed by Defendant Frances Chou, a Director of ASI, and countersigned by HS Park, CEO of Moneual.

132.   On July 8, 2014, Moneual issued commercial invoices and packing lists for these purchase orders listing ASI Computer Technologies Inc. of Fremont, California as the consignee of the goods, and purportedly shipped the goods purchased by these orders on that same date.

133.   Moneual also sent ASI an SPI informing ASI that Moneual had assigned the right to payment for goods sold pursuant to the Second Set of NH-ASI Purchase Orders to NH and instructing ASI to pay NH directly when payment became due.   On July 8, 2014, Defendant Frances Chou, identified in the SPI as a Director of ASI, signed the SPI acknowledging and consenting to the assignment and payment instructions.

134.   On July 9, 2014, NH purchased Moneual's accounts receivable due from ASI for the invoices pertaining to the Second Set of NH-ASI Purchase Orders, except that for one of these purchase orders, Moneual assigned, and NH assumed, only accounts receivable of $536,400.   NH received copies of the Second Set of NH-ASI Purchase Orders and corresponding commercial invoices, packing lists, shipping documents, and SPIs from Moneual in connection with its application to sell export receivables, and reviewed that documentation prior to approving the application to purchase the receivables.   In total, the Second Set of NH-ASI Purchase Orders had an aggregate value of $7,986,400.

135.   Payment for the goods represented in the First Set of NH-ASI Purchase Orders was due on January 2, 2015.   However, ASI defaulted on that payment and NH

1  has never received payment for the funds it advanced on the Second Set of NH-ASI

2  Purchase Orders.  Exhibit B-1, attached to this Complaint and incorporated herein by

3  reference, lists the details—including the purchase order numbers, dates issued and

4  purchased by NH, and dates payment became due—of the NH-ASI Purchase Orders.

5      136.   The First Set of Newegg Purchase Orders.  On or about December 5,

6  2013, Newegg, Inc., through Newegg Trading Limited, issued eight purchase orders,

7  each purporting to purchase 500 HTPC units from Moneual at $2,530 per unit, totaling

8  $1,265,000 per purchase order (the "First Set of NH-Newegg Purchase Orders").

9  These purchase orders were signed by Edison Chih—the COO of Newegg, Inc. and

10  Newegg Trading Limited and the same employee that signed the Chih Sales

11  Agreement between Moneual and Newegg.com in his capacity as COO—and

12  countersigned by HS Park, CEO of Moneual.

13      137.   On December 13, 2013, Moneual issued commercial invoices and packing

14  lists for these purchase orders listing Newegg Trading Limited, Newegg, Inc.'s agent

15  and alter ego, as the consignee of the goods, and purportedly shipped the goods

16  purchased by these orders on that same date.

17      138.   Moneual also sent Newegg, Inc., through its agent and alter ego, Newegg

18  Trading Limited, an SPI informing it that Moneual had assigned the right to payment

19  for goods sold pursuant to the First Set of NH-Newegg Purchase Orders to NH and

20  instructing Newegg, Inc., through Newegg Trading Limited, to pay NH directly when

21  payment became due.  On December 13, 2013, Edison Chih, the COO of Newegg, Inc.

22  and Newegg Trading Limited, signed the SPI consenting to and acknowledging the

23  assignment and payment instructions.

24      139.   Also on December 13, 2013, NH purchased Moneual's accounts

25  receivable ultimately due from Newegg, Inc. for the invoices pertaining to the First Set

26  of NH-Newegg Purchase Orders, except that for one of these purchase orders,

27  Moneual assigned, and NH assumed, only accounts receivable of $1,138,500.  NH

28  received copies of the First Set of NH-Newegg Purchase Orders and corresponding

Gibson, Dunn &
Crutcher LLP

38

SECOND AMENDED COMPLAINT

commercial invoices, packing lists, shipping documents, and SPIs from Moneual in connection with its application to sell export receivables, and reviewed that documentation prior to approving the application to purchase the receivables.  In total, the First Set of NH-Newegg Purchase Orders had an aggregate value of $9,993,500.

140.    Payment for the goods represented in the First Set of NH-Newegg Purchase Orders was due on May 9, 2014.  On or about February 12, 2014 and February 20, 2014, NH received bank transfers in the amount of $3,795,000 and $6,198,500 respectively—which together amounted to complete payment for the First Set of NH-Newegg Purchase Orders—from an account in the name of Newegg Trading Limited, Newegg, Inc.'s agent and alter ego.

141.    The Second Set of Newegg Purchase Orders.  On or about December 5, 2013, Newegg, Inc., through Newegg Trading Limited, issued three purchase orders, each purporting to purchase 500 HTPC units from Moneual at $2,530 per unit, totaling $1,265,000 per purchase order (the "Second Set of NH-Newegg Purchase Orders").  These purchase orders also were signed by Edison Chih and countersigned by HS Park.

142.    On or about February 12, 2014, Moneual issued commercial invoices and packing lists for these purchase orders listing Newegg Trading Limited, Newegg, Inc.'s agent and alter ego, as the consignee of the goods, and purportedly shipped the goods purchased by these orders on that same date.

143.    Moneual also sent Newegg, Inc., through its agent and alter ego, Newegg Trading Limited, an SPI informing it that Moneual had assigned the right to payment for goods sold pursuant to the Second Set of NH-Newegg Purchase Orders to NH and instructing Newegg, Inc., through Newegg Trading Limited, to pay NH directly when payment became due.  On February 12, 2014, Edison Chih, the COO of Newegg, Inc. and Newegg Trading Limited, signed the SPI consenting to and acknowledging the assignment and payment instructions.

144.   Also on or about February 12, 2014, NH purchased Moneual's accounts receivable ultimately due from Newegg, Inc. for the invoices pertaining to the Second Set of NH-Newegg Purchase Orders.  NH received copies of the Second Set of NH-Newegg Purchase Orders and corresponding commercial invoices, packing lists, shipping documents, and SPIs from Moneual in connection with its application to sell export receivables, and reviewed that documentation prior to approving the application to purchase the receivables.  In total, the Second Set of NH-Newegg Purchase Orders had an aggregate value of $3,795,000.

145.   Payment for the goods represented in the Second Set of NH-Newegg Purchase Orders was due on July 11, 2014, and on or about July 22, 2014, NH received a bank transfer for the total payment amount of $3,795,000 from an account in the name of Newegg Trading Limited, Newegg, Inc.'s agent and alter ego.

146.   <u>The Third Set of Newegg Purchase Orders</u>.  Also on or about December 5, 2013, Newegg, Inc., through Newegg Trading Limited, issued an additional five purchase orders, each purporting to purchase 500 HTPC units from Moneual at $2,530 per unit, totaling $1,265,000 per purchase order (the "Third Set of NH-Newegg Purchase Orders").  These purchase orders also were signed by Edison Chih and countersigned by HS Park.

147.   On or about February 20, 2014, Moneual issued commercial invoices and packing lists for these purchase orders listing Newegg Trading Limited, Newegg, Inc.'s agent and alter ego, as the consignee of the goods, and purportedly shipped the goods purchased by these orders on that same date.

148.   Moneual also sent Newegg, Inc., through its agent and alter ego, Newegg Trading Limited, an SPI informing it that Moneual had assigned the right to payment for goods sold pursuant to the Third Set of NH-Newegg Purchase Orders to NH and instructing Newegg Trading Limited to pay NH directly when payment became due. On February 20, 2014, Edison Chih, the COO of Newegg, Inc. and Newegg Trading

Limited, signed the SPI consenting to and acknowledging the assignment and payment instructions.

149.  Also on or about February 20, 2014, NH purchased Moneual's accounts receivable ultimately due from Newegg, Inc. for the invoices pertaining to the Third Set of NH-Newegg Purchase Orders, except that for one of these purchase orders, Moneual assigned, and NH assumed, only accounts receivable of $1,138,500.  NH received copies of the Third Set of NH-Newegg Purchase Orders and corresponding commercial invoices, packing lists, shipping documents, and SPIs from Moneual in connection with its application to sell export receivables, and reviewed that documentation prior to approving the application to purchase the receivables.  In total, the Third Set of NH-Newegg Purchase Orders had an aggregate value of $6,198,500.

150.  Payment for the goods represented in the Second Set of NH-Newegg Purchase Orders was due on July 18, 2014, and on or about July 25, 2014, NH received a bank transfer for the total payment amount of $6,198,500 from an account in the name of Newegg Trading Limited, Newegg, Inc.'s agent and alter ego.

151.  <u>The Fourth Set of Newegg Purchase Orders</u>.  On or about June 13, 2014, Newegg, Inc., through Newegg Trading Limited, issued three purchase orders, each purporting to purchase 500 HTPC units from Moneual at $2,530 per unit, totaling $1,265,000 per purchase order (the "Fourth Set of NH-Newegg Purchase Orders").  These purchase orders also were signed by Edison Chih and countersigned by HS Park.

152.  On July 21, 2014, Moneual issued commercial invoices and packing lists for these purchase orders listing Newegg Trading Limited, Newegg, Inc.'s agent and alter ego, as the Buyer and Advance Global as the consignee of the goods, and purportedly shipped the goods purchased by these orders on that same date.

153.  Moneual also sent Newegg, Inc., through its agent and alter ego, Newegg Trading Limited, an SPI informing it that Moneual had assigned the right to payment for goods sold pursuant to the Fourth Set of NH-Newegg Purchase Orders to NH and

instructing Newegg Trading Limited to pay NH directly when payment became due. On July 21, 2014, Edison Chih, the COO of Newegg, Inc. and Newegg Trading Limited, signed the SPI consenting to and acknowledging the assignment and payment instructions.

154.   On or about July 22, 2014, NH purchased Moneual's accounts receivable ultimately due from Newegg, Inc. (the importer) for the invoices pertaining to the Fourth Set of NH-Newegg Purchase Orders.  NH received copies of the Fourth Set of NH-Newegg Purchase Orders and corresponding commercial invoices, packing lists, shipping documents, and SPIs from Moneual in connection with its application to sell export receivables, and reviewed that documentation prior to approving the application to purchase the receivables.  In total, the Fourth Set of NH-Newegg Purchase Orders had an aggregate value of $3,795,000.

155.   Payment for the goods represented in the Fourth Set of NH-Newegg Purchase Orders was due on December 17, 2014.  However, Newegg, Inc. defaulted on that payment, and NH has never received payment for the funds it advanced on the Fourth Set of NH-Newegg Purchase Orders.

156.   The Fifth Set of Newegg Purchase Orders.  Also on or about June 13, 2014, Newegg, Inc., through Newegg Trading Limited, issued an additional five purchase orders, each purporting to purchase 500 HTPC units from Moneual at $2,530 per unit, totaling $1,265,000 per purchase order (the "Fifth Set of NH-Newegg Purchase Orders").  These purchase orders also were signed by Edison Chih and countersigned by HS Park.

157.   On July 24, 2014, Moneual issued commercial invoices and packing lists for these purchase orders listing Newegg Trading Limited, Newegg, Inc.'s agent and alter ego, as the Buyer and Advance Global as the consignee of the goods, and purportedly shipped the goods purchased by these orders on that same date.

158.   Moneual also sent Newegg, Inc., through its agent and alter ego, Newegg Trading Limited, an SPI informing it that Moneual had assigned the right to payment

1   for goods sold pursuant to the Fifth Set of NH-Newegg Purchase Orders to NH and

2   instructing Newegg Trading Limited to pay NH directly when payment became due.

3   On July 24, 2014, Edison Chih, the COO of Newegg, Inc. and Newegg Trading

4   Limited, signed the SPI consenting to and acknowledging the assignment and payment

5   instructions.

6       159.   On or about July 25, 2014, NH purchased Moneual's accounts receivable

7   ultimately due from Newegg, Inc. (the importer) for the invoices pertaining to the Fifth

8   Set of NH-Newegg Purchase Orders, except that for one of these purchase orders,

9   Moneual assigned, and NH assumed, only accounts receivable of $1,138,500.  NH

10  received copies of the Fifth Set of NH-Newegg Purchase Orders and corresponding

11  commercial invoices, packing lists, shipping documents, and SPIs from Moneual in

12  connection with its application to sell export receivables, and reviewed that

13  documentation prior to approving the application to purchase the receivables.  In total,

14  the Fifth Set of NH-Newegg Purchase Orders had an aggregate value of $6,198,500.

15      160.   Payment for the goods represented in the Fifth Set of NH-Newegg

16  Purchase Orders was due on December 22, 2014.  However, Newegg, Inc. defaulted on

17  that payment and NH has never received payment for the funds it advanced on the

18  Fifth Set of NH-Newegg Purchase Orders.  Exhibit B-2, attached to this Complaint and

19  incorporated herein by reference, lists the details—including the purchase order

20  numbers, dates issued and purchased by NH, and dates payment became due—of the

21  NH-Newegg Purchase Orders.

22      161.   On November 11, 2014, NH sent Moneual a repayment notice demanding

23  payment of the for the invoices relating to the Fourth and Fifth Set of NH-Newegg

24  Purchase Orders and the First and Second Set of NH-ASI Purchase Orders.  However,

25  to date, none of these invoices has been paid.

26      162.   The total amount of unpaid ASI receivables is approximately $9,983,000,

27  and the total amount of unpaid Newegg, Inc. receivables is approximately $9,993,000.

28      **KEB Hana**

Gibson, Dunn &
Crutcher LLP

163.   KEB Hana began providing trade financing for Moneual in connection with their exports to ASI in 2009.

164.   Beginning in 2009, KEB Hana received a steady flow of payments in connection with the ASI export receivables.  These consistent payments and the fact that Moneual appeared to continually expand its export business base and increase its revenue induced KEB Hana to extend additional credit to Moneual for direct export to overseas buyers.

165.   In or around 2012, Moneual requested that KEB Hana factor its open account export receivables, including, among others, receivables due from ASI and Newegg, Inc., acting through Newegg Trading Limited, secured by EFF Insurance.  In order to purchase EFF Insurance from KSURE, KEB Hana requested a credit investigation of Moneual and each of its import customers, including ASI, Newegg, Inc., and Newegg Trading Limited, from KSURE.  Based on KSURE's credit investigation results, KEB Hana purchased EFF insurance from KSURE with a $10,000,000 coverage limit, effective June 7, 2013, to secure ASI receivables it factored.

166.   KEB Hana also purchased EFF insurance from KSURE with $10,000,000 coverage limits on November 7, 2012 and April 24, 2013, and additional EFF insurance policies with $35,000,000 coverage limits on June 14, 2013 and October 28, 2013, to secure Newegg Trading Limited receivables it factored.  These insurance policies listed Newegg Trading Limited as the insured importer, but stated explicitly that Newegg, Inc. was the guarantor of payment for the Newegg Trading Limited purchase orders.  The insurance policies listed the United States as the "Country of Guarantor of Payment."  Before agreeing to factor the Newegg Trading Limited receivables under the varying credit limits, KEB Hana received copies of the relevant Newegg, Inc. Guaranties.

167.   On August 13, 2012, KEB Hana entered into a foreign currency transaction agreement and an agreement to increase export transactions with Moneual

(the "EFAs"), pursuant to which Moneual agreed to sell, and KEB Hana agreed to purchase, Moneual's rights and benefits to receive payments from ASI and Newegg Trading Limited for the commercial invoices Moneual sent to ASI and Newegg Trading Limited for the shipments of goods.

168.   On December 12, 2013 and August 22, 2014, KEB Hana purchased additional EFF insurance from KSURE with $67,000,000 and $45,000,000 coverage limits, respectively, to secure Newegg, Inc. receivables it factored.  Because these insurance and credit limits were significantly higher than the previous limits, Moneual could only obtain—and KEB Hana would only purchase—EFF insurance if Newegg, Inc. became the insured importer rather than the guarantor of the Newegg Trading Limited receivables.  Thus, these EFF insurance policies explicitly named Newegg, Inc. as the importer of Moneual's products.  Both policies listed 16839 Gale Avenue, in City of Industry, California—one of Newegg, Inc.'s office addresses—as the importer's address.  Both policies also listed the United States as the "Country of Payor."

169.   The December 12, 2013 policy listed Fred Chang, Newegg, Inc.'s founder, Chairman and CEO, as Newegg, Inc.'s representative, explicitly named Newegg Trading Limited as Newegg, Inc.'s agent, and stated that coverage extended to the purchase of trade receivables for purchase orders issued by Newegg Trading Limited, on Newegg, Inc.'s behalf, on the basis of sales agreements between Moneual and Newegg.com.

170.   The August 2014 policy—which also listed Newegg, Inc. as the importer—listed James Wu, formerly Newegg, Inc.'s Chief Administrative Officer and currently Newegg, Inc.'s CTO and COO, as Newegg, Inc.'s representative.

171.   On December 18, 2013, KEB Hana entered into an additional EFA with Moneual, pursuant to which Moneual agreed to sell, and KEB Hana agreed to purchase, up to certain credit limits, Moneual's rights and benefits to receive payments from ASI and Newegg, Inc. for the commercial invoices Moneual sent to ASI and

Newegg, Inc., through Newegg Trading Limited, for the shipments of goods.  The EFA explicitly stated that Newegg Trading Limited was Newegg, Inc.'s agent and representative, and that the loan KEB was extending to Moneual included the purchase of trade receivables based on purchase orders issued by Newegg Trading Limited as Newegg Inc.'s agent and arising out of the Sales Agreement between Moneual and Newegg.com.  It also noted that the purchase orders were required to state that they were issued on behalf of Newegg.com—the name of the website Newegg, Inc. owns and operates—on the basis of the Sales Agreement between Moneual and Newegg.com.  This EFA was effective until December 12, 2014.

172.   Moneual transmitted a copy of the Chang Sales Agreement to KEB Hana between November 27, 2013 and December 12, 2013, in connection with KEB Hana's purchase of EFF insurance and the execution of its additional EFA with Moneual.

173.   Prior to purchasing the EFF insurance and agreeing to factor trade receivables, KEB Hana representatives met with HS Park and Moneual's finance director, KS Kang.  Members of KEB Hana's Gasan Digital Branch also had regular contact with KS Kang and HS Park throughout the course of KEB Hana's relationship with Moneual, and would meet with them at Moneual's offices to discuss Moneual's business with KEB Hana.

174.   For each set of ASI export receivables or export receivables from Newegg Trading Limited (guaranteed by Newegg, Inc.) or Newegg, Inc. (based on purchase orders that Newegg Trading Limited issued on behalf of Newegg.com, the website owned and operated by Newegg, Inc.) that Moneual transferred to KEB Hana under the EFAs, Moneual either sent applications to sell export receivables and the documents that backed those export receivables—such as the ASI or Newegg Trading Limited purchase orders (guaranteed by Newegg, Inc. or explicitly issued on behalf of Newegg.com) and the corresponding Moneual invoices, shipping documents, and signed SPIs—to Hyun Jung Moon, a Manager of KEB Hana's Gasan Digital Station Branch, or Moneual employees Sung Hoon Kang, Sohee Kim, Gyewon Chun or Bomi

Cho hand-delivered them to that branch.  Moneual transmitted the purchase orders and other supporting documentation to KEB Hana on the dates that KEB Hana purchased the export receivables.

175.   Manager Hyung Jung Moon, Deputy Department Head Ki Seung Chun, and Branch Manager of KEB Hana's Gasan Digital Station Branch, In Ho Chung, among others, reviewed the purchase orders and other supporting documents that Moneual submitted with its applications and approved each of Moneual's applications to sell export receivables based on that documentation.

176.   Between August 13, 2012 and September 18, 2014, based on the above EFAs between KEB Hana and Moneual and the EFF insurance, and in reliance on documents that KEB Hana received from Moneual and reviewed, such as the ASI purchase orders and other supporting documentation demonstrating that ASI had purchased goods from Moneual, that Moneual had shipped the goods, and that ASI intended to pay it for the goods, KEB Hana purchased ASI receivables from Moneual based on 74 shipments of goods that Moneual purportedly had made to ASI.

177.   ASI made payments on or near the time that payment was due for the receivables that KEB Hana purchased between August 13, 2012 and April 4, 2014, which corresponded with 60 of the purported 74 shipments from Moneual to ASI.  The last payment due date for these shipments was September 4, 2014.  Exhibit C-1, attached to this Complaint and incorporated by reference herein, lists the transaction numbers, transaction dates, and dates and amounts of payment corresponding to these shipments.

178.   KEB Hana purchased an additional set of receivables that corresponded with the fourteen remaining purported shipments between August 14, 2014 and September 18, 2014.

179.   The First Set of ASI Purchase Orders.  On or about May 8, 2014, ASI issued fourteen purchase orders, each one purporting to purchase between $476,800 and $1,490,000 worth of goods from Moneual, including HTPCs priced at $2,980 per

unit (the "First Set of Hana-ASI Purchase Orders").  These purchase orders were signed by Defendant Frances Chou on behalf of ASI and countersigned by HS Park.

180.   On August 18 and August 19, 2014, Moneual issued commercial invoices and packing lists for these purchase orders listing ASI HK as the consignee of the goods, and purportedly shipped the goods purchased by these orders.

181.   Moneual also sent ASI SPIs informing ASI that Moneual had assigned the right to payment for goods sold pursuant to the First Set of Hana-ASI Purchase Orders to KEB Hana and instructing ASI to pay KEB Hana directly when payment became due.  On August 18 and August 19, 2014, Frances Chou, identified in the SPIs as a Director of ASI, signed the SPIs acknowledging and consenting to the assignment and payment instructions.

182.   KEB Hana purchased these ASI receivables from Moneual on August 14, 2014, September 11, 2014 and September 18, 2014.  KEB Hana received copies of the First Set of Hana-ASI Purchase Orders and corresponding commercial invoices, packing lists, shipping documents, and SPIs from Moneual in connection with its applications to sell export receivables, and reviewed and relied on that documentation in approving the applications to purchase the receivables.  In total, the First Set of Hana-ASI Purchase Orders had an aggregate value of $17,850,200.

183.   Payments for the goods represented in the First Set of Hana-ASI Purchase Orders were due between January 12, 2015 and January 19, 2015.  However, ASI defaulted on those payments and KEB Hana has never received payment for the funds it advanced on the First Set of Hana-ASI Purchase Orders.  Exhibit C-2, attached to this Complaint and incorporated herein by reference, lists the details—including the purchase order numbers, dates issued, and dates payment became due—of the outstanding Hana-ASI Purchase Orders.

184.   Between November 9, 2012 and August 1, 2014, based on the EFAs between KEB Hana and Moneual and in reliance on the EFF insurance policies listing Newegg, Inc. as the guarantor or insured importer and documents that KEB Hana

SECOND AMENDED COMPLAINT

Gibson, Dunn & Crutcher LLP

received from Moneual and reviewed, such as the Newegg Trading Limited purchase orders—guaranteed by Newegg, Inc. or explicitly issued on behalf of Newegg.com—the guarantees, the Sales Agreements, and other supporting documentation demonstrating that Newegg, Inc., through Newegg Trading Limited, had purchased goods from Moneual, that Moneual had shipped the goods, and that Newegg, Inc., through Newegg Trading Limited, intended to pay it for the goods, KEB Hana purchased Newegg receivables from Moneual based on 219 shipments of goods that Moneual purportedly had made to Newegg Trading Limited or its consignee.

185.   Newegg Trading Limited or Newegg, Inc., through Newegg Trading Limited, made payments on or near the time that payment was due for the receivables that KEB Hana purchased between November 9, 2012 and February 27, 2014, which corresponded with 167 of the 219 purported shipments from Moneual to Newegg Trading Limited.  The last payment due date for these shipments was July 28, 2014. Exhibit C-3, attached to this Complaint and incorporated by reference herein, lists the transaction numbers, transaction dates, and dates and amounts of payment corresponding to these shipments.

186.   On March 6, 2014, Edison Chih, Newegg, Inc.'s COO, visited Moneual's head office in Guro-gu Seoul, and met with In Ho Chung, then Branch Manager of KEB Hana's Gasan Digital Station Branch.  In this meeting, Edison Chih gave a presentation that described Newegg.com as a large, reputable United States-based retailer with a strong business profile and high credit ratings, and represented that Newegg.com—the website Newegg, Inc. owned and operated—had a close business relationship with Moneual.  Mr. Chih's business card, which he gave to In Ho Chung, bore Newegg.com's logo, stated that Mr. Chih was COO, named Newegg, Inc. as the "group headquarters," and listed Newegg, Inc.'s office address, among others.  The business card did not reference Newegg Trading Limited.  This meeting provided further comfort to KEB Hana that Moneual was in a legitimate trade relationship with

Newegg, Inc., the owner and operator of Newegg.com, a large, credible overseas distributor based in the United States.

187.   Between April 4, 2014 and August 1, 2014, based on the EFAs, and in reliance on the EFF insurance policies listing Newegg, Inc. as the insured importer, the documents that KEB Hana received from Moneual and reviewed in connection with Moneual's applications to sell export receivables, such as the Newegg, Inc. purchase orders issued through Newegg Trading Limited, the Chang Sales Agreement, and other supporting documentation demonstrating that Newegg, Inc., through Newegg Trading Limited, had purchased goods from Moneual, that Moneual had shipped the goods, and that Newegg, Inc., through Newegg Trading Limited, intended to pay it for the goods, and Edison Chih's representations that Newegg.com—the consumer-facing website owned and operated by Newegg, Inc.—was Moneual's counterparty, KEB Hana purchased two additional sets of receivables from Moneual that corresponded with the fifty-two remaining purported shipments.

188.   <u>The First Set of Newegg Purchase Orders</u>.  On or about December 5, 2013, Newegg, Inc., through Newegg Trading Limited, issued thirty-seven purchase orders, each one purporting to purchase $1,265,000 worth of goods, including HTPCs, from Moneual, except for one that purported to purchase $1,214,400 worth of goods (the "First Set of Hana-Newegg Purchase Orders").  These purchase orders were signed by Edison Chih on behalf of Newegg, Inc. and Newegg Trading Limited and countersigned by HS Park.

189.   On April 3, 2014, May 26, 2014, May 29, 2014, June 12, 2014, June 17, 2014, and June 24, 2014, Moneual issued commercial invoices and packing lists for these purchase orders listing Newegg Trading Limited, Newegg, Inc.'s agent and alter ego, as the consignee of the goods, and purportedly shipped the goods purchased by these orders.

190.   Moneual also sent Newegg, Inc., through Newegg Trading Limited, SPIs informing it that Moneual had assigned the right to payment for goods sold pursuant to

the First Set of Hana-Newegg Purchase Orders to KEB Hana and instructing Newegg Trading Limited, Newegg, Inc.'s agent and alter ego, to pay KEB Hana directly when payment became due.  On April 3, 2014, May 26, 2014, May 29, 2014, June 12, 2014, June 17, 2014, and June 24, 2014, Edison Chih, the COO of Newegg, Inc. and Newegg Trading Limited, signed the SPIs acknowledging and consenting to the assignment and payment instructions.

191.   KEB Hana purchased Moneual's accounts receivable ultimately due from Newegg, Inc. (as the importer) for the invoices pertaining to the First Set of Hana-Newegg Purchase Orders on April 4, 2014, May 27, 2014, May 29, 2014, June 12, 2014, June 17, 2014 and June 26, 2014.  KEB Hana received copies of the First Set of Hana-Newegg Purchase Orders and corresponding commercial invoices, packing lists, shipping documents, and SPIs from Moneual in connection with its applications to sell export receivables, and reviewed and relied on that documentation prior to approving the applications to purchase the receivables.  In total, the First Set of Hana-Newegg Purchase Orders had an aggregate value of $46,754,400.

192.   Payments for the goods represented in the First Set of Hana-Newegg Purchase Orders were due between September 1, 2014 and November 21, 2014. However, Newegg, Inc. defaulted on those payments and KEB Hana has never received payment for the funds it advanced on the First Set of Hana-Newegg Purchase Orders.

193.   Although payment for some of these receivables came due in September 2014, Moneual's finance director, KS Kang, had informed Moneual prior to the due date that payment would be delayed due to defective parts from a Chinese manufacturer that had held up the manufacturing process.  When KEB Hana inquired about the payment after the default, Moneual assured KEB Hana that payment was imminent.  Further, the EFF policy insuring these receivables had a clause that mandated a two-month grace period for defaults before KEB Hana could file an insurance claim on outstanding payments.

194.   <u>The Second Set of Newegg Purchase Orders</u>.  On or about June 13, 2014, Newegg, Inc., through Newegg Trading Limited, issued fifteen purchase orders, each one purporting to purchase either $1,265,000 or $1,490,000 worth of goods from Moneual, including HTPCs, except for one that purported to purchase $1,400,600 worth of goods (the "Second Set of Hana-Newegg Purchase Orders").  These purchase orders were signed by Edison Chih on behalf of Newegg, Inc. and Newegg Trading Limited, and countersigned by HS Park.

195.   On June 24, 2014, July 21, 2014, and July 30, 2014, Moneual issued commercial invoices and packing lists for these purchase orders listing Newegg Trading Limited, Newegg, Inc.'s agent and alter ego, as the consignee of the goods, and purportedly shipped the goods purchased by these orders.

196.   Moneual also sent Newegg, Inc., through Newegg Trading Limited, SPIs informing it that Moneual had assigned the right to payment for goods sold pursuant to the Second Set of Hana-Newegg Purchase Orders to KEB Hana and instructing Newegg Trading Limited, Newegg, Inc.'s agent and alter ego, to pay KEB Hana directly when payment became due.  On June 24, 2014, July 21, 2014, and July 30, 2014, Edison Chih, the COO of Newegg, Inc. and Newegg Trading Limited, signed the SPIs acknowledging and consenting to the assignment and payment instructions.

197.   KEB Hana purchased Moneual's accounts receivable ultimately due from Newegg, Inc. (as the importer) for the invoices pertaining to the Second Set of Hana-Newegg Purchase Orders on June 26, 2014, July 22, 2014 and August 1, 2014.  KEB Hana received copies of the Second Set of Hana-Newegg Purchase Orders and corresponding commercial invoices, packing lists, shipping documents, and SPIs from Moneual in connection with its applications to sell export receivables, and reviewed and relied on that documentation prior to approving the applications to purchase the receivables.  In total, the Second Set of Hana-Newegg Purchase Orders had an aggregate value of $20,235,600.

Gibson, Dunn & Crutcher LLP

SECOND AMENDED COMPLAINT

198.   Payments for the goods represented in the Second Set of Hana-Newegg Purchase Orders were due between November 21, 2014 and December 29, 2014. However, Newegg, Inc. defaulted on those payments and KEB Hana has never received payment for the funds it advanced on the Second Set of Hana-Newegg Purchase Orders.  Exhibit C-4, attached to this Complaint and incorporated herein by reference, lists the details—including the purchase order numbers, dates issued, and dates payment became due—of the outstanding Hana-Newegg Purchase Orders.

199.   On or around July 15, 2016, KEB Hana sent ASI and Newegg, Inc. a demand for payment of the invoices relating to the First Set of Hana-ASI Purchase Orders and the First and Second Set of Hana-Newegg Purchase Orders.  However, to date, none of these invoices has been paid.  The total amount of the unpaid ASI receivables is approximately $17,850,200, and the total amount of unpaid Newegg receivables is approximately $66,990,000.

**KB**

200.   KB began its business relationship with Moneual in 2008.  From that time, KB received consistent, timely payments for the Moneual export receivables it factored.

201.   In or around 2011, Moneual requested that KB factor its open account export receivables due from ASI and Newegg Trading Limited but guaranteed by Newegg, Inc., secured by EFF Insurance.  In order to purchase EFF Insurance from KSURE, KB requested a credit investigation of Moneual and each of its import customers, including ASI, Newegg, Inc., and Newegg Trading Limited, from KSURE.  Based on KSURE's credit investigation results, KB purchased EFF Insurance from KSURE with a $10,000,000 coverage limit, effective June 7, 2013, to secure ASI receivables it factored.

202.   KB also purchased EFF Insurance from KSURE with a $20,000,000 coverage limit, effective October 28, 2013, to secure Newegg Trading Limited receivables it factored.  The insurance policy listed Newegg Trading Limited as the

SECOND AMENDED COMPLAINT

Gibson, Dunn & Crutcher LLP

insured importer, but stated explicitly that Newegg, Inc. was the guarantor of payment for the Newegg Trading Limited purchase orders.  The insurance policy listed the United States as the  "Country of Guarantor of Payment."  In connection with factoring the export receivables, KB received a copy of the January 2013 Guaranty.

203.   On June 10, 2013 and October 29, 2013, KB and Moneual entered into EFAs pursuant to which Moneual agreed to sell, and KB agreed to purchase, Moneual's rights and benefits to receive payments from ASI and Newegg Trading Limited or Newegg, Inc. for the commercial invoices Moneual sent to ASI and Newegg Trading Limited for the shipments of goods.

204.   After Newegg.com—owned and operated by Newegg, Inc.—entered into the Sales Agreements with Moneual, Moneual transmitted the Chih Sales Agreement to KB.  The Newegg Trading Limited purchase orders issued after November 27, 2013 that backed the trade receivables KB purchased explicitly stated that they were issued on behalf of Newegg.com.

205.   Before purchasing the EFF insurance and agreeing to factor these trade receivables, KB representatives met with HS Park and Moneual's finance director, KS Kang.  Members of KB's Yeongdeungpo Hi-Tech Branch, which was responsible for the management of Moneual's relationship with KB, also had regular contact with KS Kang and HS Park throughout the course of KB's relationship with Moneual, and would meet with them at Moneual's offices to discuss Moneual's business with KB.

206.   For each set of ASI export receivables or export receivables from Newegg Trading Limited (guaranteed by Newegg, Inc., and later, based on purchase orders issued on behalf of Newegg.com) that Moneual transferred to KB under the EFAs, Moneual employees Sung Hoon Kang, Sohee Kim, Gyewon Chun or Bomi Cho would hand-deliver or send Moneual's applications to sell export receivables and the documents that backed those export receivables—such as the ASI or Newegg Trading Limited purchase orders guaranteed by or issued on behalf of Newegg.com, and the corresponding Moneual invoices, shipping documents, and signed SPIs—to KB's

Yeongdeungpo Hi-Tech Branch.  Moneual transmitted the purchase orders and other supporting documentation to KB on the dates that KB purchased the export receivables, except that KB required Moneual to provide the SPIs in connection with the EFAs.

207.   Members of KB's Yeongdeungpo Hi-Tech Branch—specifically, team member Jaekyung Lee, Relations Team Head Jaekwang Park, and former Branch Manager Se-Wook Oh—received and reviewed the purchase orders and other supporting documents that Moneual submitted with its applications, and approved each of Moneual's applications to sell export receivables based on that documentation.

208.   Between June 2013 and July 2014, based on the above EFAs between KB and Moneual and in reliance on the information in the EFF insurance policies and the documents that KB received from Moneual and reviewed, such as the ASI and Newegg Trading Limited purchase orders—guaranteed by Newegg, Inc. or issued on behalf of Newegg.com—the Guaranty, the Supply Agreement and Chih Sales Agreement, and other supporting documentation demonstrating that ASI and Newegg Trading Limited, on behalf of Newegg.com or pursuant to Newegg, Inc.'s Guaranty, had purchased goods from Moneual, that Moneual had shipped the goods, and that ASI and Newegg, Inc., through Newegg Trading Limited, intended to pay the Banks for the goods, KB purchased Moneual's ASI and Newegg Trading Limited receivables based on various sets of purchase orders, as detailed below.

209.   The First Set of ASI Purchase Orders.  On June 13, 2013, KB purchased Moneual's accounts receivable due from ASI corresponding to five purchase orders issued by ASI, each purporting to purchase $1,068,000 worth of goods from Moneual per purchase order (the "First Set of KB-ASI Purchase Orders").  These purchase orders were signed by Defendant Frances Chou on behalf of ASI and countersigned by HS Park. KB received copies of the First Set of KB-ASI Purchase Orders and corresponding commercial invoices, packing lists, shipping documents, and SPIs from Moneual in connection with its application to sell export receivables, and reviewed that

documentation prior to approving the application to purchase the receivables.  In total, the First Set of KB-ASI Purchase Orders had an aggregate value of $5,340,000.

210.   Payment for the goods represented in the First Set of KB-ASI Purchase Orders was due on December 10, 2013, and on or about December 4, 2013, KB received a wire transfer for the total payment amount of $5,340,000 from an account in the name of ASI HK.

211.   The Second Set of ASI Purchase Orders.  On July 29, 2013, KB purchased Moneual's accounts receivable due from ASI corresponding to four purchase orders issued by ASI, each purporting to purchase $1,068,000 worth of goods from Moneual per purchase order (the "Second Set of KB-ASI Purchase Orders"). These purchase orders were signed by Defendant Frances Chou on behalf of ASI and countersigned by HS Park.  KB received copies of the Second Set of KB-ASI Purchase Orders and corresponding commercial invoices, packing lists, shipping documents, and SPIs from Moneual in connection with its application to sell export receivables, and reviewed that documentation prior to approving the application to purchase the receivables.  In total, the Second Set of KB-ASI Purchase Orders had an aggregate value of $4,272,000.

212.   Payment for the goods represented in the Second Set of KB-ASI Purchase Orders was due on January 25, 2014, and on or about January 24, 2014, KB received a total payment of $4,272,000 for the Second Set of KB-ASI Purchase Orders from an account in the name of ASI HK.

213.   The Third Set of ASI Purchase Orders.  On November 5, 2013, KB purchased Moneual's accounts receivable due from ASI corresponding to eight purchase orders issued by ASI, each purporting to purchase $1,068,000 worth of goods from Moneual per purchase order (the "Third Set of KB-ASI Purchase Orders"). These purchase orders were signed by Defendant Frances Chou on behalf of ASI and countersigned by HS Park.  KB received copies of the Third Set of KB-ASI Purchase Orders and corresponding commercial invoices, packing lists, shipping documents, and

SPIs from Moneual in connection with its application to sell export receivables, and reviewed that documentation prior to approving the application to purchase the receivables. In total, the Third Set of KB-ASI Purchase Orders had an aggregate value of $8,544,000.

214.   Payment for the goods represented in the Third Set of KB-ASI Purchase Orders was due on May 4, 2014, and on or about May 8, 2014, KB received a total payment of $8,544,000 for the Third Set of KB-ASI Purchase Orders from an account in the name of ASI HK.

215.   <u>The Fourth Set of ASI Purchase Orders.</u>  On November 28, 2013, KB purchased Moneual's accounts receivable due from ASI corresponding to three purchase orders issued by ASI purporting to purchase $1,068,000, $640,800, and $427,200 worth of goods from Moneual per purchase order (the "Fourth Set of KB-ASI Purchase Orders"). These purchase orders were signed by Defendant Frances Chou on behalf of ASI and countersigned by HS Park. KB received copies of the Fourth Set of KB-ASI Purchase Orders and corresponding commercial invoices, packing lists, shipping documents, and SPIs from Moneual in connection with its application to sell export receivables, and reviewed that documentation prior to approving the application to purchase the receivables. In total, the Fourth Set of KB-ASI Purchase Orders had an aggregate value of $2,136,000.

216.   Payment for the goods represented in the Fourth Set of KB-ASI Purchase Orders was due on May 26, 2014, and on or about June 5, 2014, KB received a wire transfer for the total payment amount of $2,136,000 from an account in the name of ASI HK.

217.   <u>The Fifth Set of ASI Purchase Orders.</u>  On December 6, 2013, KB purchased Moneual's accounts receivable due from ASI corresponding to four purchase orders issued by ASI, each purporting to purchase $1,490,000 worth of goods, from Moneual per purchase order, except that one purchase order purported to purchase $1,192,000 worth of goods from Moneual (the "Fifth Set of KB-ASI

SECOND AMENDED COMPLAINT

Gibson, Dunn & Crutcher LLP

Purchase Orders"). These purchase orders were signed by Defendant Frances Chou on behalf of ASI and countersigned by HS Park. KB received copies of the Fifth Set of KB-ASI Purchase Orders and corresponding commercial invoices, packing lists, shipping documents, and SPIs from Moneual in connection with its application to sell export receivables, and reviewed that documentation prior to approving the application to purchase the receivables. In total, the Fifth Set of KB-ASI Purchase Orders had an aggregate value of $5,662,000.

218.   Payment for the goods represented in the Fifth Set of KB-ASI Purchase Orders was due on June 4, 2014, and on or about June 5, 2014, KB received a total payment of $5,662,000 for the Fifth Set of KB-ASI Purchase Orders from an account in the name of ASI HK.

219.   <u>The Sixth Set of ASI Purchase Orders</u>. On January 24, 2014, KB purchased Moneual's accounts receivable due from ASI corresponding to three purchase orders issued by ASI, each purporting to purchase $1,490,000 worth of goods, from Moneual per purchase order, except that one purchase order purported to purchase $1,341,000 worth of goods from Moneual (the "Sixth Set of KB-ASI Purchase Orders"). These purchase orders were signed by Defendant Frances Chou on behalf of ASI and countersigned by HS Park. KB received copies of the Sixth Set of KB-ASI Purchase Orders and corresponding commercial invoices, packing lists, shipping documents, and SPIs from Moneual in connection with its application to sell export receivables, and reviewed that documentation prior to approving the application to purchase the receivables. In total, the Sixth Set of KB-ASI Purchase Orders had an aggregate value of $4,321,000.

220.   Payment for the goods represented in the Sixth Set of KB-ASI Purchase Orders was due on July 23, 2014, and on or about July 21, 2014, KB received a wire transfer for the total payment amount of $4,321,000 from an account in the name of ASI HK.

221.  <u>The Seventh Set of ASI Purchase Orders</u>.  On or about April 21, 2014, ASI issued six purchase orders, each purporting to purchase 500 HTPC units from Moneual at $2,980 per unit, totaling $1,490,000 per purchase order (the "Seventh Set of KB-ASI Purchase Orders").  These purchase orders were signed by Defendant Frances Chou on behalf of ASI and countersigned by HS Park.

222.  On May 7, 2014, Moneual issued commercial invoices and packing lists for these purchase orders listing ASI Computer Technologies Inc. of Fremont, California as the consignee of the goods, and purportedly shipped the goods purchased by these orders on that same date.

223.  Moneual also sent ASI an SPI informing ASI that Moneual had assigned the right to payment for goods sold pursuant to the Seventh Set of KB-ASI Purchase Orders to KB and instructing ASI to pay KB directly when payment became due.  On May 7, 2014, Defendant Frances Chou, identified in the SPI as a Director of ASI, signed the SPI consenting to and acknowledging the assignment and payment instructions.

224.  On May 8, 2014, KB purchased Moneual's ASI Receivables for the invoices pertaining to the Seventh Set of KB-ASI Purchase Orders, except that for one of these purchase orders, Moneual assigned, and KB assumed, only accounts receivable of $1,102,600.  KB received copies of the Seventh Set of KB-ASI Purchase Orders and corresponding commercial invoices, packing lists, shipping documents, and SPIs from Moneual in connection with its application to sell export receivables, and reviewed that documentation prior to approving the application to purchase the receivables.  In total, the Seventh Set of KB-ASI Purchase Orders had an aggregate value of $8,552,600.

225.  Payment for the goods represented in the Seventh Set of KB-ASI Purchase Orders was due on November 3, 2014.  However, ASI defaulted on that payment and KB has never received payment for the funds it advanced on the Seventh Set of KB-ASI Purchase Orders.

Gibson, Dunn & Crutcher LLP

SECOND AMENDED COMPLAINT

226.   <u>The Eighth Set of ASI Purchase Orders</u>.  On or about April 21, 2014, ASI issued six purchase orders, each purporting to purchase 500 HTPC units from Moneual at $2,980 per unit, totaling $1,490,000 per purchase order (the "Eighth Set of KB-ASI Purchase Orders").  These purchase orders were signed by Defendant Frances Chou on behalf of ASI and countersigned by HS Park.

227.   On June 5, 2014, Moneual issued commercial invoices and packing lists for these purchase orders listing ASI Computer Technologies Inc. of Fremont, California as the consignee of the goods, and purportedly shipped the goods purchased by these orders on that same date.

228.   Moneual also sent ASI an SPI informing ASI that Moneual had assigned the right to payment for goods sold pursuant to the Eighth Set of KB-ASI Purchase Orders to KB and instructing ASI to pay KB directly when payment became due.  On June 5, 2014, Defendant Frances Chou, identified in the SPI as a Director of ASI, signed the SPI consenting to and acknowledging the assignment and payment instructions.

229.   On June 9, 2014, KB purchased Moneual's ASI Receivables for the invoices pertaining to the Eighth Set of KB-ASI Purchase Orders, except that for two of these purchase orders, Moneual assigned, and KB assumed, only accounts receivable of $298,000 and $1,192,000, respectively.  KB received copies of the Eighth Set of KB-ASI Purchase Orders and corresponding commercial invoices, packing lists, shipping documents, and SPIs from Moneual in connection with its application to sell export receivables, and reviewed that documentation prior to approving the application to purchase the receivables.  In total, the Eighth Set of KB-ASI Purchase Orders had an aggregate value of $7,450,000.

230.   Payment for the goods represented in the Eighth Set of KB-ASI Purchase Orders was due on December 2, 2014.  However, ASI defaulted on that payment and KB has never received payment for the funds it advanced on the Eighth Set of KB-ASI Purchase Orders.

Gibson, Dunn & Crutcher LLP

231.   <u>The Ninth Set of ASI Purchase Orders</u>.  On or about April 21, 2014, ASI issued one purchase order, purporting to purchase 500 HTPC units from Moneual at $2,980 per unit, totaling $1,490,000.  On or about July 9, 2014, ASI issued two additional purchase orders, each purporting to purchase 500 HTPC units from Moneual at $2,980 per unit, totaling $1,490,000 per purchase order (the "Ninth Set of KB-ASI Purchase Orders").  These purchase orders were signed by Defendant Frances Chou on behalf of ASI and countersigned by HS Park.

232.   On July 18, 2014, Moneual issued commercial invoices and packing lists for these purchase orders listing ASI HK as the consignee of the goods, and purportedly shipped the goods purchased by these orders on that same date.

233.   Moneual also sent ASI an SPI informing ASI that Moneual had assigned the right to payment for goods sold pursuant to the Ninth Set of KB-ASI Purchase Orders to KB and instructing ASI to pay KB directly when payment became due.  On July 18, 2014, Frances Chou, identified in the SPI as a Director of ASI, signed the SPI in acknowledging and consenting to the assignment and payment instructions.

234.   On July 21, 2014, KB purchased Moneual's accounts receivable due from ASI for the invoices pertaining to the Ninth Set of KB-ASI Purchase Orders, except that for one of these purchase orders, Moneual assigned, and KB assumed, only accounts receivable of $1,341,000.  KB received copies of the Ninth Set of KB-ASI Purchase Orders and corresponding commercial invoices, packing lists, shipping documents, and SPIs from Moneual in connection with its application to sell export receivables, and reviewed that documentation prior to approving the application to purchase the receivables.  In total, the Ninth Set of KB-ASI Purchase Orders had an aggregate value of $4,321,000.

235.   Payment for the goods represented in the Ninth Set of KB-ASI Purchase Orders was due on January 14, 2015.  However, ASI defaulted on that payment and KB has never received payment for the funds it advanced on the Ninth Set of KB-ASI Purchase Orders.  <u>Exhibit D-1</u>, attached to this Complaint and incorporated herein by

reference, lists the details—including the purchase order numbers, dates purchased, and dates payment became due—for each of the KB-ASI purchase orders.

236.   <u>The First Set of Newegg Purchase Orders</u>.  On or about October 30, 2013, KB purchased Moneual's accounts receivable due from Newegg Trading Limited corresponding to sixteen purchase orders issued by Newegg Trading Limited and guaranteed by Newegg, Inc.  Fifteen of these purchase orders purported to purchase $1,265,000 worth of goods from Moneual per purchase order (the "First Set of KB-Newegg Purchase Orders").  The final purchase order purported to purchase $1,012,000 worth of goods from Moneual.  These purchase orders were signed by Edison Chih on behalf of Newegg, Inc. and Newegg Trading Limited and countersigned by HS Park.

237.   Moneual also sent Newegg Trading Limited SPIs informing it that Moneual had assigned the right to payment for goods sold pursuant to the First Set of KB-Newegg Purchase Orders to KB and instructing Newegg Trading Limited to pay KB directly when payment became due.  Edison Chih, the COO of Newegg, Inc. and Newegg Trading Limited, signed the SPIs acknowledging and consenting to the assignment and payment instructions.

238.   KB received copies of the First Set of KB-Newegg Purchase Orders and corresponding commercial invoices, packing lists, shipping documents, and SPIs from Moneual in connection with its application to sell export receivables, and reviewed that documentation prior to approving the application to purchase the receivables.  In total, the First Set of KB-Newegg Purchase Orders had an aggregate value of $19,987,000.

239.   Payment for the goods represented in the First Set of KB-Newegg Purchase Orders was due on March 29, 2014.  On or about January 8, 2014 and January 15, 2014, KB received a payment of $10,120,000 and $9,867,000 respectively, which together amounted to complete payment for the First Set of KB-Newegg Purchase Orders, from an account in the name of Newegg Trading Limited, Newegg, Inc.'s agent and alter ego.

Gibson, Dunn &
Crutcher LLP

240.   The Second Set of Newegg Purchase Orders.  On or about January 8, 2014, KB purchased Moneual's accounts receivable due from Newegg, Inc. corresponding to eight purchase orders issued by Newegg, Inc., through Newegg Trading Limited, each purporting to purchase $1,265,000 worth of goods from Moneual (the "Second Set of KB-Newegg Purchase Orders").  These purchase orders were signed by Edison Chih on behalf of Newegg, Inc. and Newegg Trading Limited and countersigned by HS Park.

241.   Moneual also sent Newegg, Inc., through Newegg Trading Limited, SPIs informing it that Moneual had assigned the right to payment for goods sold pursuant to the Second Set of KB-Newegg Purchase Orders to KB and instructing Newegg Trading Limited, Newegg, Inc.'s agent and alter ego, to pay KB directly when payment became due.  Edison Chih, the COO of Newegg, Inc. and Newegg Trading Limited, signed the SPIs acknowledging and consenting to the assignment and payment instructions.

242.   KB received copies of the Second Set of KB-Newegg Purchase Orders and corresponding commercial invoices, packing lists, shipping documents, and SPIs from Moneual in connection with its application to sell export receivables, and reviewed that documentation prior to approving the application to purchase the receivables.  In total, the Second Set of KB-Newegg Purchase Orders had an aggregate value of $10,120,000.

243.   Payment for the goods represented in the Second Set of KB-Newegg Purchase Orders was due on or about June 7, 2014, and on or about June 11, 2014, KB received a total payment of $10,120,000 for the Second Set of KB-Newegg Purchase Orders from an account in the name of Newegg Trading Limited, Newegg, Inc.'s agent and alter ego.

244.   The Third Set of Newegg Purchase Orders.  On or about January 15, 2014, KB purchased Moneual's accounts receivable due from Newegg, Inc. corresponding to eight purchase orders issued by Newegg, Inc., through Newegg

Gibson, Dunn &
Crutcher LLP

Trading Limited.  Seven of these purchase orders purported to purchase $1,265,000 worth of goods from Moneual (the "Third Set of KB-Newegg Purchase Orders").  The final purchase order purported to purchase $1,012,000 worth of goods from Moneual. These purchase orders were signed by Edison Chih on behalf of Newegg, Inc. and Newegg Trading Limited and countersigned by HS Park.

245.   Moneual also sent Newegg, Inc., through Newegg Trading Limited, SPIs informing it that Moneual had assigned the right to payment for goods sold pursuant to the Third Set of KB-Newegg Purchase Orders to KB and instructing Newegg Trading Limited, Newegg, Inc.'s agent and alter ego, to pay KB directly when payment became due.  Edison Chih, the COO of Newegg, Inc. and Newegg Trading Limited, signed the SPIs acknowledging and consenting to the assignment and payment instructions.

246.   KB received copies of the Third Set of KB-Newegg Purchase Orders and corresponding commercial invoices, packing lists, shipping documents, and SPIs from Moneual in connection with its application to sell export receivables, and reviewed that documentation prior to approving the application to purchase the receivables.  In total, the Third Set of KB-Newegg Purchase Orders had an aggregate value of $9,867,000.

247.   Payment for the goods represented in the Third Set of KB-Newegg Purchase Orders was due on or about June 9, 2014, and on or about June 17, 2014, KB received a total payment of $9,867,000 for the Third Set of KB-Newegg Purchase Orders from an account in the name of Newegg Trading Limited, Newegg, Inc.'s agent and/or alter ego.

248.   The Fourth Set of Newegg Purchase Orders.  On or about December 5, 2013, Newegg, Inc., through Newegg Trading Limited, issued sixteen purchase orders, each purporting to purchase 500 HTPC units from Moneual at $2,530 per unit, totaling $1,265,000 per purchase order (the "Fourth Set of KB-Newegg Purchase Orders"). These purchase orders were signed by Edison Chih on behalf of Newegg, Inc. and Newegg Trading Limited, and countersigned by HS Park.

Gibson, Dunn & Crutcher LLP

SECOND AMENDED COMPLAINT

249.   On June 12, 2014 and June 17, 2014, Moneual issued commercial invoices and packing lists for subsets of these purchase orders—eight purchase orders on each date—listing Newegg Trading Limited, Newegg, Inc.'s agent, as the consignee of the goods, and purportedly shipped the goods purchased by these orders on these same dates.

250.   Moneual also sent Newegg, Inc., through Newegg Trading Limited, SPIs informing it that Moneual had assigned the right to payment for goods sold pursuant to the Fourth Set of KB-Newegg Purchase Orders to KB and instructing Newegg Trading Limited, Newegg, Inc.'s agent and alter ego, to pay KB directly when payment became due.  On June 12, 2014 and June 17, 2014, Edison Chih, the COO of Newegg, Inc. and Newegg Trading Limited, signed the SPIs acknowledging and consenting to the assignment and payment instructions.

251.   On or about June 17, 2014, KB purchased Moneual's accounts receivable due from Newegg, Inc., through Newegg Trading Limited, for the invoices pertaining to the Fourth Set of KB-Newegg Purchase Orders.  KB received copies of the Fourth Set of KB-Newegg Purchase Orders and corresponding commercial invoices, packing lists, shipping documents, and SPIs from Moneual in connection with its application to sell export receivables, and reviewed that documentation prior to approving the application and purchasing the receivables.  In total, the Fourth Set of KB-Newegg Purchase Orders had an aggregate value of $19,987,000.

252.   Payment for the goods represented in the Fourth Set of KB-Newegg Purchase Orders was due on November 9, 2014 and November 14, 2014.  However, Newegg, Inc. (as the ultimate issuer of the purchase orders) defaulted on that payment and KB has never received payment for the funds it advanced on the Fourth Set of KB-Newegg Purchase Orders.  Exhibit D-2, attached to this Complaint and incorporated herein by reference, lists the details—including the purchase order numbers, dates purchased, and dates payment became due—for each of the KB-Newegg Purchase Orders.

Gibson, Dunn & Crutcher LLP

SECOND AMENDED COMPLAINT

253.   On November 5, 2014, KB sent Moneual a repayment notice demanding payment of the for the invoices relating to the Seventh, Eighth, and Ninth Sets of KB-ASI Purchase Orders and the Fourth Set of KB-Newegg Purchase Orders.  However, to date, none of these invoices has been paid.  The total amount of the unpaid Newegg receivables is approximately $19,987,000 and the total amount of unpaid ASI receivables is approximately $20,323,600.

**The Fraudulent Scheme Unravels and Defendants' Participation is Exposed**

254.   On or about October 20, 2014, Moneual filed for receivership in Korea, owing in excess of $500 million to its lenders, including the Banks.  As confirmed by news reports, Moneual's receivership filing was "abrupt," "unexpected" and "a shock" because Moneual had posted revenue of approximately U.S. $1.1 billion and an operating profit of approximately U.S. $9.65 billion in 2013.

255.   In late 2014, the Korean Customs Service conducted an investigation of Moneual's activities and prepared an internal investigation report.  On or about January 23, 2015, the Seoul district prosecutor's office indicted HS Park and other Moneual employees.  The indictment charged that those individuals had caused Moneual to execute large-scale fraud schemes using circular transactions.  The indictment further charged that Moneual had greatly exaggerated the price of its HTPCs, often charging nearly $3,000 per unit when in fact, according to the Korean authorities, they were worth only approximately $7 to $18 per unit—a fraction of a percent of the amount that Moneual had billed to ASI and Newegg and that the Banks had advanced to Moneual.  The indictment also detailed how Moneual's foreign importers, like ASI and Newegg, Inc., through its alter ego and agent, Newegg Trading Limited, provided Moneual with purchase order numbers to enable Moneual executives to generate false and fraudulent purchase orders, which Moneual then used to obtain financing from at least ten banks, including the plaintiff Banks.

256.   In reliance on these purchase orders from Moneual's foreign importers, the Banks believed they were purchasing valid export receivables, when in fact, they

1  were providing Moneual with loans and advances based on bogus purchase orders that

2  Moneual's foreign importers helped Moneual create.

3      257.   The Banks are informed and believe and on that basis allege that both the

4  ASI Defendants and Newegg, Inc. knew about Moneual's scheme to defraud its

5  lenders and agreed to assist Moneual in perpetrating that scheme.  Making these

6  circular payments enabled the participants to continue to deceive the Banks and to

7  prolong the fraudulent scheme.

8      258.   The Korean authorities' investigation of the fraud revealed the following:

9  Moneual continuously increased its trade finance limits by providing false corporate

10  credit rating data to KSURE and the Banks.  Moneual represented to KSURE and the

11  Banks that its HTPCs were actually sold in the United States, executing fraudulent

12  Supply and Sales Agreements with ASI and Newegg.com pursuant to which Moneual

13  promised to export hundreds of millions of dollars of Moneual products to these

14  importers in specific years and ASI and Newegg.com—Newegg, Inc.'s consumer-

15  facing website— guaranteed that they would purchase that amount of product in those

16  years.

17      259.   With regard to ASI, the Korean authorities' investigation of the fraud

18  revealed the following: ASI prepared and emailed fraudulent purchase orders to

19  Moneual or emailed ASI purchase order numbers accessed from ASI's purchase order

20  system to Moneual's Vice President, CW Shin, so that he could create fraudulent

21  purchase orders.  Moneual would then submit the fraudulent purchase orders, along

22  with fraudulent invoices and shipping documents, to financial institutions to sell them

23  export receivables based on these documents.  SY Park and/or Chang-il Choi, two

24  Moneual employees, would tell CW Shin how many purchase orders Moneual needed

25  in light of previously-sold export receivables that were approaching maturity.

26      260.   When ASI first became involved in the scheme, Moneual would ship the

27  HTPCs to ASI, who then sold the HTPCs to various paper companies that HS Park

28  established in Hong Kong and in the U.S., including, for example, Polaris Media

Gibson, Dunn &
Crutcher LLP

67
SECOND AMENDED COMPLAINT

Research Inc. and Media Research Holding Limited (together, "Polaris").  Polaris and the other paper companies then sold the HTPCs to PK Paradigms Holdings Ltd. ("PK Paradigms"), another paper company set up by HS Park.  When the payment dates for the export receivables approached, HS Park transferred money to PK Paradigms disguised as payment for manufacturing supplies and parts for new products that Moneual was importing into Korea, when in fact Moneual was bringing back the very HTPCs it had exported.  However, beginning in 2013, the transfer of ownership of the HTPCs took place only on paper, without any physical transfer of goods.  The Banks are informed and believe, and on that basis allege, that the physical transfer of goods may have ceased as early as 2011.  To summarize, the movement or purported movement of goods in the ASI-Moneual transactions was as follows:



SECOND AMENDED COMPLAINT

Gibson, Dunn &
Crutcher LLP

261.   The money from the advances Moneual received from financial institutions was then transferred in reverse to the supposed flow of the HTPCs to allow ASI to make payments to financial institutions for the export receivables.  ASI's purchase orders provided for payment by ASI within 180 days of shipment.  After shipping or purportedly shipping the goods, Moneual would sell the export receivables to financial institutions, including the Banks, in exchange for an advance of funds. When a set of export receivables would become due, Moneual would transfer funds from previous bank advances to PK Paradigms, purportedly for the supplies and parts it was purchasing from PK Paradigms.  PK Paradigms would then transfer the funds to the paper companies, purportedly for the purchase of HTPCs.  The paper companies HS Park created or controlled, as ASI's purported "customers," would then transfer funds to ASI, who would use the funds to pay the Banks for the export receivables they had purchased, pursuant to the signed SPIs.  To summarize, the money in the ASI-Moneual transactions flowed as follows:



Gibson, Dunn &
Crutcher LLP

69

SECOND AMENDED COMPLAINT

262.   With regard to Newegg, Inc., the Korean authorities' investigation of the fraud revealed the following: The Korean authorities determined that the buyer of Moneual's HTPCs was "Newegg in the U.S.," necessarily referring to Newegg, Inc., which owns and operates Newegg.com.  The Korean authorities further confirmed that Moneual involved "Newegg, the second largest computer component supplier in the US" in the fraudulent transactions beginning in September 2012 in order to continue the scheme after Moneual had reached KSURE's insurance limits for ASI and CNBM. Newegg, Inc. used Newegg Trading Limited, its Hong Kong subsidiary and affiliate, to make it easier for Moneual to carry out the fraud.

263.   The Korean authorities' investigation further concluded that, as with ASI, Moneual employees would calculate the number of purchase orders needed in light of previously-sold export receivables that were approaching maturity, and ask Frances Chou to coordinate with Newegg, Inc. employees to obtain the purchase orders. Frances Chou would contact Edison Chih, who would provide the purchase orders or purchase order numbers, and Frances Chou would send the purchase orders or purchase order numbers to Moneual.

264.   The Korean authorities' investigation also found that the purported flow of goods followed a similar structure to the ASI transactions.  Moneual purported to deliver goods to Newegg Trading Limited or to Advance Global on behalf of Newegg Trading Limited (who was in turn acting at all times on behalf of and at the direction of Newegg, Inc.).  Newegg Trading Limited or Advance Global would then purport to sell the goods to PK Paradigms or another paper company established by HS Park, Amerex Corporation Ltd., which then purported to sell parts or manufacturing supplies to Moneual.  However, all of the purported transactions between Moneual and Newegg, Inc., through Newegg Trading Limited, took place on paper only; no physical transfer of goods ever occurred.  As with ASI, the money for the Newegg transactions was transferred in reverse to the supposed flow of the goods to allow Newegg, Inc.,

1    through Newegg Trading Limited, to make payments to financial institutions for the

2    export receivables they had purchased, in accordance with the signed SPIs.

3          265.   Although bank branch managers or credit analysts visited the Hong Kong-

4    based manufacturing contractor Moneual purportedly used to manufacture its goods,

5    Moneual would receive advance notice of these visits, and would hire actors to work

6    on the assembly line and arrange boxes and products to make the factory look like a

7    legitimate manufacturing plant.

8          266.   The Korean authorities' investigation also revealed that in exchange for

9    the foreign importers' participation in Moneual's fraudulent scheme to obtain money

10   from financial institutions in exchange for bogus export receivables, Moneual paid the

11   foreign importers, including ASI and Newegg, Inc. (or Newegg Trading Limited on

12   Newegg, Inc.'s behalf), and executives and employees of those foreign importers,

13   kickbacks, which HS Park called "commissions."  Moneual involved ASI and

14   Newegg, Inc. (which the Korean authorities referred to as "credible and solid"

15   companies) so that it could increase its export finance loan limits by using ASI and

16   Newegg Inc.'s credit ratings and financial statements.

17         267.   Specifically with respect to ASI, the Banks are informed and believe and

18   on that basis allege that Moneual calculated the "commissions" it paid to ASI by

19   applying an agreed-upon percentage to ASI's monthly purchase amount from

20   Moneual, and later, to ASI's quarterly or half-yearly purchase amount from Moneual.

21         268.   The Banks are informed and believe and on that basis allege that

22   beginning in 2008, Moneual paid ASI a 1.5 percent commission.  However, upon

23   information and belief, in 2012, at ASI's request, Moneual reduced ASI's

24   "commission" and began to pay personal "commissions," calculated in the same

25   fashion, directly (or, through intermediaries or family members or to offshore

26   accounts) to officers, employees and agents of ASI including, among others, the

27   Individual Defendants.

28

269.   HS Park testified in the Korean criminal proceedings that the Individual Defendants were aware of the fraudulent scheme and actively participated, and that they demanded, received, and accepted millions in bribes from Moneual in return for their participation in the fraudulent scheme.  Between 2012 and 2014, Bill Chen and Frances Chou emailed Moneual personnel, including HS Park, numerous times to request that Moneual pay them personal "commissions."   HS Park admitted that he remitted "commissions" to the Individual Defendants numerous times to keep the circular transactions going.  Specifically, testimony in the Korean criminal proceedings revealed that Moneual paid key personnel at ASI, including the Individual Defendants, in excess of $8 million in kickbacks between 2012 and 2014.  A ledger detailing Moneual's flow of funds for the circular transactions with ASI demonstrates that between 2012 and 2014, Moneual, through its paper companies, made multiple wire payments to the Individual Defendants or their family members or designated companies.  Specifically:

a.     Defendant Bill Chen and/or his designated company received kickbacks on at least the following occasions: April 10, 2013 ($40,000); July 8, 2013 ($60,000 and $129,500); October 4, 2013 ($64,655 and $50,000); January 15, 2014 ($100,000); and  January 20, 2014 ($1,538,186).  The Banks are informed and believe and on that basis allege that some of the kickback payments Bill Chen received were wired to an account in the name of THC Ltd., although most of the payments were made to him in cash in person during his many business trips to Hong Kong.

b.     Defendant Frances Chou and/or her designated relative received wire transfers on at least the following occasions: October 10, 2012 ($48,000); November 2, 2012 ($35,158); November 30, 2012 14,680); January 3, 2013 ($13,125); February 1, 2013 ($21,985); March 4, 2013 ($110,958); April 3, 2013 ($22,878); May 3, 2013

Gibson, Dunn &
Crutcher LLP

1   ($22,460); June 4, 2013 ($20,930); June 27, 2013 ($518,120);

2   August 6, 2013 ($31,880); September 17, 2013 ($27,020); October

3   3, 2013 ($27,485); January 13, 2014 ($34,030); February 17, 2014

4   ($33,200); March 13, 2014 ($33,390); April 8, 2014 ($34,750); and

5   May 7, 2014 ($34,910).

6       c.    Defendant Henry Chen and/or his paper company received wire

7   transfers on at least the following occasions: October 8, 2012

8   ($125,237); January 17, 2013 ($183,499); April 5, 2013

9   ($112,091); July 2, 2013 ($230,944); October 9, 2013 ($140,493);

10   January 16, 2014 ($156,364); and February 26, 2014 ($200,000).

11   The Banks are informed and believe and on that basis allege that

12   some or all of the kickback payments Henry Chen received were

13   wired an account in the name of THC Ltd.

14       d.    Defendant Christine Liang and/or her paper company received wire

15   transfers on at least the following occasions: October 15, 2012

16   ($450,000); October 19, 2012 ($457,419); January 17, 2013

17   ($575,801); April 23, 2013 ($199,613); July 12, 2013 ($1,719,414);

18   October 18, 2013 ($1,142,958); and May 2, 2014 ($1,166,152).

19   The Banks are informed and believe and on that basis allege that

20   some or all of the kickback payments Christine Liang received

21   were wired to an account in the name of Berwick Resources Ltd, a

22   Taiwanese company that she personally controlled.

23   270.   The Banks are informed and believe and on that basis allege that HS Park

24   directed Jeff Kim, a Moneual employee who managed the bank accounts of HS Park's

25   paper companies, to make the commission payments by wiring funds from Paradigms

26   or other paper companies to the Individual Defendants' bank accounts or to bank

27   accounts of companies they designated.

28

271.   The Banks are informed and believe and on that basis allege that the Individual Defendants also received cash payments from Moneual.

272.   Specifically with respect to Newegg, Inc., the Korean authorities' investigation revealed that the money HS Park wired to Newegg Trading Limited, on behalf of Newegg, Inc., through the fraudulent circular transactions so that it could pay the Banks included an additional one to two percent "commission" that Newegg, Inc. would retain as payment for its participation in the scheme.  HS Park also paid "commissions" directly to Edison Chih.

273.   ASI and Newegg Inc.'s participation in the fraudulent scheme to defraud the Banks was systemic and institutional, involving multiple officers, employees, and agents of the company who participated in laundering money and creating and concealing fraudulent transactions with Moneual.  The scheme was condoned at the highest levels of the companies by virtue of the involvement of ASI and Newegg, Inc.'s most senior officers including for ASI, its President, Christine Liang, and its Vice Presidents Bill Chen and Henry Chen, and for Newegg, Inc., its COO Edison Chih, who signed the purchase orders and SPIs, and its founder, CEO, and Chairman, Fred Chang, who signed Newegg, Inc.'s Guaranties of Newegg Trading Limited's payments to Moneual and served as Newegg, Inc.'s representative under certain EFF policies insuring the Moneual-Newegg transactions, despite the fact that the transactions between Newegg, Inc., through Newegg Trading Limited, and Moneual took place on paper only.  Fred Chang and Edison Chih also signed the Sales Agreements despite the fact that Newegg, Inc. (acting in the name of its consumer-facing website Newegg.com) had no intention of purchasing any of Moneual's products for resale.

274.   HS Park was convicted in the Seoul Central District Court of defrauding ten Korean banks, including the Plaintiff banks, of over $3 billion between 2007 and 2014 based on loans that Moneual received for fraudulent export contracts.  On October 16, 2015, HS Park was sentenced to 23 years in prison, and fines and

forfeitures of approximately $35 million.  On May 17, 2016, the Seoul High Court reduced his sentence to 15 years in prison.  He is currently serving his sentence.

275.   The Banks are informed and believe and on that basis alleges that other employees or executives of Moneual have also been convicted of fraud based on their participation in the fraudulent schemes of Moneual and HS Park to defraud Moneual's lenders.

276.   The Banks were not aware of the fraudulent scheme until the Korean authorities announced the findings of their investigation on October 31, 2014.

<u>COUNT I</u>

**Fraud**

**(against ASI and Individual Defendants)**

277.   The Banks reallege the allegations of paragraphs 1 through 276 and incorporates those allegations as if fully set forth here.

278.   While engaging in and carrying out the course of conduct alleged above, Moneual and ASI made numerous misrepresentations of material fact to the Banks, and/or concealed from or failed to disclose to the Banks facts that would have been material to the Banks' decision to engage in financing relationships with Moneual, and/or that were necessary to make the statements of Moneual and ASI not misleading.

279.   Based on these misrepresentations, the Banks agreed to purchase Moneual's right to payment from ASI for the export receivables described herein. Moneual assigned those receivables to the Banks, and ASI acknowledged and consented to the assignments.  These assignments established a commercial relationship between ASI and the Banks, and ASI then transacted directly with the Banks by making payments to the Banks as described herein, pursuant to the assignments.

280.   ASI's misrepresentations, concealments, and failures to disclose included, among others, the following:

a. ASI issued multiple sets of purchase orders that Moneual used to secure advances from the Banks even after Moneual stopped shipping goods to ASI (by 2013, and potentially as early as 2011).  ASI would not have issued those purchase orders unless it intended to deceive the Banks into providing financing to Moneual for nonexistent transactions.  ASI knew or had reason to expect that Moneual was transmitting the purchase orders to the Banks because through the SPIs, it was aware that Moneual was assigning the export receivables, or  "sales contracts" represented by the purchase orders and invoices, to the Banks, and it acknowledged and consented to those assignments of export receivables backed by the purchase orders.  ASI knew or should have known that the Banks would reasonably rely on the purchase orders in agreeing to purchase the credit receivables under the EFAs.  Nevertheless, ASI did not inform the banks that its receipt of the HTPCs were part of a fraudulent scheme involving circular transactions, or, that after 2013, that it was no longer receiving the goods described in the purchase orders it issued or assisted Moneual in issuing or fabricating.

b. Between 2006 and August 2014, ASI sent the Banks multiple wire transfers amounting to hundreds of millions of dollars from an account of its Hong Kong affiliate in payment for the invoices pertaining to various sets of fraudulent purchase orders.  Due to the nature of Moneual's fraudulent scheme, based on circular transactions, even when ASI did receive goods from Moneual, the wire transfers did not reflect payment for genuine transactions.  When Moneual stopped shipping goods to ASI, ASI continued to make wire transfers to the Banks.  ASI knew that the wire transfers did not represent payment for genuine transactions, and it knew that Banks were receiving these payments because it was transmitting them directly to the Banks.  ASI failed to disclose that the

Gibson, Dunn &
Crutcher LLP

SECOND AMENDED COMPLAINT

wire transfers represented payments for circular transactions, and after 2013, failed to disclose that it was not receiving any goods in exchange for the wire transfers it was making to the Banks.  ASI made these payments to create the illusion that its purchase orders represented genuine transactions, in order to deceive the Banks into continuing to finance Moneual's exports to ASI, thereby prolonging the fraudulent scheme.

c.    ASI acknowledged and consented to the SPIs even though it knew that the purchase orders referenced by the SPIs were fraudulent.  ASI knew or had reason to expect that Moneual would transmit the SPIs to the Banks because the SPIs confirmed that ASI would pay the Banks directly for the export receivables.  Nevertheless, ASI failed to disclose that the purchase orders referenced in the SPIs were fraudulent.  ASI signed the SPIs to deceive the Banks into continuing to finance Moneual's exports to ASI, thereby prolonging the fraudulent scheme.

d.    After Moneual stopped shipping goods to ASI, ASI entered into a Supply Agreement with Moneual in November 2013 that required ASI Corp. to purchase a high quantity of goods from Moneual—$50 million in the first year of the Supply Agreement and $250 million in the second.  However, because Moneual was no longer shipping goods to ASI, ASI could not have resold the large quantity of goods it committed to purchase.  ASI had reason to know that Moneual would forward the Supply Agreement to IBK, KEB Hana and KB because IBK, KEB Hana and KB had entered into EFAs with Moneual to purchase its ASI receivables—and had purchased some of Moneual's ASI receivables—before Moneual and ASI signed the Supply Agreement.  Further, ASI already had made multiple payments to IBK, KEB Hana and KB for the ASI receivables those Banks purchased from Moneual before Moneual and ASI entered the Supply

Agreement.  Thus, ASI was aware that IBK, KEB Hana, and KB had been purchasing ASI receivables from Moneual and collecting on those advances before ASI entered the Supply Agreement.  In addition, because ASI knew that Moneual was obtaining advances on its ASI receivables from multiple financial institutions, it could reasonably expect that Moneual would seek export trade financing for its ASI receivables from other financial institutions, including NH.  Despite not receiving any goods from Moneual by 2013, ASI entered into the Supply Agreement to deceive the Banks into continuing to finance Moneual's exports to ASI, as it knew or could reasonably expect that Moneual would transmit it to the Banks to provide comfort to them that Moneual had guaranteed customers for the high volume of export receivables it sold, and the Banks could expect repayment.

281.   Moneual and ASI made each of the misrepresentations set forth in paragraph 280(a)-(d) with knowledge of its falsity, and with the intent to deceive the Banks, by inducing them to advance millions of dollars to Moneual against fraudulent receivables that ASI had no intent to pay.

282.   The misrepresentations and deceit directed at the Banks were known or condoned at the highest levels of ASI's institutional structure.  ASI's most senior officers and agents, including its President, Christine Liang; its Vice Presidents Bill Chen and Henry Chen; and its agent and director, Frances Chou, participated in the fraudulent scheme to defraud the Banks, and conspired with and aided and abetted Moneual to carry out the fraudulent scheme by, among other things, the following:

a.   Defendant Christine Liang, the President of ASI, received kickbacks from Moneual in amounts that the Banks are informed and believe exceeded $5 million, paid to Berwick Resources Ltd., an account she controlled;

b.   Defendant Bill Chen, ASI's Vice President of Finance, participated in numerous communications and transactions with Moneual and its agents

regarding transferring funds among ASI, Moneual, and multiple sham corporations set up by Moneual as part of the circular transactions that were the essence of the fraudulent scheme; colluded with Moneual and its agents to set up sham entities as customers or vendors of ASI as part of the circular transactions, to convey false information to the Banks, and to conceal negative information from becoming publicly known; and received kickbacks from Moneual in amounts that the Banks are informed and believe exceeded $1 million;

c.   Defendant Henry Chen, ASI's Vice President of Business Development and/or Vice President of Sales, communicated directly with agents of Moneual regarding submitting fraudulent purchase orders to Moneual and other entities regarding structuring the circular transactions that were the essence of the fraudulent scheme, and received kickbacks from Moneual in amounts that the Banks are informed and believe exceeded $1 million;

d.   Defendant Frances Chou, ASI's director and its employee or agent, provided material assistance to Moneual by creating sham entities to participate in the circular transactions, developing web pages for those sham entities to give them the appearance of genuine companies, and participating in or orchestrating the submission of fraudulent purchase orders and the transfer of funds among ASI, Moneual, and multiple sham corporations set up by Moneual as part of the circular transactions that were the essence of the fraudulent scheme; and received kickbacks from Moneual in amounts that the Banks are informed and believe exceeded $3 million.

283.   The Banks relied on the representations of Moneual and ASI set forth above in determining to advance hundreds of millions of dollars to Moneual against purported receivables which Moneual and ASI knew to be fraudulent.  Further, the Banks' reliance on the representations of Moneual and ASI was reasonable and

justifiable in light of the efforts made by Moneual and ASI to conceal the fraudulent scheme, mislead the Banks' into continuing to participate in factoring worthless receivables, and lull the Banks into a continuing relationship with Moneual and ASI by creating the illusion of general regularity of business process and legitimacy associated with the worthless receivables.  The Banks would not have advanced money to Moneual pursuant to the EFAs if the Banks had known that the purchase orders that ASI issued for Moneual HTPCs were fraudulent, or that Moneual was engaged in a massive scheme to defraud the Banks and numerous other banks by conspiring with foreign importers such as ASI to create the illusion that Moneual was exporting millions of dollars of goods in legitimate business transactions.

284.   More specifically, the Banks justifiably relied on the representations of Moneual and ASI in that the Banks conducted a commercially reasonable investigation into the business of its customer Moneual and the creditworthiness of Moneual's customers including ASI and reasonably determined, based on information which turned out to be false, that Moneual's business was legitimate and would support the factoring agreement for Moneual's receivables.  Moreover, the Banks conducted a customary and market-standard review of the purchase orders and other documentation backing the export receivables, and justifiably relied on the statements made in those documents concerning the price, quantity ordered, and shipment of the goods. Although those statements turned out to be false, their falsity could not be determined from the face of the documents.  Further, from all external indications, ASI was a profitable, reputable company with over $1 billion in revenue and multiple locations worldwide that engaged in distributing the types of goods Moneual purported to be selling.  Given the size, breadth, history and experience of ASI in the relevant industry, the Banks had no reason to doubt that the products were worth the nearly $3,000 per unit that ASI was supposedly paying for them.  Further, the Banks continuously received payment from ASI for the export receivables that came due up until the

1   month before the Korean authorities uncovered the fraudulent scheme.  Thus, the

2   Banks had no reason to suspect that ASI was engaged in a scheme to defraud them.

3        285.   In addition to defrauding the Banks directly by making the

4   misrepresentations alleged above, ASI rendered substantial assistance to HS Park and

5   Moneual to enable them to carry out the scheme to defraud Moneual's lenders,

6   including the Banks.

7        286.   ASI rendered such assistance by, among other actions:

8        a.    entering into the Supply Agreement with Moneual calling for the

9              minimum purchase of hundreds of millions of dollars of Moneual

10             products even though it was no longer receiving any products from

11             Moneual when it entered the Supply Agreement;

12       b.    issuing purchase orders for multiple units of HTPCs at high prices,

13             enabling Moneual to use those purported purchase orders to induce the

14             Banks to enter into EFAs and ultimately advance large sums to Moneual

15             against fraudulent receivables;

16       c.    paying the Banks in respect of Moneual's purported receivable on

17             multiple sets of purchase orders, thereby enabling Moneual to construct

18             and prolong its deceptive scheme; and

19       d.    suffering or permitting its executives, officers, and employees to receive

20             millions of dollars in bribes in the form of kickbacks from Moneual.

21       287.   The Individual Defendants rendered such assistance by, among other

22   actions:

23       a.    colluding with Moneual to set up sham entities to act as customers or

24             vendors of ASI for the purpose of facilitating the circular transactions;

25       b.    submitting false and fraudulent purchase orders to Moneual and other

26             entities to create the appearance of legitimate transactions that Moneual

27             would use to obtain financing from the Banks;

28

Gibson, Dunn &
Crutcher LLP

c.    directing or orchestrating the transfer of funds among ASI, Moneual, and multiple sham corporations that constituted the circular transactions that were the essence of the fraudulent scheme; and

d.    accepting bribes and kickbacks from Moneual amounting to millions of dollars in exchange for concealing the nature and extent of the massive fraudulent scheme.

288.   The Banks are informed and believe and on that basis allege that ASI through its directors, officers, employees, and agents, including without limitation the Individual Defendants, had actual knowledge of the fraudulent scheme perpetrated against Moneual's lenders, including the Banks, at the time that ASI and the Individual Defendants rendered each act substantially assisting Moneual and its executives, including HS Park, to carry out their fraudulent scheme.  ASI and the Individual Defendants therefore aided and abetted Moneual and HS Park in the scheme to defraud the Banks.

289.   The Banks are informed and believe and on that basis allege that ASI and the Individual Defendants shared a common plan or design with Moneual and its executives, including HS Park, and agreed with Moneual and its executives to defraud Moneual's lenders, including the Banks.  In furtherance of that common plan or design, ASI and the Individual Defendants conspired with Moneual and HS Park to defraud the Banks by engaging in the acts and making the representations alleged above.  ASI and the Individual Defendants are therefore liable to the same extent as Moneual and HS Park for the damages the Banks sustained as a result of the scheme to defraud them.

290.   As a result of the foregoing misrepresentations, concealments, and nondisclosures made to the Banks, and the Banks' reliance thereon, the Banks have been damaged in a minimum amount of $131,626,600 plus interest according to proof.

291.   The Banks are informed and believe and on that basis allege that ASI, through its officers, directors, or managing agents, including the Individual

Defendants, had advance knowledge of the unfitness of its employees and agents, and employed them with an intent to deceive and/or with a conscious disregard of the rights of others, including the Banks, and that each authorized and ratified the fraudulent conduct of its employees and agents as alleged herein.  The Banks are therefore entitled to exemplary damages against ASI in an amount sufficient to punish it and deter similar conduct in the future.

292.   By virtue of their actions as alleged herein, each of the Individual Defendants has engaged in acts of malice and fraud directed at the Banks.  The Banks are therefore entitled to exemplary damages against each Individual Defendant, in an amount sufficient to punish them and deter similar conduct in the future.

## COUNT II

### Fraud

### (NH, KEB Hana, and KB against Newegg, Inc. and Magnell)

293.   NH, KEB Hana, and KB reallege the allegations of paragraphs 1 through 277 and incorporates those allegations as if fully set forth here.

294.   While engaging in and carrying out the course of conduct alleged above, Moneual and Newegg, Inc., either directly or through its alter ego and agent, Newegg Trading Limited, made numerous misrepresentations of material fact to NH, KEB Hana, and KB, and/or concealed from or failed to disclose to NH, KEB Hana, and KB facts that would have been material to their decisions to engage in financing relationships with Moneual, and/or that were necessary to make the statements of Moneual and Newegg, Inc. not misleading.

295.   Based on these misrepresentations, the Banks agreed to purchase Moneual's right to payment from Newegg, Inc., acting through Newegg Trading Limited, for the export receivables described herein.  Moneual assigned those receivables to the Banks, and Edison Chih, the COO of Newegg, Inc. and Newegg Trading Limited, acknowledged and consented to the assignments.  These assignments established a commercial relationship between Newegg Trading Limited, as Newegg,

Gibson, Dunn & Crutcher LLP

Inc.'s alter ego and agent, and the Banks, and Newegg Trading Limited, as Newegg, Inc.'s alter ego and agent, then transacted directly with the Banks by making payments to the Banks as described herein, pursuant to the assignments.

296.   Newegg, Inc.'s misrepresentations, concealments, and failures to disclose included, among others, the following:

a.   **Purchase Orders:**

- Newegg Trading Limited issued multiple sets of fraudulent purchase orders that were either guaranteed by Newegg.com or, in the case of all outstanding purchase orders, explicitly issued on behalf of Newegg.com, which is owned and operated by Newegg, Inc., and thus necessarily refers to Newegg, Inc.

- These purchase orders contained Newegg.com's logo, referenced Newegg.com's Standard PO Terms and Conditions and Vendor Code of Conduct, and stated that Newegg.com would issue payments for goods and/or services according to the prices and payment terms in the purchase orders.

- Moneual used these purchase orders to secure advances from NH, KEB Hana, and KB even though its transactions with Newegg, Inc., through Newegg Trading Limited, took place on paper only, and no goods were actually transferred.  Because the purchase orders purported to place orders for goods that Newegg, Inc. had no intention of Newegg Trading Limited actually receiving on its behalf, and which Newegg Trading Limited in fact did not receive, the purchase orders constituted misrepresentations.

- Newegg, Inc. knew or had reason to expect that Moneual was transmitting the purchase orders to NH, KEB Hana, and KB because Edison Chih, the COO of Newegg, Inc. and Newegg Trading Limited, signed SPIs acknowledging that Moneual was

assigning the export receivables, or "sales contracts" represented

by the purchase orders and invoices, to NH, KEB Hana, and KB,

and consenting to those assignments of export receivables backed

by the purchase orders.  Indeed, Edison Chih requested that

Moneual include Newegg, Inc. in the fraudulent scheme so that

Newegg, Inc. could boost its revenue figures.

- Newegg, Inc. knew or should have known that NH, KEB Hana, and
KB would reasonably rely on the purchase orders in agreeing to
purchase the credit receivables and extending additional credit
limits to Moneual for its transactions with Newegg, Inc. (executed
by Newegg Trading Limited).  Nevertheless, Newegg, Inc.
continued to authorize, cause, and direct Newegg Trading Limited
to issue the purchase orders, and did not inform NH, KEB Hana,
and KB that neither Newegg, Inc. nor Newegg Trading Limited
was actually receiving the goods described in the purchase orders it
caused Newegg Trading Limited to issue on its behalf or assisted
Moneual in issuing or fabricating.

- Newegg, Inc. would not have guaranteed the Newegg Trading
Limited purchase orders or authorized, caused, and directed
Newegg Trading Limited to issue purchase orders on its behalf
unless it intended to deceive NH, KEB Hana, and KB into
providing financing to Moneual for nonexistent transactions.

b.    **Wire Transfers:**

- Between January 2013 and August 2014, Newegg Trading Limited,
as Newegg, Inc.'s alter ego and agent, sent NH, KEB Hana, and KB
multiple wire transfers amounting to hundreds of millions of dollars
in payment for the invoices pertaining to the various sets of
fraudulent purchase orders even though its transactions with

Moneual took place on paper only and no goods were actually shipped.  These payments to NH, KEB Hana, and KB for non-existent, fraudulent export receivables constituted a misrepresentation because they represented that genuine transactions were taking place when they were not.

- Newegg, Inc. knew that the wire transfers did not represent payment for genuine transactions, and it knew that NH, KEB Hana and KB were receiving these payments because Newegg Trading Limited was transmitting the payments directly to these Banks on Newegg, Inc.'s behalf.  Further, if Newegg Trading Limited had not issued the payments, Newegg, Inc. would have been responsible for the payments pursuant to (1) the guaranties, (2) the terms of the Sales Agreements Newegg.com entered into with Moneual, and (3) the EFF insurance policies, which listed Newegg, Inc. as the guarantor of payment, and later, the insured importer and payor, for the Moneual transactions.

- Newegg, Inc. caused, directed and authorized Newegg Trading Limited to make these false payments and failed to disclose that neither Newegg, Inc. nor Newegg Trading Limited was receiving any goods in exchange for the wire transfers Newegg Trading Limited was making to NH, KEB Hana and KB on Newegg Inc.'s behalf.

- Newegg, Inc. caused, directed and authorized Newegg Trading Limited to make these payments on its behalf to create the illusion that its purchase orders represented genuine transactions, in order to deceive NH, KEB Hana and KB into continuing to finance Moneual's exports to Newegg, Inc. through Newegg Trading

1    Limited, Newegg, Inc.'s alter ego and agent, thereby prolonging the

2    fraudulent scheme.

3    c.    **SPIs:**

4    - Edison Chih, the COO of Newegg, Inc. and Newegg Trading

5      Limited, acknowledged and consented to the SPIs assigning the

6      export receivables that Newegg Trading Limited incurred on

7      Newegg, Inc.'s behalf to NH, KEB Hana, and KB even though it

8      knew that the purchase orders referenced by the SPIs were

9      fraudulent.  The acknowledgment and acceptance of the assignment

10     of non-existent, fraudulent export receivables to these Banks

11     constituted a misrepresentation.

12   - Newegg, Inc. knew or had reason to expect that Moneual would

13     transmit the SPIs to NH, KEB Hana and KB because the SPIs

14     confirmed that Newegg Trading Limited, on behalf of Newegg,

15     Inc., would pay them directly for the export receivables.

16   - Nevertheless, Newegg, Inc. caused, directed, and authorized

17     Newegg Trading Limited, its alter ego and agent, to make the

18     misrepresentations in the SPIs and failed to disclose that the

19     purchase orders referenced in the SPIs were fraudulent.

20   - Newegg, Inc. caused, directed and authorized Edison Chih, the

21     COO of Newegg, Inc. and Newegg Trading Limited, to sign the

22     SPIs in order to deceive the NH, KEB Hana, and KB into

23     continuing to finance Moneual's exports to Newegg, Inc., through

24     its alter ego and agent Newegg Trading Limited, thereby

25     prolonging the fraudulent scheme.

26   d.    **Guaranties:**

27   - In August 2012 and January 2013, Newegg, Inc. executed

28     Guaranties on behalf of Newegg Trading Limited purporting to

Gibson, Dunn &
Crutcher LLP

SECOND AMENDED COMPLAINT

guaranty payment of up to $70 million, collectively, to Moneual and its successors and assigns for goods purchased, even though it knew or should have known that Newegg Trading Limited never received any goods from Moneual.

- Agreeing to guaranty payment for products that Newegg, Inc. knew or should have known Newegg Trading Limited was not receiving constituted a misrepresentation.

- Newegg, Inc. issued the Guaranties to allow Moneual to obtain EFF insurance to cover its transactions with Newegg Trading Limited. Without Newegg, Inc.'s Guaranties, Moneual would not have received EFF insurance from KSURE, and without EFF insurance, NH, KEB Hana, and KB would not have agreed to extend credit limits to Moneual to purchase its export receivables from Newegg Trading Limited. Thus, Moneual could not have carried out the fraudulent scheme using Newegg Trading Limited as an importer without the Newegg, Inc. Guaranties.

- Newegg, Inc. issued the Guaranties to deceive NH, KEB Hana and KB into financing Moneual's exports to Newegg, Inc. through Newegg Trading Limited, Newegg, Inc.'s alter ego and agent, thereby prolonging the fraudulent scheme.

e. **Sales Agreements:**

- Newegg, Inc. (acting in the name of its consumer-facing website, Newegg.com) entered into two Sales Agreements with Moneual in November 2013 that required Newegg.com to purchase a high quantity of goods from Moneual—$250 million in two years under the Chih Sales Agreement and $400 million under the Chang Sales Agreement.

Gibson, Dunn & Crutcher LLP

SECOND AMENDED COMPLAINT

- Newegg, Inc. (acting in the name of its consumer-facing website, Newegg.com) entered into the Sales Agreements even though Moneual never shipped any goods to Newegg, Inc. or Newegg Trading Limited, Newegg, Inc.'s alter ego and agent, and thus, Newegg.com could not have resold the exorbitant amount of goods it committed to purchase.

- Newegg, Inc. knew or should have known that Moneual was not shipping any goods to it or to Newegg Trading Limited because Newegg Trading Limited, its alter ego and agent, already had issued purchase orders guaranteed by Newegg, Inc., received invoices, acknowledged and consented to assignment of export receivables to KEB Hana and KB, and made payments to KEB Hana for those receivables—even though it had not received any product—when Newegg, Inc. entered into the Sales Agreements.

- Newegg, Inc.'s agreement and guarantee—issued under the name of its consumer-facing website, Newegg.com—to purchase hundreds of millions of dollars' worth of Moneual's products over two years for resale with knowledge that all past transactions with Moneual were, in fact, sham circular transactions and that all future transactions with Moneual would be sham circular transactions constituted a misrepresentation, as it represented that Moneual and Newegg, Inc. intended to engage in legitimate trade transactions, when in fact, it had no intention of doing so.

- Newegg, Inc. (acting in the name of its consumer-facing website, Newegg.com) executed the Sales Agreements so that Moneual could obtain higher EFF insurance credit limits, and thus, could request additional credit extensions from the Banks.  Moneual could not receive higher EFF insurance credit limits unless

SECOND AMENDED COMPLAINT

Gibson, Dunn & Crutcher LLP

Newegg, Inc., which had a high credit rating, became the insured importer.  Without KSURE's agreement to provide EFF insurance, NH, KEB Hana, and KB would not have agreed to extend initial (NH) or additional (KEB Hana and KB) credit limits to Moneual to purchase its export receivables for the transactions with Newegg, Inc., executed by its alter ego and agent, Newegg Trading Limited, on Newegg, Inc.'s behalf.  Thus, Moneual could not have perpetuated the fraudulent scheme if Newegg, Inc. (acting in the name of its consumer-facing website, Newegg.com) had not executed the Sales Agreements.

- Newegg, Inc. had reason to know that Moneual would forward the Sales Agreements to KEB Hana and KB because KEB Hana and KB had entered into EFAs with Moneual to purchase its receivables from Newegg, Inc.'s alter ego and agent, Newegg Trading Limited—and had purchased some of Moneual's Newegg Trading Limited receivables—and Newegg, Inc. had guaranteed those receivables before Moneual and Newegg.com signed the Sales Agreements.

- Newegg, Inc. knew or had reason to know that Moneual had assigned Newegg Trading Limited export receivables it had guaranteed to KEB Hana and KB because Edison Chih, the COO of Newegg, Inc. and Newegg Trading Limited, signed SPIs acknowledging those assignments.  Further, Newegg Trading Limited, Newegg, Inc.'s alter ego and agent, already had made payments to KEB Hana for Newegg Trading Limited receivables it had purchased from Moneual before Moneual and Newegg, Inc. entered the Sales Agreements.  Thus, Newegg, Inc. was aware that KEB Hana and KB had been purchasing Newegg Trading Limited

SECOND AMENDED COMPLAINT

Gibson, Dunn & Crutcher LLP

receivables from Moneual before Newegg, Inc. (acting in the name of its consumer-facing website, Newegg.com) entered the Sales Agreements.  In addition, because Newegg, Inc. knew that Moneual was obtaining advances on its Newegg Trading Limited receivables from multiple financial institutions, it could reasonably expect that Moneual would seek export trade financing for the Newegg Trading Limited purchase orders executed on behalf of Newegg.com from other financial institutions, including NH. Finally, Newegg, Inc. knew or had reason to know that Moneual would transmit the Sales Agreements to the Banks because the Sales Agreements were referenced in the EFF insurance policies the Banks purchased after Newegg, Inc. (acting in the name of its consumer-facing website, Newegg.com) executed the Sales Agreements, and the purchase orders also referenced sales agreements.

- Despite never receiving any goods from Moneual, Newegg, Inc., (acting in the name of its consumer-facing website, Newegg.com), entered into the Sales Agreements to deceive NH, KEB Hana and KB into continuing to finance Moneual's exports to Newegg, Inc., through Newegg Trading Limited, as it knew or could reasonably expect that Moneual would transmit the Sales Agreements to NH, KEB Hana and KB as evidence of the Sales Agreements referenced in the insurance policies, and to provide comfort to them that Moneual had guaranteed customers for the high volume of export receivables it sold, and that they could expect repayment.

297.   Moneual and Newegg, Inc., either directly or through its alter ego and agent, Newegg Trading Limited, made each of the misrepresentations set forth in paragraph 296 (a)-(e) with knowledge of its falsity, and with the intent to deceive NH,

KEB Hana, and KB, by inducing them to advance millions of dollars to Moneual against fraudulent receivables that Newegg, Inc. had no intent to pay, or to cause its alter ego and agent Newegg Trading Limited, to pay on its behalf.

298.   NH, KEB Hana, and KB relied on the representations of Moneual and Newegg, Inc. set forth above in determining to advance hundreds of millions of dollars to Moneual against purported receivables which Moneual and Newegg, Inc. knew to be fraudulent.  Further, NH, KEB Hana, and KB's reliance on the representations of Moneual and Newegg, Inc. was reasonable and justifiable in light of the efforts made by Moneual and Newegg, Inc. to conceal the fraudulent scheme; mislead NH, KEB Hana, and KB into continuing to participate in factoring worthless receivables and lull NH, KEB Hana, and KB into a continuing relationship with Moneual and Newegg, Inc. by creating the illusion of general regularity of business process and legitimacy associated with the worthless receivables.  NH, KEB Hana, and KB would not have advanced money to Moneual pursuant to the EFAs if they had known that the purchase orders that Newegg Trading Limited issued for Moneual HTPCs—which were guaranteed by Newegg, Inc. or issued on Newegg, Inc.'s behalf—were fraudulent.  Further, these Banks would not have advanced money to Moneual for the outstanding receivables if they had not believed—as Newegg, Inc. and Moneual intended them to—that Newegg, Inc. was Moneual's transaction partner and importer, that Newegg, Inc. was causing, directing and authorizing Newegg Trading Limited to act on its behalf as its alter ego and agent, and that Newegg, Inc. ultimately was financially responsible for Newegg Trading Limited's actions.  Finally, NH, KEB Hana, and KB would not have advanced money to Moneual pursuant to the EFAs if they had known that Moneual was engaged in a massive scheme to defraud them and numerous other banks by conspiring with foreign importers such as Newegg, Inc. to create the illusion that Moneual was exporting millions of dollars of goods in legitimate business transactions.

Gibson, Dunn &
Crutcher LLP

299.   More specifically, NH, KEB Hana, and KB justifiably relied on the representations of Moneual and Newegg, Inc. in that they conducted a commercially reasonable investigation into the business of its customer Moneual and the creditworthiness of Moneual's customer Newegg, Inc. and its alter ego and agent, Newegg Trading Limited, and reasonably determined, based on information which turned out to be false, that Moneual's business was legitimate and would support the EFAs for Moneual's receivables.  Moreover, NH, KEB Hana, and KB conducted a customary and market-standard review of the purchase orders and other documents backing the export receivables, and justifiably relied on the statements made in those documents concerning the price, quantity ordered, the shipment of the goods. Although those statements turned out to be false, their falsity could not be determined from the face of the documents.

300.   From all external indications, Newegg Trading Limited was a subsidiary and affiliate of Newegg, Inc., which owns and operates the website Newegg.com, the second largest online-only distributor that sold primarily the types of goods Moneual purported to be selling, and Newegg, Inc., had guaranteed payment to Moneual for Newegg Trading Limited.  Further, Newegg Trading Limited's purchase orders contained Newegg.com's logo, referenced Newegg.com's standard purchase order terms and conditions and vendor code of conduct, stated that Newegg.com would issue payments based on the purchase orders, and, after Newegg, Inc. (acting in the name of its consumer-facing website, Newegg.com) entered into the Sales Agreements, explicitly stated that they were issued on behalf of Newegg.com—a profitable, reputable company with over $2 billion in revenue.  Given the size, breadth, history and experience of Newegg, Inc. in the relevant industry, the Banks had no reason to doubt that the products were worth the more than $2,500 per unit that Newegg, Inc., through its agent and alter ego Newegg Trading Limited, was supposedly paying for them.  Finally, NH, KEB Hana, and KB continuously received payment from Newegg Trading Limited or from Newegg, Inc. through Newegg Trading Limited for the export

receivables that came due up until the month before the Korean authorities uncovered the fraudulent scheme.  Thus, NH, KEB Hana and KB had no reason to suspect that Newegg, Inc. and its alter ego and agent, Newegg Trading Limited, were engaged in a scheme to defraud them.

301.   In addition to defrauding NH, KEB Hana, and KB directly by making the misrepresentations alleged above, Newegg, Inc. rendered substantial assistance to HS Park and Moneual to enable them to carry out the scheme to defraud Moneual's lenders, including the Banks.

302.   Newegg, Inc. rendered such assistance by, among other actions:

a.   executing guaranties so that Moneual could obtain EFF insurance to cover its transactions with Newegg Trading Limited, which allowed Moneual to procure initial trade financing from KEB Hana and KB for these transactions;

b.   entering into the Sales Agreements with Moneual calling for the minimum purchase of hundreds of millions of dollars of Moneual products, which, among other things, enabled Moneual to obtain higher EFF insurance credit limits, and in turn, initial or additional trade financing from NH, KEB Hana and KB;

c.   serving as the insured importer and payor under the EFF insurance policies;

d.   causing, directing and authorizing Newegg Trading Limited, its alter ego and agent, to issue purchase orders on its behalf for multiple units of HTPCs, enabling Moneual to use those purported purchase orders to induce NH, KEB Hana, and KB to enter into EFAs and ultimately advance large sums to Moneual against fraudulent receivables;

e.   causing, directing and authorizing Newegg Trading Limited, its alter ego and agent, to pay NH, KEB Hana, and KB on its behalf in respect of Moneual's purported receivable on multiple sets of purchase orders,

thereby enabling Moneual to construct and prolong its deceptive scheme; and

f.     suffering or permitting its executives, officers, and employees to receive millions of dollars in bribes in the form of kickbacks from Moneual.

303.   NH, KEB Hana, and KB are informed and believe and on that basis allege that Newegg, Inc., through its directors, officers, employees, and agents, including without limitation Edison Chih and Fred Chang, had actual knowledge of the fraudulent scheme perpetrated against Moneual's lenders, including the Banks, at the time that Newegg.com rendered each act substantially assisting Moneual and its executives, including HS Park, to carry out their fraudulent scheme.  Newegg, Inc. therefore aided and abetted Moneual and HS Park in the scheme to defraud NH, KEB Hana, and KB.

304.   NH, KEB Hana, and KB are informed and believe and on that basis allege that Newegg, Inc. shared a common plan or design with Moneual and its executives, including HS Park, and agreed with Moneual and its executives to defraud Moneual's lenders, including NH, KEB Hana, and KB.  In furtherance of that common plan or design, Newegg, Inc. conspired with Moneual and HS Park to defraud NH, KEB Hana, and KB by engaging in the acts and making the representations alleged above. Newegg, Inc. is therefore liable to the same extent as Moneual and HS Park for the damages NH, KEB Hana, and KB sustained as a result of the scheme to defraud them.

305.    As a result of the foregoing misrepresentations, concealments, and nondisclosures made to NH, KEB Hana, and KB, and their reliance thereon, NH, KEB Hana, and KB have been damaged in a minimum amount of $96,970,000, plus interest according to proof.

306.   NH, KEB Hana, and KB are informed and believe and on that basis allege that Newegg, Inc., through its officers, directors, or managing agents, had advance knowledge of the unfitness of its employees and agents, and employed them with an intent to deceive and/or with a conscious disregard of the rights of others, including

NH, KEB Hana, and KB, and that it authorized and ratified the fraudulent conduct of its employees and agents as alleged herein.  NH, KEB Hana, and KB are therefore entitled to exemplary damages against Newegg.com in an amount sufficient to punish the defendants and deter similar conduct in the future.

## COUNT III

### Negligent Misrepresentation

### (against ASI)

307.   The Banks reallege the allegations of paragraphs 1 through 292 and incorporates those allegations as if fully set forth here.

308.   The statements and representations of Moneual and ASI as set forth above were untrue.  Moneual and ASI made those statements and representations with no reasonable ground for believing them to be true, and with the intent to induce the Banks to rely upon them.

309.   The Banks were unaware of the falsity of those statements and representations, and justifiably relied on those statements and representations in determining to advance hundreds of millions of dollars to Moneual against purported receivables which Moneual and ASI either knew to be fraudulent or had no reasonable grounds to believe were genuine.

310.   As a proximate result of the Banks' reliance on the truth of the statements and representations of ASI, and their other acts and omissions as alleged above, each bank has been damaged in the amounts set forth below, plus interest according to proof:

- IBK: $83,469,800
- NH: $9,983,000
- KEB Hana: $17,850,200
- KB: $20,323,600

## COUNT IV

SECOND AMENDED COMPLAINT

Gibson, Dunn & Crutcher LLP

**Negligent Misrepresentation**

**(NH, KEB Hana, and KB against Newegg, Inc. and Magnell)**

311.   NH, KEB Hana, and KB reallege the allegations of paragraphs 1 through 276 and 293 through 306 and incorporates those allegations as if fully set forth here.

312.   The statements and representations of Moneual and Newegg, Inc., directly or through its alter ego and agent, Newegg Trading Limited, as set forth above were untrue.  Moneual and Newegg, Inc. made those statements and representations with no reasonable ground for believing them to be true, and with the intent to induce NH, KEB Hana, and KB to rely upon them.

313.   NH, KEB Hana, and KB were unaware of the falsity of those statements and representations, and justifiably relied on those statements and representations in determining to advance hundreds of millions of dollars to Moneual against purported receivables which Moneual and Newegg, Inc. either knew to be fraudulent or had no reasonable grounds to believe were genuine.

314.   As a proximate result of NH, KEB Hana, and KB's reliance on the truth of the statements and representations of Newegg, Inc., and its other acts and omissions as alleged above, each bank has been damaged in the amounts set forth below, plus interest according to proof:

- NH: $9,993,000
- KEB Hana: $66,990,000
- KB: $19,987,000

## COUNT V

**Violations of California Business & Professions Code §§ 17200 *et seq*.,**

**Resulting in Unfair Competition**

**(against ASI and the Individual Defendants)**

315.   The Banks reallege the allegations of paragraphs 1 through 292 and 307 through 310 and incorporates those allegations here as if fully set forth.

Gibson, Dunn &
Crutcher LLP

316.   ASI's aforementioned actions constitute "unlawful" business practices under California Business & Professions Code §§17200 *et seq.*—including, but not limited to (i) voluntarily and intentionally participating in Moneual's scheme to defraud the Banks; (ii) using mail and wire communications in violation of 18 U.S.C. §1341 and 18 U.S.C. §1343 by issuing fraudulent purchase orders via email  and making wire transfers to the Banks in order to enable Moneual to continue its fraudulent scheme; and (iii) negligently supervising its employees, thereby allowing them to perpetrate the fraud.

317.   The Individual Defendants' aforementioned actions constitute "unlawful" business practices under California Business & Professions Code §§17200 *et seq.*— including, but not limited to (i) voluntarily and intentionally participating in Moneual's scheme to defraud the Banks; (ii) using mail and wire communications in violation of 18 U.S.C. §1341 and 18 U.S.C. §1343 by issuing fraudulent purchase orders via email and making wire transfers to the Banks in order to enable Moneual to continue its fraudulent scheme; (iii) accepting bribes and kickbacks from Moneual amounting to millions of dollars in exchange for concealing the nature and extent of the massive fraudulent scheme.

318.   ASI and the Individual Defendants' conduct also constituted an "unfair" and "fraudulent" practice under California Business & Professions Code §§17200 *et seq.*, in that it was immoral, unethical and unscrupulous, and intended to deceive the public.

319.   As a direct and proximate result of ASI and the Individual Defendants' unlawful, unfair and fraudulent acts, the Banks lost money and property in the form of injury to their business, including damage to their reputation and client relationships, as well as actual and consequential damages, including the loss of past, present, and future profits.  Pursuant to California Business and Professions Code §17203, the Banks seek restitution and further equitable relief from ASI and the Individual Defendants as a result of their unfair, unlawful, and fraudulent acts.

Gibson, Dunn & Crutcher LLP

## COUNT VI

### Violations of California Business & Professions Code §§ 17200 *et seq*.,

### Resulting in Unfair Competition

### (NH, KEB Hana, and KB against Newegg, Inc. and Magnell)

320.   NH, KEB Hana, and KB reallege the allegations of paragraphs 1 through 277, 293 through 306, and 311 through 314 and incorporates those allegations here as if fully set forth.

321.   Newegg, Inc.'s aforementioned actions constitute "unlawful" business practices under California Business & Professions Code §§17200 *et seq*.—including, but not limited to (i) voluntarily and intentionally participating in Moneual's scheme to defraud the Banks; and (ii) using mail and wire communications in violation of 18 U.S.C. §1341 and 18 U.S.C. §1343 by issuing or causing, directing and authorizing its alter ego and agent, Newegg Trading Limited, to issue fraudulent purchase orders via email and make wire transfers to NH, KEB Hana, and KB in order to enable Moneual to continue its fraudulent scheme.

322.    Newegg, Inc.'s aforementioned conduct also constituted an "unfair" and "fraudulent" practice under California Business & Professions Code §§17200 *et seq.*, in that it was immoral, unethical and unscrupulous, and intended to deceive the public.

323.   As a direct and proximate result of Newegg, Inc.'s unlawful, unfair and fraudulent acts, NH, KEB Hana, and KB have lost money or property in the form of injury to their business, including damage to their reputation and client relationships, as well as actual and consequential damages, including the loss of past, present, and future profits.  Pursuant to California Business and Professions Code § 17203, NH, KEB Hana, and KB seek restitution and further equitable relief from Newegg, Inc. as a result of its unfair, unlawful and fraudulent acts.

## PRAYER FOR RELIEF

WHEREFORE, the Banks pray that this Court:

Gibson, Dunn & Crutcher LLP

SECOND AMENDED COMPLAINT

1.  Enter judgment in favor of the Banks and against ASI and the Individual Defendants for compensatory damages and restitution in an amount to be proven at trial, plus pre-judgment interest;

2.  Enter judgment in favor of NH, KEB Hana and KB and against Newegg for compensatory damages and restitution in an amount to be proven at trial, plus pre-judgment interest;

3.  Grant the Banks exemplary damages on Counts I and II according to proof;

4.  Grant the Banks their reasonable attorneys' fees and costs of suit; and

5.  Grant the Banks such other and further relief as the Court deems fit.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38 and Local Rule 38-1, the Banks demand a trial by jury of all issues so triable.

Dated:  May 21, 2018                    MAURICE SUH
                                        GIBSON, DUNN & CRUTCHER LLP


                                        By:  /s/ Maurice Suh
                                                        Maurice Suh

                                        Attorneys for Plaintiffs

Gibson, Dunn &
Crutcher LLP

SECOND AMENDED COMPLAINT